















APB   8/18/04   14:26

3:04-CV-01663   PEDICINI V. TAYEBI

*1*

*CMP.*



ORIGINAL

1   STANLEY MANDEL & IOLA LLP
    MATTHEW J. ZEVIN, SBN: 170736
2   550 West C Street, Suite 1600
    San Diego, CA 92101
3   Telephone:    (619) 235-5306
    Facsimile:    (815) 377-8419
4

5   BRODSKY & SMITH LLC
    MARC L. ACKERMAN
6   EVAN J. SMITH
    Two Bala Plaza, Suite 602
7   Bala Cynwyd, PA 19004
    Telephone:    (610) 667-6200
8   Facsimile:    (610) 667-9029
9

10  Attorneys for Plaintiffs

11              UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13  ROSARIO PEDICINI, Derivatively on Behalf of    CASE NO. 04CV 1663 L    (POR)
    WIRELESS FACILITIES, INC.,
14                                                  VERIFIED SHAREHOLDER
                     Plaintiff,                     DERIVATIVE COMPLAINT FOR
15                                                  BREACH OF FIDUCIARY DUTY AND
    vs.                                             UNJUST ENRICHMENT AND
16                                                  VIOLATIONS OF CALIFORNIA
    MASOOD K. TAYEBI, ERIC M. DeMARCO,              CORPORATIONS CODE SECTIONS
17  SCOTT ANDERSON, SCOT JARVIS,                    25402 & 25502.2
    BANDEL CARANO, WILLIAM HOGLAND,
18  WILLIAM A. OWENS, and TERRY
    ASHWILL,
19
                     Defendants,
20
    - and -
21
    WIRELESS FACILITIES, INC. a Delaware
22  corporation,

23                   Nominal Defendant.             DEMAND FOR JURY TRIAL

24

25

26

27

28

1    Plaintiff, Rosario Pedicini, alleges, upon personal knowledge as to herself and her own acts,

2  and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made

3  by and through her attorneys, which includes a review of the public filings of Wireless Facilities, Inc.

4  ("Wireless Facilities," the "Corporation" or the "Company") including, without limitation, Forms 10-

5  K and 10-Q, annual reports, proxy statements, press releases, published reports and news articles, as

6  follows:

7                                    **INTRODUCTION AND OVERVIEW**

8    1.    This is a verified stockholder's derivative action brought on behalf of Wireless

9  Facilities by one of its shareholders against its entire Board of Directors and/or several of the

10  Corporation's top officers for: (i) breach of fiduciary duty in misappropriating and misusing internal

11  proprietary non-public material corporate information to personally profit by illegal insider trading in

12  the Company's stock; (ii) failing to properly oversee or implement federal or state laws prohibiting

13  such illegal insider trading as well as Wireless Facilities's own policies and rules restricting the

14  misuse of internal corporate information for such purposes; (iii) causing Wireless Facilities to be sued

15  for, and exposed to, liability for violations of the anti-fraud provisions of the federal securities laws;

16  and (iv) for the illegal insider trading in the Corporation's stock in violation of California

17  Corporations Code §§ 25402 and 25502.5.

18    2.    Defendants are liable as participants in a fraudulent course of business by

19  disseminating materially false and misleading statements and/or concealing material adverse facts

20  regarding the Company so that the Company's financial results were materially inflated and

21  inaccurate at all relevant times such that the false and misleading information disseminated by

22  defendants caused the Company stock to trade at artificially inflated prices.

23    3.    In disseminating the false and misleading information set forth in the preceding

24  paragraph, defendants deceived the investing public regarding Wireless Facilities's business,

25  operations, management and the intrinsic value of Wireless Facilities common stock.

26    4.    As a result of defendants' illegal conduct, Wireless Facilities has been significantly

27  and materially damaged.  First, in violation of California common law and statute, certain corporate

28  insiders have misappropriated and misused material non-public proprietary information regarding

-2-

1    defendants' inability to manage and control the financial and manufacturing capabilities of the

2    Company, for their own personal profit, selling more than 1.3 million shares of their privately held

3    Wireless Facilities stock and garnering for themselves illicit proceeds of over $18 million.  In

4    addition, the false statements made by defendants, which artificially inflated the price of the

5    Company's common stock and thus permitted the corporate insiders to profit from their insider

6    trading activities, have resulted in the Company being named a defendant in several securities fraud

7    class action lawsuits.   These class action lawsuits in federal district court in California, seek

8    significant damages and will cost the Company millions of dollars to defend and likely millions of

9    dollars more to settle or satisfy.

10           5.       The illegal insider trading activities of certain of the defendants will make the

11   securities class action suits much more difficult, if not impossible, to defend and will provide a basis

12   for Wireless Facilities's directors' and officers' liability insurance carrier to disclaim coverage under

13   the active and deliberate dishonesty exclusion or the insider trading exclusion and/or negotiate a

14   defense expense sharing allocation with Wireless Facilities that will be unfavorable to the Company.

15   Moreover, these revelations of certain defendants' illegal insider trading and violations of the

16   securities laws have badly damaged Wireless Facilities's corporate image and good will.  For at least

17   the foreseeable future, Wireless Facilities will suffer from what is known as the "liar's discount," a

18   term applied to the stocks of companies who have been implicated in illegal behavior and have misled

19   securities analysts and the investing public, such that Wireless Facilities's ability to raise equity

20   capital on favorable terms in the future will be impaired.

21           6.       Management of Wireless Facilities is antagonistic to this lawsuit and making demand

22   on the Board of Directors would be futile.  Clearly, the directors will not bring any action directly

23   against them on behalf of the Company.  Moreover, in order to properly prosecute this lawsuit, it

24   would be necessary for the Directors to sue themselves – something they are unwilling to do.  Such a

25   suit would require the Directors to expose themselves to multi-million dollar liability to the Company,

26   which, due to the particular language of currently utilized directors' and officers' liability insurance

27   policies (*i.e.*, the insured vs. insured exclusion), would not be an insured claim, while the claims

28   asserted via this derivative action may be insured.

1    7.    Since the insider trading activities of the insider selling defendants are illegal under

2  specific California corporate law and are not covered by Wireless Facilities's directors' and officers'

3  liability insurance, in order to adequately protect Wireless Facilities's interests in this situation, it is

4  necessary for the Company  to seek and obtain preliminary injunctive relief against the individual

5  defendants who sold Wireless Facilities stock based on misappropriated proprietary corporate

6  information, imposing a constructive trust on and/or freezing those insider selling proceeds so that

7  they will be available to Wireless Facilities if this suit is successful on the merits.  Absent such a

8  freeze, these defendants who sold Wireless Facilities stock based on inside information will dissipate

9  and/or secrete their insider sales proceeds, making it much more difficult to recover those proceeds.

10  Under these circumstances, making a pre-suit demand also would unreasonably delay the pursuit of

11  important legal remedies.

12                          **JURISDICTION AND VENUE**

13    8.    This Court has jurisdiction over the subject matter of this action pursuant to 28

14  U.S.C. § 1332.

15    9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Wireless Facilities

16  has its headquarters in this District and it conducts substantial business in this District and many of

17  the acts and practices complained of herein occurred in substantial part in this District.  Additionally,

18  the defendants named in this shareholders' derivative action have received substantial compensation

19  from their business activities within this judicial district.

20                             **THE PARTIES**

21    10.    Plaintiff, Rosario Pedicini resides in Frankfurt, Germany and is an owner of shares of

22  Wireless Facilities stock.  Plaintiff purchased 250 shares of Wireless Facilities stock on October 26,

23  2000 and another 250 shares on October 4, 2001 and has owned Wireless Facilities stock

24  continuously through to the present.  Plaintiff brings this action derivatively in the right of and for the

25  benefit of Wireless Facilities.  Plaintiff will fairly and adequately represent the interests of Wireless

26  Facilities and the shareholders of Wireless Facilities in enforcing the rights of the Company.

27    11.    Nominal Defendant Wireless Facilities is a Delaware corporation with its

28  headquarters located at 4810 Eastgate Mall, San Diego, California 92121.  Wireless Facilities is an

-4-

1    independent provider of outsourced communications and security systems engineering and integration

2    services and other technical services for the wireless communications industry, the United States

3    government and enterprise customers.  According to the Company, the principal services it provides

4    include the design, deployment, integration and the overall management of wireless communications

5    networks.   It also provides communications systems engineering, systems integration and the

6    outsourcing of technical services, such as operational test and evaluation and program management

7    for the federal government and the design, deployment and integration of security and other in

8    building systems including access control and intrusion detection for enterprise customers.

9          12.     Defendant Masood K. Tayebi, Ph.D ("Tayebi") is the co-founder of the Company,

10   and until April 2004 was the Chief Executive Officer of the Company.  He has been Chairman of the

11   Company since April 2002.  Defendant Tayebi co-founded the Company with his brother, Massih

12   Tayebi.  According to the Company's FY03 Proxy Statement, as of April 2, 2004, defendant Tayebi

13   owned or controlled over 7,214,900 shares of Wireless Facilities stock, approximately 10.5% of all

14   outstanding common shares of the Company.   In exchange for his purported loyalty and fidelity,

15   defendant Tayebi, as one of the two individuals that served as an officer and employee-director of the

16   Company (along with defendant Eric M. DeMarco), received the following significant compensation

17   package from Wireless Facilities during FY03: salary – $267,684.   During the relevant period,

18   defendant Tayebi also sold 1,125,000 shares of his personally held company stock for proceeds in

19   excess of $16.0 million.  Additionally, the FY03 Proxy Statement details several transactions between

20   the Company and entities owned by defendant Tayebi and/or his brothers Jalil Tayebi and Massih

21   Tayebi.  According to the Company's FY03 Proxy Statement, as of April 2, 2004, Massih Tayebi

22   owned or controlled over 7,700,000 shares of Wireless Facilities stock, approximately 11% of all

23   outstanding common shares of the Company.  Similarly, according to the Company's FY03 Proxy

24   Statement, as of April 2, 2004, Sean Tayebi owned or controlled over 3,100,000 shares of Wireless

25   Facilities stock, approximately 4.5% of all outstanding common shares of the Company.

26         13.     Defendant Eric M. DeMarco ("DeMarco"), is, and at relevant times relevant to the

27   allegations raised herein, was a director of Wireless Facilities.  He joined the Company in 2003 as

28   President and Chief Operating Officer and assumed the role of CEO and director as of April 1, 2004.

1   On information and belief, in exchange for his purported loyalty and fidelity, defendant DeMarco, as

2   one of the two individuals that served as an officer and employee-director of the Company (along

3   with defendant Tayebi), received a significant compensation package from Wireless Facilities.

4   Details of the package have not been made available by the Company.

5       14.    Defendant Scott Anderson ("Anderson") is, and at all times relevant to the allegations

6   raised herein, was a director of Wireless Facilities.   According to the Company's FY03 Proxy

7   Statement, as of April 2, 2004, defendant Anderson owned or controlled over 715,000 shares of

8   Wireless Facilities stock, approximately 1.0% of the outstanding common shares of the Company.

9   Since 1997, the same year he joined the Wireless Facilities Board, defendant Anderson has been a

10  member of Cedar Grove Investments, LLC (formerly Cedar Grove Partners, LLC), an investment

11  company that concentrates in the wireless and internet industries.  Wireless Facilities is one of Cedar

12  Grove's portfolio companies and, in addition to defendant Anderson, Scott Jarvis, his boss and the

13  founder of Cedar Grove, is likewise a member of the Board.  Defendant Anderson is a member of the

14  Audit Committee, along with his boss, defendant Scot Jarvis and defendant William Hoglund.

15      15.    Defendant Scot Jarvis ("Jarvis") is, and at all times relevant to the allegations raised

16  herein was, a director of the Company and has served in this position since 1997.  According to the

17  Company's FY03 Proxy Statement, as of April 2, 2004, defendant Jarvis owned or controlled 715,699

18  shares of Wireless Facilities stock, approximately 1% of all outstanding stock of the Company.

19  During the relevant period, defendant Jarvis was a member of the Audit Committee, along with

20  defendant Anderson and defendant William Hoglund.  In 1997, the same year he joined the Wireless

21  Facilities Board, defendant Jarvis co-founded Cedar Grove Investments, LLC (formerly Cedar Grove

22  Partners, LLC), an investment company that concentrates in the wireless and internet industries.

23  Wireless Facilities is one of Cedar Grove's portfolio companies.  Defendant Anderson is an employee

24  of Cedar Grove Investments, LLC.  Defendant Jarvis is also a partner is Oak Investment Partners, a

25  venture capital group.  Defendant Bandel Carano is a General Partner of Oak Investment Partners,

26  owns over 3.8 million shares Wireless Facilities stock and, along with defendant Jarvis, is the only

27  other member of the Board's Compensation Committee.

28      16.    Defendant Bandel Carano ("Carano") is, and at all times relevant to the allegations

-6-

1  raised herein was, a director.  Carano served as a director from 1998 to June 2001 and then from

2  October 2001 to the present.  According to the Company's FY03 Proxy Statement, as of April 2,

3  2004, defendant Carano owned or controlled over 3,850,000 shares of Wireless Facilities stock,

4  approximately 5.5% of all outstanding stock of the Company.  During the relevant period, defendant

5  Carano and defendant Jarvis were the only two members of the Compensation Committee.

6  Defendant Carano is a General Partner of Oak Investments Partners, a venture capital group.

7  Defendant Jarvis is a partner in Oak Investment Partners.

8      17.    Defendant William Hoglund ("Hoglund") is, and at all times relevant to the

9  allegations raised herein was, a director.  According to the Company's FY03 Proxy Statement, as of

10  April 2, 2004, defendant Hoglund owned or controlled over 110,000 shares of Wireless Facilities

11  stock.  Defendant Hoglund is a member of the Company's Audit Committee, along with defendants

12  Jarvis and Anderson.

13      18.    Defendant William A. Owens ("Owens") has served as a director since February

14  2003.  According to the Company's FY03 Proxy Statement, as of April 2, 2004, defendant Owens

15  owned or controlled over 53,000 shares of Wireless Facilities stock.  Defendant Owens does not sit on

16  either of the Board's committees.

17      19.    Defendant Terry Ashwill ("Ashwill") was Executive Vice President and CFO of the

18  Company until his retirement in 2004.  According to the Company's FY03 Proxy Statement, as of

19  April 2, 2004, defendant Ashwill did not own or control any shares of Wireless Facilities stock.

20  However, during the relevant period, defendant Ashwill sold 233,351 shares of his privately held

21  Company stock for proceeds in excess of $2.4 million.  In exchange for his purported loyalty and

22  fidelity, defendant Ashwill received the following significant compensation package from Wireless

23  Facilities during FY03: salary – $237,838, along with the option to purchase 60,000 shares of

24  Company stock.  Additionally, in 2003, the Company forgave a balance of $201,230.00 on a

25  relocation loan previously made to defendant Ashwill.

26      20.    The defendants named in ¶¶ 12-18 are sometimes collectively referred to herein as

27  the "Director Defendants."  The defendants named on ¶¶ 12-19 are sometimes collectively referred to

28  herein as the "Individual Defendants."

21.     The Director Defendants owed the Company and its public shareholders the duty to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Wireless Facilities, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the defendants were aware or should have been aware posed a risk of serious injury to the Company.

22.     Notwithstanding their positions of trust and fidelity, and in violation of California law, while in the possession of materially adverse non-public information regarding Wireless Facilities, defendants Tayebi and Ashwill sold significant amounts of Company stock in the amounts indicated below:

| NAME | SHARES SOLD | PROCEEDS |
|---|---|---|
| Tayebi | 1,125,000 | $16,098,750 |
| Ashwill | 233,351 | $2,49,887 |
| | | |
| TOTAL | 1,358,351 | $18,548,637 |

23.     In contrast to the actions taken by defendants as alleged herein, including the sale of millions of dollars worth of their Wireless Facilities shares while in possession of material adverse information, to properly discharge the aforesaid duties, defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of the Company pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a like position.  The Director Defendants were required, among other things:

a)      To, in good faith, manage, conduct, supervise and direct the business and affairs of Wireless Facilities carefully and prudently and in accordance with the laws of whichever state controls its "internal affairs," the laws of the United States and the rules and regulations and the charter and by-laws of Wireless Facilities;

b)      To neither violate nor knowingly permit any officer, director or employee of Wireless Facilities to violate applicable federal and state laws, rules and regulations or any rule or

-8-

1   regulation of Wireless Facilities;

2         c)     To exercise reasonable control and supervision over the public statements to

3 the securities markets and trading in Wireless Facilities stock by the officers and employees of

4 Wireless Facilities;

5         d)     To remain informed as to the status of Wireless Facilities's operations, and

6 upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry

7 in connection therewith, and to take steps to correct such conditions or practices and make such

8 disclosures as are necessary to comply with the federal securities laws;

9         e)     To supervise the preparation, filing and/or dissemination of any SEC filings,

10 press releases, audits, reports or other information required by law, to examine and evaluate any

11 reports or examinations, audits, or other financial information concerning the financial condition of

12 Wireless Facilities and to cause Wireless Facilities to obey and comply with and not violate the

13 federal or state securities laws;

14         f)     To ensure that Wireless Facilities was operated in a diligent, honest and

15 prudent manner in compliance with all applicable federal and state laws, rules and regulations;

16         g)     To maintain and implement an adequate system of controls and information

17 systems, such that no officer, director or employee of the Corporation would make false statements

18 about Wireless Facilities to the securities markets or would be able to misappropriate internal

19 confidential information for his or her own benefit and profit, by insider stock trading or otherwise;

20 and

21         h)     To ensure that the Company's financial statements were prepared in

22 accordance with Generally Accepted Accounting Principles ("GAAP").

23     24.     The Director Defendants, particularly the members of the Audit Committee, were

24 responsible for maintaining and establishing adequate internal accounting controls for Wireless

25 Facilities and to ensure that the Company's financial statements were based on accurate financial

26 information. According to GAAP, to accomplish the objectives of accurately recording, processing,

27 summarizing, and reporting financial data, a corporation must establish an internal accounting control

28 structure. Among other things, the Director Defendants were required to:

a)      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

b)      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

i)      transactions are executed in accordance with management's general of specific authorization;

ii)      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

25.      Moreover, according to Appendix D to Statement on Auditing Standards No. 55, ("SAS 55"), management should consider, among other things, such objectives as: (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . [and] to maintain accountability for assets;" and (ii) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

26.      According to SAS 55.13:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

27.      Wireless Facilities's Audit Committee Charter applicable as of April 20, 2004 provided that the purpose of the Audit Committee was to, *inter alia*:

a)      Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

b)      Assist the board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's accounting policies and procedures, (iii) the Company's compliance with legal and regulatory requirements, . . . (v) the Company's disclosure controls and procedures, and (vi) the Company's internal controls.

1    28.    Moreover, the Audit Committee Charter required that members of the Audit

2  Committee be independent.  According to the very rules set forth by defendants, a member of the

3  Audit Committee must be independent as that term is defined by Nasdaq rules.  That is, the Audit

4  Committee member must not have any relationship that may interfere with the exercise of their

5  independence from management and the Company.  Clearly, as set forth herein, defendants Anderson

6  and Jarvis, as venture capital colleagues  whose firms owned over five million shares of Company

7  stock were inextricably intertwined with defendants Tayebi and DeMarco such that their position on

8  the Audit Committee compromised their ability to be independent as required by Nasdaq rules.

9    29.    As alleged in detail below, the Director Defendants, particularly the members of the

10  Audit Committee, failed to implement and maintain an adequate internal accounting control system

11  for Wireless Facilities, and thereby violated: (i) their fiduciary duties of loyalty and good faith; (ii)

12  GAAP; and (iii) the Audit Committee Charter.

13    30.    The Director Defendants further breached their duties of loyalty and good faith by:

14  (i) causing or allowing the Company to conduct its business in an unsafe, imprudent, and unlawful

15  manner; and (ii) causing the Company to suffer damages, as alleged herein.

16    31.    Defendants, as corporate officers and/or directors, owed Wireless Facilities and its

17  shareholders the duty of due care in the performance of their responsibilities with respect to Wireless

18  Facilities's operations.  Each defendant in this action, individually or jointly, as hereinbefore alleged,

19  failed to exercise reasonable diligence and due care, was grossly negligent or reckless, and committed

20  one or more of the following actions or omissions constituting breaches of fiduciary duty:

21    •    Defendants Tayebi and Ashwill with the acquiescence, authority and/or permission
22         of the Board, misused proprietary non-public corporate information to profit by over
         $18 million by insider selling the Company's stock in violation of Company policies
23         and rules against such misuse of information or sales and in violation of federal and
         state laws as well;

24    •    Defendants authorized, caused or permitted Wireless Facilities to conduct its business
25         in an unsafe, imprudent and dangerous manner by pursuing unsound practices,
         including concealing the true nature of their reckless, unsafe and unsound accounting
26         practices and the serious adverse impact of these practices on Wireless Facilities's
         financial condition and prospects;

27    •    Defendants authorized, caused or permitted Wireless Facilities to operate and report
28

-11-

information in a manner which was contrary to federal and state regulations, thus exposing it to liability for violation of the federal securities laws for which the Company has been sued in a class action in federal court in California; and

- Defendants' conduct as alleged herein has also damaged Wireless Facilities by exposing it to the cost of the defense of and possible cost of liability for violation of the federal securities laws as a result of the securities class action lawsuits now pending against it in federal court, damage to the goodwill and reputation of Wireless Facilities due to the negative adverse publicity that their actions have generated, and they have impaired Wireless Facilities's ability to raise capital at a reasonable and/or low cost as the Corporation's credit rating has been adversely affected, and its cost of capital has therefore increased, to the harm of the Corporation.

32.    By reason of their corporate positions and their ability to control the business and corporate affairs of Wireless Facilities at all relevant times, defendants owed Wireless Facilities and its stockholders fiduciary obligations of candor, fidelity, trust, and loyalty, and are and were required to use their ability to control Wireless Facilities in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Wireless Facilities and its stockholders and not in furtherance of their own personal interests.  In addition, each director owed Wireless Facilities, while he occupied such directorship, the fiduciary duty to exercise due care and diligence in the management and administration of the affairs of Wireless Facilities and in the use and preservation of its property and assets.  In violation of their fiduciary duties, defendants permitted and/or caused Wireless Facilities to conduct its business in an unsafe, imprudent and dangerous manner by violating the federal securities laws and permitting certain insiders to misappropriate and misuse confidential non-public corporate information for their personal profit.

33.    Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves by remaining as officers and/or directors of a large corporation and to continue and prolong the illusion of the Company's success, to inflate the price of its common stock, and to conceal the adverse facts concerning defendants' wrongful conduct, and Wireless Facilities's management, financial position and future prospects so that they could: (a) protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby; and (b) inflate the price of the Company's common stock in order to enhance the value of their securities holdings and options to purchase Wireless Facilities stock and to

-12-

1    allow certain insiders to liquidate approximately $18 million of Wireless Facilities stock, while in

2    possession of material adverse non-public information.  Such participation involved, among other

3    things, planning and creating (or causing to be planned and created), proposing (or causing the

4    proposal of) and authorizing, approving and acquiescing in the conduct complained of herein.

5          34.    As members of the Board of Directors of Wireless Facilities, the directors named

6    herein as defendants were themselves directly responsible for authorizing or permitting the

7    authorization of, or failing to monitor, the practices which resulted in the misappropriation of

8    confidential corporate information and violation of the federal securities laws as alleged herein.  Each

9    of them had knowledge of and actively participated in and approved of the wrongdoings alleged or

10   abdicated his or her responsibilities with respect to these wrongdoings.   The alleged acts of

11   wrongdoing subjected Wireless Facilities to unreasonable risks of loss.

12         35.    By reason of their membership on the Wireless Facilities Board of Directors and

13   positions as executive officers of the Company, the defendants were each controlling persons of

14   Wireless Facilities and had the power and influence to cause, and did cause, the Company to engage

15   in and/or permit the conduct complained of herein.

16                          **SUBSTANTIVE ALLEGATIONS**

17   **Background**

18         36.    Wireless Facilities is an independent provider of outsourced communications and

19   security systems engineering and integration services and other technical services for the wireless

20   communications industry, the United States government and enterprise customers.  The principal

21   services the Company provides include the design, deployment, integration and the overall

22   management of wireless communications networks.   It also provides communications systems

23   engineering, systems integration and the outsourcing of technical services, such as operational test

24   and evaluation and program management for the federal government and the design, deployment and

25   integration of security and other in building systems including access control and intrusion detection

26   for enterprise customers.

27   **Materially False and Misleading Statements Issued**

28         37.    On April 26, 2000, defendants caused Wireless Facilities to report record revenues

                                      -13-

1  and earnings for its first quarter ended March 31, 2000. Revenue for the quarter increased 188% to a

2  record $43.3 million, compared to $15.0 million in the first quarter of 1999. Revenue growth

3  reflected continued strong worldwide demand for mobile voice and personal communications

4  services ("PCS") as well as increased capital investment by network operators and equipment

5  suppliers to establish wireless data networks. Net income for the quarter rose 267% to a record $5.8

6  million, or $0.12 per diluted share, compared to $1.6 million in net income, or $0.05 per diluted share

7  in the corresponding quarter a year ago. The number of shares used in the calculation of Earnings Per

8  Share ("EPS") in the current period increased 54% from the first quarter of 1999. Also, the impact of

9  goodwill from acquisitions was approximately two cents per share. Commenting on these results,

10  defendant Tayebi stated:

11
12      "WFI enjoyed a very strong quarter, which we believe demonstrates our unique value
        proposition as an independent provider of turnkey outsourcing services for the
13      wireless industry[.] . . . Wireless networks are rapidly expanding to meet growing
        subscriber demand for enhanced voice and mobile data applications, and
14      increasingly, carriers are building high speed broadband wireless data networks to
        extend the reach of existing fiber optic networks in business settings. We continue to
15      strengthen and expand our end to end service capabilities through key hires and
        strategic acquisitions in response to these market opportunities.

16
17      During the quarter we made two key acquisitions. The Walter Group, an established
        leader in telecom network development and management consulting, provides WFI
18      with expanded capabilities in business planning, site acquisition and program
        management services. The acquisition of a Network Operations Center near Dallas,
19      Texas from Ericsson provides the Company with network management and
        operations capabilities that enable WFI to deliver a complete suite of network
20      management solutions to multiple wireless operators and service providers across a
        wide platform of technologies. Both of these acquisitions brought us many talented
21      people, extended our service offerings and strengthened our customer relationships.

22
        Armed with end to end network deployment and management services, WFI is
23      exceptionally well positioned to contribute to and benefit from the phenomenal
        growth of wireless communications and its convergence with the Internet."

24      38.      On May 15, 2000, defendants caused Wireless Facilities to file its quarterly report

25  with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Tayebi and

26  reaffirmed the previously announced financial results. With respect to its financial results, the

27  Company represented:

28
                                          -14-

In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

39. On July 26, 2000, defendants caused Wireless Facilities to announce outstanding financial results with record revenues and earnings reported for the second quarter and six months ended June 30, 2000. Revenue for the second quarter increased 229% to a record $59.4 million, compared to $18.1 million in the second quarter of 1999. Sequentially, revenue grew 37% over the Company's first quarter of 2000. Excluding the effects of goodwill charges related to acquisitions, net income, rose 632% to a record $9.3 million, or $0.18 per diluted share, compared to net income of $1.3 million, or $0.04 per diluted share in the corresponding quarter a year ago. The number of shares used in the calculation of earnings per diluted share in the current period increased 52% from the second quarter of 1999. Reported net income for the quarter rose 652% to a record $7.9 million, or $0.16 per diluted share, compared to $1.0 million in net income, or $0.03 per diluted share in the corresponding quarter a year ago. Commenting on these results, defendant Tayebi stated:

"We are very pleased with the growth WFI achieved in the second quarter, driven by the phenomenal global growth in wireless telecommunications and the accelerating demand for outsourced services[.] . . . While domestic market growth in mobile voice applications continues to exceed analysts' expectations, we are very excited about new market opportunities for wireless Internet applications and the implementation of Third Generation (3G) wireless technology.

Recent auctions in Europe for 3G spectrum licenses and the enormous costs associated with their acquisition are driving aggressive network assessment and deployment schedules with telecom operators and equipment suppliers. While still a very small percentage of our business, we were pleased to begin several 3G engagements in the second quarter. New 3G auctions are scheduled throughout Europe and the United States this year creating, we believe, even greater demand for outsourced services and WFI's turnkey network solutions."

40. On August 14, 2000, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Tayebi and reaffirmed the previously announced financial results. With respect to its financial results, the defendants caused the Company to represent:

-15-

1
2
3
4

> In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

5   41.   On October 25, 2000, defendants caused Wireless Facilities to announce financial

6   results with record revenues and record earnings reported for the third quarter and nine months ended

7   September 30, 2000.  Revenue for the third quarter increased 207% to $73.1 million, compared to

8   $23.8 million in the third quarter of 1999.  Sequentially, revenue grew 23% over the Company's

9   second quarter of 2000.  Excluding the effects of goodwill and other charges related to acquisitions,

10  net income rose 238% to $10.8 million, or $0.21 per diluted share, compared to net income of $3.2

11  million, or $0.10 per diluted share in the corresponding quarter a year ago.  Reported net income for

12  the quarter rose 221% to $9.0 million, or $0.17 per diluted share, compared to $2.8 million in net

13  income, or $0.08 per diluted share in the corresponding quarter a year ago.

14  42.   On November 14, 2000, defendants caused Wireless Facilities to file its quarterly

15  report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Tayebi and

16  reaffirmed the previously announced financial results.  With respect to its financial results, defendants

17  caused the Company to represent:

18
19
20
21

> In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

22  43.   On February 14, 2001, defendants caused Wireless Facilities to announce financial

23  results for the fourth quarter and fiscal year ended December 31, 2000.  Revenue for the fourth

24  quarter increased 124% to $80.1 million, compared to $35.8 million in the fourth quarter of 1999.

25  Excluding the effects of goodwill and other charges related to acquisitions, net income rose 164% to

26  $12.1 million, or $0.24 per diluted share, compared to net income of $4.6 million, or $0.11 per diluted

27  share, in the corresponding quarter a year ago.  For the full year, revenues rose 176% to $255.9

28  million, compared to $92.7 million in 1999.  Excluding the effects of goodwill and other charges

1  related to acquisitions, net income increased 251% to $38.9 million, or $0.77 per diluted share,

2  compared to net income of $11.1 million, or $0.31 per share, for the full year in 1999.

3      44.    On March 17, 2001, defendants caused Wireless Facilities to file its annual report

4  with the SEC on Form 10-K. The Company's Form 10-K report was signed by defendants Tayebi

5  and Ashwill and reaffirmed the previously announced financial results.  Furthermore, the Company's

6  10-K included an Independent Auditors Report, signed by the Company's accountants KPMG LLP

7  ("KPMG"), which was integrated into Wireless Facilities's Form 10-K report stated the following:

8      In our opinion, the consolidated financial statements referred to above present fairly,
9      in all material respects, the financial position of Wireless Facilities, Inc. and
       subsidiaries as of December 31, 1999 and 2000, and the results of their operations
10     and their cash flows for each of the years in the three year period ended
       December 31, 2000, in conformity with accounting principles generally accepted in
11     the United States of America.

12      45.    On May 9, 2001, defendants caused Wireless Facilities to announce financial results

13  for its first quarter ended March 31, 2001.  Revenue for the first quarter increased 22% to $52.7

14  million, compared to $43.3 million in the first quarter of 2000, but declined sequentially from the

15  fourth quarter of 2000.    Quarterly revenue was impacted by a global slowdown in wireless

16  telecommunications spending.  Excluding the effects of goodwill and other charges related to

17  acquisitions, net loss for the quarter totaled $4.9 million, or $0.11 per diluted share, compared to net

18  income of $6.7 million, or $0.14 per diluted share, in the corresponding quarter a year ago.  The

19  quarterly loss included pre-tax charges of $4.6 million for losses related to a single broadband

20  wireless customer that filed for bankruptcy protection.  Excluding this charge and excluding the

21  effects of goodwill and other charges related to acquisitions, the Company would have reported a net

22  loss of $3.3 million, or $0.07 per diluted share.

23      46.    On May 15, 2001, defendants caused Wireless Facilities to file its quarterly report

24  with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Tayebi and

25  Ashwill and reaffirmed the previously announced financial results.  With respect to its financial

26  results, defendants caused the Company to represent:

27     In the opinion of management, these consolidated financial statements include all
28     adjustments, consisting of normal recurring adjustments, necessary for a fair

-17-

presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

47.    On August 8, 2001, defendants caused Wireless Facilities to announce financial results for the second quarter and six months ended June 30, 2001. Revenue for the second quarter increased sequentially by four percent from the first quarter of 2001 to $54.7 million, but decreased eight percent compared to the $59.4 million reported in the second quarter of 2000. The increase in sequential quarterly revenue reflected increases in both the Company's domestic and international operations. The net reported loss for the second quarter totaled $38.3 million, or $0.87 per diluted share. Financial results for the second quarter included a number of unusual charges, a change in the effective tax rate and amortization of goodwill and other charges related to acquisitions. Excluding the effects of these charges and the change in effective tax rate, net income would have been $1.8 million, or $0.04 per diluted share compared to a net loss of $4.9 million, or $0.11 per diluted share in the first quarter of 2001.

48.    On August 10, 2001, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendants Tayebi and Ashwill and reaffirmed the previously announced financial results. With respect to its financial results, defendants caused the Company to represent:

In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

49.    On November 7, 2001, defendants caused Wireless Facilities to announce financial results for the third quarter and nine months ended September 30, 2001. Revenue for the third quarter totaled $54.8 million, an increase of $0.1 million sequentially from the second quarter of 2001, but a decrease of 25% compared to the $73.1 million reported in the third quarter of 2000. Excluding the effects of amortization of goodwill and intangibles, net income was $0.8 million, or $0.02 per diluted share, compared to pro forma net income of $1.8 million, or $0.04 per diluted share, in the second quarter of 2001.

-18-

1        50.     On November 13, 2001, defendants caused Wireless Facilities to file its quarterly

2  report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Tayebi and

3  reaffirmed the previously announced financial results. With respect to its financial results, defendants

4  caused the Company to represent:

5            In the opinion of management, these consolidated financial statements include all
               adjustments, consisting of normal recurring adjustments, necessary for a fair

6            presentation of the results of operations for the interim periods presented. Interim
               operating results are not necessarily indicative of operating results expected in

7            subsequent periods or for the year as a whole.

8        51.     On February 13, 2002, defendants caused Wireless Facilities to announce financial

9  results for the fourth quarter and full year ended December 31, 2001. Revenue for the fourth quarter

10  totaled $45.0 million, a decrease of 18% compared to the $54.8 million reported in the third quarter of

11  2001 and a decrease of 44% compared to the $80.1 million reported in the fourth quarter of 2000.

12  Including charges for amortization of goodwill and other intangibles resulting from prior acquisitions

13  ($3.3 million), severance costs ($1.5 million) and a revision in the annual effective tax rate ($4.4

14  million), the reported net loss for the fourth quarter totaled $10.4 million, or $0.22 per diluted share.

15        52.     On March 19, 2002, defendants caused Wireless Facilities to file its annual report

16  with the SEC on Form 10-K. The Company's Form 10-K report was signed by defendants Tayebi

17  and Ashwill and reaffirmed the previously announced financial results.

18        53.     On May 8, 2002, defendants caused Wireless Facilities to release financial results for

19  the first quarter ended March 31, 2002. The results for first quarter 2002 reflected the continued

20  weakness in the telecommunications market, specifically the level of wireless telecom infrastructure

21  spending during the quarter. During this period, the Company experienced a continuation of

22  customer slowdowns and project scope reductions and postponements related to wireless network

23  deployment, which were highlighted in its recent Annual Report on Form 10-K filed with the SEC on

24  March 19, 2002. As announced on April 30, 2002, the Company's revenue for the first quarter

25  totaled $40.1 million, a decrease of 11% compared to the $45.0 million reported in the fourth quarter

26  of 2001, and a decrease of 24% compared to the $52.7 million reported in the first quarter of 2001.

27  Defendants further caused the Company to announce a substantial net loss in the quarter due to the

28  continued weakness in the wireless telecommunications market. Reported net loss for the first quarter

-19-

1  2002 was $71.7 million ($1.52 per basic and diluted share) compared to a reported and "As Adjusted"

2  net loss of $10.4 million ($0.22 per basic and diluted share) and $8.7 million ($0.18 per basic and

3  diluted share), respectively, in fourth quarter 2001, and compared to a reported and "As Adjusted" net

4  loss of $8.5 million ($0.19 per basic and diluted share) and $7.7 million ($0.18 per basic and diluted

5  share), respectively, in first quarter 2001.  During the first quarter, the Company recorded a net

6  provision for taxes of $10.1 million related to providing an additional valuation allowance for

7  deferred tax assets.  Cash from operations for the quarter was $1.3 million.  Total cash and cash

8  equivalents at the end of the first quarter increased $1.2 million to $62.3 million.

9       54.     On May 15, 2002, defendants caused Wireless Facilities to file its quarterly report

10  with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Tayebi and

11  reaffirmed the previously announced financial results.  With respect to its financial results, defendants

12  caused the Company to represent:

13        In the opinion of management, these consolidated financial statements include all
          adjustments, consisting of normal recurring adjustments, necessary for a fair
14        presentation of the results of operations for the interim periods presented.  Interim
          operating results are not necessarily indicative of operating results expected in
15        subsequent periods or for the year as a whole.

16

17       55.     On August 7, 2002, defendants caused Wireless Facilities released financial results

18  for the second quarter and six months ended June 30, 2002.  Revenue for the second quarter totaled

19  $46.8 million, an increase of 17% compared to the $40.1 million reported in the first quarter of 2002

20  and a decrease of 14% compared to the $54.7 million reported in the second quarter of 2001.

21  Reported net income for the second quarter of 2002 was $2.2 million, or $0.04 per diluted share,

22  compared to a reported net loss of $71.7 million, or $1.52 per diluted share, for the first quarter of

23  2002, and a reported net loss of $38.3 million, or $0.87 per diluted share, for the second quarter of

24  2001.  Cash flow from operations for the quarter was $8.8 million, an increase of $7.5 million

25  compared to the $1.3 million reported in the first quarter of 2002.  Cash increased by $13.8 million

26  from $62.3 million at March 31, 2002 to $76.1 million at June 30, 2002.  Currently, the Company has

27  no debt outstanding other than capital lease obligations of $4.5 million.  Commenting on the news,

28  defendant Tayebi stated:

> "Several recently implemented strategies contributed to this significant improvement in the Company's performance[.] . . . The increase in revenue has come in a very difficult operating environment as we continue to focus on strengthening our relationships with carriers, vendors and strategic partners. Our adoption of the variable cost model and consequent cost restructuring has reduced our SG&A expense structure and increased profitability. We have also focused on strengthening our balance sheet by increasing our cash position and reducing our debt."

56.     On August 13, 2002, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Tayebi and reaffirmed the previously announced financial results. With respect to its financial results, the Company represented:

> In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented. Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

57.     On November 6, 2002, defendants caused Wireless Facilities to release financial results for the third quarter and nine months ended September 30, 2002. Revenue for the third quarter totaled $49.1 million, an increase of five percent compared to the $46.8 million reported in the second quarter of 2002 and a decrease of 10% compared to the $54.8 million reported in the third quarter of 2001. Net income reported for the third quarter of 2002 was $2.5 million, or $0.04 per diluted share, compared to net income of $2.2 million, or $0.04 per diluted share in the second quarter of 2002, and net loss of $2.9 million, or $0.06 per diluted share, for the third quarter of 2001. Commenting on the results, defendant Tayebi stated:

> "In our core business we feel that we will continue to earn a growing market share, measured against our peers and competitors. Furthermore, we continue to grow that portion of our business that has traditionally been done in house by our customers. This, combined with the changes we have made in past quarters to our cost structure and to our business model are paying off[.] . . . Our new focus on enterprise markets such as Wireless LAN and integration of alternative technologies, as well as strategic commitment to larger scale and longer term outsourcing, all position WFI to take advantage of key opportunities."

58.     On November 5, 2002, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Tayebi

1    reaffirmed the previously announced financial results. With respect to its financial results, defendants

2    caused the Company to represent:

3    
4    > In the opinion of management, these consolidated financial statements include all
5    > adjustments, consisting of normal recurring adjustments, necessary for a fair
6    > presentation of the results of operations for the interim periods presented. Interim
     > operating results are not necessarily indicative of operating results expected in
     > subsequent periods or for the year as a whole.

6    
7         59.     On February 12, 2003, defendants caused Wireless Facilities to release financial

8    results for the fourth quarter and full year ended December 31, 2002. Revenue for the fourth quarter

9    of 2002 totaled $51.0 million, an increase of 3.9% compared to the $49.1 million reported in the third

10   quarter of 2002 and an increase of 13.3% compared to the $45.0 million reported in the fourth quarter

11   of 2001. Net income reported for the fourth quarter of 2002 was $3.1 million, or $0.05 per diluted

12   share, compared to net income of $2.5 million, or $0.04 per diluted share in the third quarter of 2002,

13   and net loss of $10.4 million, or $0.22 per share, for the fourth quarter of 2001. Commenting on the

14   results, defendant Tayebi stated:

15   
16   > "In our core business, we feel very encouraged by what we have seen over the past
     > three quarters[.] . . . We continue to strengthen our ongoing relationships with our
17   > top tier carrier and vendor customers. As those relationships mature, we are seeing a
     > steady flow of long term profitable projects which have allowed us to build up our
18   > backlog and finish the year with three consecutive quarters of revenue growth and
     > profitability. Furthermore, we are seeing increasingly positive results from the
19   > changes we have made to our internal cost structure and to our business model. Our
     > balance sheet continues to get stronger, and we continue to grab increased market
20   > share relative to our peers, all of which bode well for the future.

21   > While we are still cautious about the wireless industry, we are increasingly optimistic
     > about the financial direction of WFI and its position within the overall marketplace.
22   > Strategically, our primary area of focus will remain on growing the portion of our
     > business that has traditionally been performed in house by our carrier and vendor
23   > customers. We will also continue to aggressively pursue the operational outsourcing
     > model, which aligns well with our customers' initiatives, and to which WFI's skill set
24   > and operational scale are uniquely suited. Finally, we are very encouraged by the
     > initial interest we have received in WFI's enterprise based, WLAN and security
25   > systems initiatives. This is another area that we will continue to pursue in 2003, and
26   > from which we hope to see significant future revenues in the coming quarters."

27        60.     On March 21, 2003, defendants caused Wireless Facilities to file its annual report

28   with the SEC on Form 10-K. The Company's Form 10-K report was signed by defendants Tayebi

1   and Ashwill and reaffirmed the previously announced financial results.

2         61.     On May 5, 2003, defendants caused Wireless Facilities to release financial results for

3   the first quarter of 2003.  Revenue for the first quarter of 2003 totaled $53.9 million, an increase of

4   5.7% compared to the $51.0 million reported in the fourth quarter of 2002 and an increase of 34.4%

5   compared to the $40.1 million reported in the first net income for the first quarter of 2003 increased

6   29.0% to $4.0 million, or $0.06 per diluted share, compared to net income of $3.1 million, or $0.05

7   per diluted share in the fourth quarter of 2002.  Commenting on the results, defendant Tayebi stated:

8
9
10
11
12
13
> "We are very pleased to report another solid quarter of financial and operational results[.] . . .  We continue to excel at our core competencies and traditional business while we explore market opportunities in areas such as operational outsourcing, wireless LAN and electronic security integration[.] . . .  Despite continued market uncertainty in the wireless industry, WFI is building on its momentum from the last half of 2002 and we are excited about our prospects, especially related to our Enterprise Solutions and Outsourcing Divisions.  Our core business with existing customers is strong and we are actively pursuing new opportunities that have the potential to add to our expected future growth."

14         62.     On May 9, 2003, defendants caused Wireless Facilities to file its quarterly report with

15   the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Tayebi and reaffirmed

16   the previously announced financial results.  With respect to its financial results, defendants caused the

17   Company to represent:

18
19
20
> In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented.  Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

21         63.     On August 4, 2003, defendants caused Wireless Facilities to released financial results

22   for the second quarter ended June 30, 2003.  Revenue for the second quarter of 2003 totaled $56.8

23   million, an increase of 5.4% compared to the $53.9 million reported in the first quarter of 2003 and an

24   increase of 21.4% compared to the $46.8 million reported in the same.  Net income for the second

25   quarter of 2003 increased 20% to $4.8 million, or $0.07 per diluted share, compared to net income of

26   $4.0 million, or $0.06 per diluted share for the first quarter of 2003.  Net income for the second

27   quarter of 2003 was 118.2% higher than the $2.2 million, or $0.04 per diluted share for the second

28   quarter of 2002.  Commenting on the results, defendant Tayebi stated:

-23-

"Our operating strategies once again translated into exceptional results[.] . . . We believe our ongoing efforts to manage our business based on the strength of our core competencies and market opportunities, especially related to our Enterprise Solutions and Outsourcing business groups, should continue to produce results that grow and add value to our Company."

64.     On August 8, 2003, Wireless Facilities filed its quarterly report with the SEC on Form 10-Q.   The Company's Form 10-Q was signed by defendant Tayebi and reaffirmed the previously announced financial results.  With respect to its financial results, defendants caused the Company to represent:

In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented.  Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

65.     During August 2003, defendant Tayebi sold 750,000 shares of his privately held Company stock for proceeds of over $9.8 million.

66.     On October 30, 2003, defendants caused Wireless Facilities to release its financial results for the third quarter ended September 30, 2003.  Revenue for the third quarter of 2003 totaled $68.6 million, an increase of $19.5 million or 39.7% compared to the $49.1 million reported in the same quarter last year and an increase of $11.8 million or 20.8% compared to the $56.8 million reported in the second quarter of 2003.  Net income of $6.6 million for the third quarter of 2003 was 164% higher than the $2.5 million for the third quarter of 2002.  Net income for the third quarter of 2003 increased $1.8 million or 37.5% compared to net income of $4.8 million sequentially.  Earnings per share of $0.09 for the third quarter 2003 was 125% higher than $0.04 year over year and sequentially increased $0.02 or 28.6%.  Commenting on these results, defendant Tayebi stated:

"Both our Wireless Network Services (WNS) and our Enterprise Solutions businesses delivered strong results in a challenging but improving environment[.] . . . Also, as we look ahead to the fourth quarter and the year 2004, we are feeling increasingly optimistic about our ability to achieve improving financial performance."

67.     On November 5, 2003, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Tayebi and

-24-

reaffirmed the previously announced financial results.  With respect to its financial results, defendants caused the Company to represent:

> In the opinion of management, these consolidated financial statements include all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results of operations for the interim periods presented.  Interim operating results are not necessarily indicative of operating results expected in subsequent periods or for the year as a whole.

68.     On or about December 5, 2003, after having sold all or substantially all of his shares in the Company, defendant Ashwill announced that he would be retiring from the Company effective in early 2004.

69.     On January 26, 2004, defendant Tayebi sold 375,000 shares of his privately held Company stock for proceeds in excess of $6.2 million.

70.     On February 19, 2004, defendants caused Wireless Facilities to announce results for fourth quarter of fiscal 2003.  Revenues for the fourth quarter of fiscal 2003 increased 63% to $82.9 million from $51.0 million in the fourth quarter of fiscal 2002.  Operating income increased 216% to $7.9 million from $2.5 million in the fourth quarter of fiscal 2002.  Net income increased 161% to $8.1 million from $3.1 million in the fourth quarter of fiscal 2002, and EPS increased 120% to $0.11 (diluted) from $.05 (diluted) in the fourth quarter of fiscal 2002.  For full fiscal year 2003, revenues increased 40% to $262.2 million from $187 million in fiscal 2002.  Operating income increased to $22.2 million from a loss of $54.7 million in fiscal 2002.  Net income increased to $23.5 million from a loss of $63.9 million in fiscal 2002, and EPS increased to $0.32 (diluted) from a loss per common share of $1.33 (diluted and basic) in fiscal 2002.  Commenting on these results, defendant Tayebi stated:

> "Today WFI reported results for the quarter and for the year that demonstrate the extent to which our business has not only recovered from the prolonged downturn in the telecommunications industry, but has emerged stronger than at any time in our nearly ten year history.
>
> As we look to 2004 and beyond, we have good reason to believe that the Company is better positioned today than at any point in our past.  Strategically, we have diversified into synergistic businesses that allow us to capitalize on our engineering talent and core capabilities: the enterprise market for voice and data networks and security systems and the government market for communications and information technology systems.  Operationally, we have strengthened and diversified our

-25-

1    customer base and are well positioned for growth in each of our core markets.  And
2    financially, we have the means available to us to continue to execute on our strategy
     with a strong balance sheet and growing operating income."

3         71.    On March 8, 2004, defendants caused Wireless Facilities to file its annual report with

4    the SEC on Form 10-K.  The Company's Form 10-K report was signed by defendants Tayebi and

5    DeMarco and reaffirmed the previously announced financial results.

6         72.    On April 27, 2004, defendants caused Wireless Facilities to report results for the first

7    quarter of fiscal year 2004.  Revenues for the first quarter of fiscal 2004 increased 82% to $98.0

8    million from $53.9 million in the first quarter of fiscal 2003.  Operating income increased 106% to

9    $6.6 million from $3.2 million in the first quarter of fiscal 2003.  Net income increased 48% to $5.9

10   million from $4 million in the first quarter of fiscal 2003, and EPS increased 33% to $0.08 (diluted)

11   from $0.06 (diluted) in the first quarter of fiscal 2003.  Increased revenues in the first quarter of fiscal

12   2004 were a result of significant increases in Wireless Facilities's Mexico and European operations,

13   as well as increases in deployment and engineering activities for Western Wireless, Sprint, and

14   T Mobile in the U.S.  Commenting on the results, defendant DeMarco stated:

15        "In the first quarter, the momentum that we have seen building in the wireless
16        industry continued to drive the organic growth of WFI and resulted in higher than
          expected revenues.  While revenues across the Company were up 82% year over
17        year, revenues in our wireless network services business were up 42%, all of which
          was from organic growth.  Higher than expected revenues were primarily the result
18        of greater than expected progress on our turnkey deployment contracts.  In addition,
          our results in our European operations were exceptionally strong this quarter with
19        65% year over year growth, largely as a result of 3G activities by the major European
20        carriers.

21        In the first quarter we were also successful both domestically and internationally in
          bidding on and winning new engineering and deployment contracts for regional,
22        national, and international wireless carriers.  Outsourcing trends, network investment
          trends, and wireless market growth are all combining to serve as catalysts for the
23        continued growth in demand for our services.  In addition, in our enterprise network
24        services division we were successful in winning two relatively large
          telecommunications outsourcing and security systems integration procurements that
25        will serve as important reference accounts as we continue to execute on our
          enterprise strategy.  And just last week, we received word from a government
26        customer that we have been awarded a sizeable classified contract with the federal
27        government which should contribute meaningfully to growth in our government
          network services division this year."

28

73.     On May 10, 2004, defendants caused Wireless Facilities to file its quarterly report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendant DeMarco, and reaffirmed the historical financial results for first fiscal quarter of 2003.

74.     The statements contained in ¶¶ 36-73 were materially false and misleading when made and, as result of the above, the Company's financial results were materially inflated at all relevant times.

**The Truth Begins to Emerge**

75.     On August 8, 2004, Wireless Facilities reported results for the second quarter of fiscal year 2004. In addition, defendants were forced to have the Company announce that it intends to restate its financial statements filed on Form 10-K for the years 2001 through 2003 to account for certain foreign tax contingencies. More specifically, the Company on, in its press release, stated:

> The restatement is the result of an extensive analysis by the Company that identified adjustments, which are required to properly state prior period financial statements. The restatement will not affect the Company's reported current year operating results.

> Revenues for the second quarter of fiscal 2004 increased 84% to $102.3 million from $55.5 million in the second quarter of fiscal 2003. Increased revenues in the second quarter were the result of significant increases in the Company's international operations as well as increases in activity with Western Wireless, T Mobile, and Sprint in the US. In addition, the acquisition that created the government network services division in the first quarter of 2004 also contributed to second quarter year over year revenue growth.

> Operating income for the second quarter of 2004 was $8.9 million. Adjusted net income from continuing operations, excluding the impact of an investment asset impairment charge of $3.1 million, was $7.3 million and adjusted EPS from continuing operations was $.10 (diluted). Net income from continuing operations including the impact of the asset impairment charge was $4.2 million or $.06 per share (diluted). Net income including the impact of both the asset impairment charge and the discontinued operations charge of $2.5 million was $1.7 million or $.02 per share (diluted).

> During the second quarter of 2004, the Company made the decision to divest its Scandinavian network management business. This resulted in a one time discontinued operations charge of approximately $2.5 million primarily related to contractually mandated employee severance costs that were incurred to prepare the unit for sale. All prior period results from the Scandinavian operation will be reclassified to conform to the current year presentation as a discontinued operation. The investment asset impairment charge of $3.1 million relates to a 2001 investment in a privately held technology company that was accounted for under the cost

-27-

method.  Based upon recent developments, the Company determined that it is unlikely to recover the carrying value of the investment.

The restatement of prior year financial statements is the result of the Company's recent analysis of contingent tax liabilities primarily in foreign jurisdictions.  These tax contingencies were generated in prior years and require adjustments to properly state prior year financial statements.  The preliminary estimate of the impact of the adjustments is between approximately 3 – 8% of net income or loss for any given year from 2000 to 2003 for an aggregate increase of expenses of $10 million to $12 million.  In addition, the Company intends to consider recording other adjustments related to various financial statement accounts that were identified in prior years but not recorded at the time based on the judgment that such amounts were immaterial.  Since the restatement will change the opening balances of certain balance sheet accounts for 2004 and the restatement process is not yet complete, the Company is currently unable to present prior year comparative data.  Accordingly, the Company intends to delay the filing of its Form 10 Q for the period ending June 30, 2004 until the amended Form 10 K/A for 2003 is filed.  The Company expects to make such filings within two months.  All other normal closing procedures have been completed for the quarter ended June 30, 2004.   The adjustments referred to in this announcement are preliminary estimates and the Company expects to report final results when it files its Form 10 K/A.  A detailed description of the restatement and other adjustments and amounts will be contained in the Form 10 K/A.

"In the second quarter, we continued to benefit from subscriber, minutes of use, and data growth in the wireless industry, combined with the continuing trend on the part of the major carriers to outsource their design, deployment, and technology upgrade activities.  With our focus on diversifying our US customer base and capturing significant new international business in both Europe and Latin America, we were able to grow our wireless network services business by 65% year over year.  In addition, as we indicated we would do last quarter, we were able to make substantial improvements in our operating margin," said Eric M. DeMarco, President and CEO of WFI.

"Looking out to the remainder of 2004 and into 2005, we believe that the market for our services will continue to remain firm as the primary factors contributing to strong second quarter results outsourcing and network investment trends by the carriers – are likely to continue.  In addition, our business in our two other vertical markets, enterprise and government, also remains fundamentally sound.  Specifically related to our outlook for the balance of 2004, while our revenue guidance remains within the range previously provided, a slightly different geographic mix of revenues combined with substantially higher than expected accounting and consulting costs related to compliance with the Sarbanes Oxley legislation adopted by Congress last year, has caused our adjusted earnings guidance to be lower than previously anticipated.  Fortunately, the bulk of the nearly $2 million we expect to spend in compliance costs in 2004 will not be recurring in 2005."

76.     News of this shocked the market.  Shares of Wireless Facilities fell as much as, 30% and reached at one point on August 5, 2004, its 52 week low of $4.61 per share on unusually heavy

1 trading volume.

## WIRELESS FACILITIES'S VIOLATION OF GAAP RULES

77.     The Company announced financial results that were in violation of GAAP and the following principles:

a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

b)     The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

c)     The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

d)     The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated  (FASB Statement of Concepts No. 1, ¶42);

e)     The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

f)     The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated  (FASB Statement of Concepts No. 2, ¶¶58-59); and

g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

78.     The information concealed by the defendants detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. § 229.303).

**Members of the Audit Committee Abdicate Their Oversight Responsibilities**

79.     Throughout FY 2003, the members of the Audit Committee, defendants Hoglund, Anderson, and Jarvis received or should have received numerous reports regarding the business affairs of the Company and the manner by which defendants were improperly recognizing revenue relating to software licenses. Indeed, in FY03, the Audit Committee held eight meetings, yet it never took any action as the defendants caused the Company to issue false and misleading financial reports that failed to acknowledge the improper accounting procedures in place.

80.     In breach of both their fiduciary duty of good faith and their responsibilities pursuant to the Audit Committee Charter, the members of the Audit Committee wilfully ignored the obvious and pervasive problems with Wireless Facilities's accounting practices. The members of the Audit Committee made no effort to establish and maintain adequate internal controls for the Company to ensure that the Company's financial results were calculated and recorded in accordance with GAAP.

81.     The foregoing misconduct of defendants Hoglund, Anderson, and Jarvis caused Wireless Facilities to suffer damages, including, but not limited to, downgrading of the Company's credit ratings, loss of credibility in the market and the necessity to defend various class action lawsuits pending in federal court in California.

**Illicit and Illegal Insider Trading**

82.     Defendants own significant amounts of Wireless Facilities stock and/or hold millions of vested options to purchase Wireless Facilities stock. This huge equity stake gave defendants a very strong motive to do everything they could to keep Wireless Facilities's stock price up, including the false and misleading statements set forth above. These top insiders, defendants Tayebi, the co-founder of the Company and Board Chairman, and Ashwill, the Company's CFO, engaged in this activity because they knew they faced little or no individual risk as, if they were caught and sued, they would be protected by huge amounts of directors' and officers' liability insurance (purchased not with their funds, but rather with Wireless Facilities's stockholders' monies and with Wireless Facilities's own assets), which they could use to defend themselves and settle any securities suits.

83.     While purchasers of Wireless Facilities's securities during the Relevant Period have suffered significant losses, Wireless Facilities's insiders did not fare nearly so badly. During the

-30-

1  Relevant Period and with the stock trading at artificially inflated prices, defendant Tayebi, the co-

2  founder of the Company and defendant Ashwill sold 1,358,351 shares for total proceeds of

3  $18,548,637, as shown below:

| NAME | DATE | SHARES/PRICE | PROCEEDS |
|---|---|---|---|
| Masood K. Tayebi | 01/26/2004 | 375,000 @ $16.740 | $6,277,500 |
| | 08/29/2003 | 375,000 @ $14.620 | $5,482,500 |
| | 08/02/2003 | 375,000 @ $11.570 | $4,338,750 |
| | | Total Shares Sold: | Total Proceeds: |
| | | 1,125,000 | $16,098,750 |
| Terry M. Ashwill | 11/03/2003 | 40,000 @ $18.150 | $726,000 |
| | 08/01/2003 | 4,784 @ $12.990 | $62,144.16 |
| | 07/23/2003 | 2,500 @ $12.000 | $30,000 |
| | 07/21/2003 | 2,500 @ $11.500 | $28,750 |
| | 07/14/2003 | 11,867 @ $12.500 | $148,337.50 |
| | 07/09/2003 | 2,500 @ $12.470 | $31,175 |
| | 07/08/2003 | 2,500 @ $12.300 | $30,750 |
| | 07/07/2003 | 2,500 @ $12.000 | $30,000 |
| | 07/02/2003 | 2,500 @ $11.760 | $29,400 |
| | 07/01/2003 | 5,000 @ $11.610 | $58,050 |
| | 06/19/2003 | 2,500 @ $11.000 | $27,500 |
| | 06/18/2003 | 5,000 @ $10.770 | $53,850 |
| | 06/16/2003 | 2,500 @ $10.620 | $26,550 |
| | 06/13/2003 | 2,500 @ $10.250 | $25,625 |
| | 06/10/2003 | 2,500 @ $10.250 | $25,625 |
| | 06/05/2003 | 2,500 @ $10.500 | $26,250 |
| | 06/02/2003 | 5,000 @ $10.260 | $51,300 |
| | 05/29/2003 | 20,000 @ $10.180 | $203,600 |
| | 05/28/2003 | 15,000 @ $10.020 | $150,300 |
| | 01/06/2003 | 24,000 @ $6.880 | $165,120 |
| | 12/18/2002 | 18,000 @ $6.800 | $122,400 |
| | 12/17/2002 | 17,200 @ $6.800 | $116,960 |
| | 12/16/2002 | 20,000 @ $6.760 | $135,200 |
| | 11/27/2002 | 20,000 @ $7.250 | $145,000 |
| | | Total Shares Sold: | Total Proceeds: |
| | | 233,351 | $2,449,887 |

84.    Defendants inflated the price of Wireless Facilities shares by issuing false and materially misleading statements that allowed the defendants to (i) deceive the investing public regarding Wireless Facilities's business, operations, management and the intrinsic value of Wireless Facilities common stock; (ii) enabled defendants to successfully float the secondary offering; and (iii) allowed certain insiders to sell over 1.3 million shares of company stock and garner illegal proceeds of more than $18 million.

85.    The sale of over $18 million of Company stock by insiders of Wireless Facilities was

-31-

1   unusual in nature and timing, which is strong evidence that defendants acted to capitalize on their

2   material misrepresentations and failure to disclose adverse non-public information.

3        86.     The insiders' stock sales were also per se evidence of defendants' scienter because

4   they all occurred during the time when the Company was failing to perform as indicated in earlier

5   statements defendants caused the Company to make and defendants had artificially inflated Wireless

6   Facilities's financials, and before the time when defendants issued the August 8, 2004 statements

7   which caused the stock price to plummet.

8        87.     Since the time that defendants made their revelations concerning the true financial

9   condition and growth prospects of the Company, a disclosure which decimated the price of its stock,

10  several shareholder class action lawsuits have been filed against the Company alleging that Wireless

11  Facilities's public disclosures were materially false and misleading and in violation of federal

12  securities laws.  These class action lawsuits are in the federal court in the Southern District of

13  California and will continue to expose the Company to enormous liability and costs.

14  **Derivative and Futility of Demand Allegations**

15       88.     Plaintiff brings this action derivatively in the right of and for the benefit of Wireless

16  Facilities to redress injuries suffered and to be suffered by Wireless Facilities as a direct result of the

17  violations of law, breaches of fiduciary duty, corporate mismanagement, abuse of control, as well as

18  the aiding and abetting thereof, by the Director Defendants.  Wireless Facilities is named as a nominal

19  defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

20  Court which it would not otherwise have.

21       89.     Plaintiff will adequately and fairly represent the interests of Wireless Facilities and its

22  shareholders in enforcing and prosecuting their rights.

23       90.     It would be futile to require plaintiff to issue a demand to the Director Defendants

24  requesting them to take action against themselves and certain senior Wireless Facilities executives for

25  their intentional or reckless conduct as alleged herein.  Not only would this require them to investigate

26  and bring claims against themselves for their own misconduct, but their actions, to date, prove

27  conclusively that they will not take action.

28       91.     Plaintiff did not make a demand on the Board of Directors of Wireless Facilities to

-32-

1    bring this action because such demand would be futile given the facts as alleged herein and, therefore,

2    such a demand is excused.

3        92.    The directors of Wireless Facilities cannot be relied upon to reach a truly independent

4    decision as to whether to commence the demanded actions against themselves and the officers,

5    employees or consultants responsible for the misconduct alleged in this complaint, in that, *inter alia*,

6    the Board of Directors is dominated by defendants who were personally and directly involved in the

7    misconduct alleged and/or who each approved the actions complained of, and to whose directives and

8    views the Board has consistently acceded and will continue to accede.  This domination of the Board

9    of Directors by certain defendants has impaired the Board's ability to validly exercise its business

10   judgment and rendered it incapable of reaching an independent decision as to whether to accept

11   plaintiff's demands.

12       93.    In order to bring this action for breaching their fiduciary duties and engaging in other

13   misconduct, the members of the Wireless Facilities Board of Directors would have been required to

14   sue themselves and/or their fellow directors and allies in the top ranks of the Corporation, who are

15   their good friends and with whom they have entangling financial alliances, interests and

16   dependencies, which they would not do.  Therefore, the Director Defendants would not be able to

17   vigorously prosecute any such action.

18       94.    The members of the Wireless Facilities Board of Directors receive benefits, stock

19   options and other emoluments by virtue of their membership on the Board and their control of

20   Wireless Facilities.  They have thus benefited from the wrongdoing herein alleged and have engaged

21   in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of

22   exercising independent objective judgment in deciding whether to bring this action.  The board

23   members also have close personal and business ties with each other and are, consequently, interested

24   parties and cannot in good faith exercise independent business judgment to determine whether to

25   bring this action against themselves and one another.

26       95.    The composition of Wireless Facilities's Board of Directors is designed to (and does)

27   make them dependent on and deferential to defendant Tayebi and his financial backers, defendants

28   Carano, Jarvis and Anderson who, as a practical matter, control and dominate the process by which

1  directors are selected for nomination or renomination to the Board.  Non-employee directors are given

2  stock options to purchase thousands of shares of Wireless Facilities stock, the amount of which the

3  officers named as defendants herein are in a position to influence or control.  Thus, no non-officer

4  Board member can be independent as he or she has a direct economic incentive to please the top

5  officers and directors to stay on the Board.

6       96.    Despite their knowledge of these facts, the defendants intentionally allowed the

7  Company to disseminate false and misleading financial information to the investing public without

8  reasonably assuring themselves that the Company would comply with required accounting procedures

9  and otherwise comply with its legal requirements.

10       97.    The defendants undertook this course of conduct with intentional and/or reckless

11  breach of their fiduciary duties because they were afraid that taking the drastic action that was

12  necessary to correct and address the severe lack of any internal controls would: (a) harm the market

13  price of Wireless Facilities's stock; (b) result in the loss of goodwill in the investing community; and

14  (c) jeopardize their personal reputations and financial interests.

15       98.    Plaintiff has not made any demand on the Wireless Facilities Board of Directors or its

16  shareholders to institute an action against the Defendants for their breach of fiduciary duties and other

17  misconduct since such demand would be a futile and useless act for, *inter alia*, the following reasons:

18       a)    A majority of the Wireless Facilities Board of Directors participated in,

19  approved or recklessly disregarded the wrongs complained of herein, which could not have been an

20  exercise of good faith business judgment.

21       b)    Wireless Facilities's Board has engaged in a systematic course of conduct

22  pursuant to which they have continually favored the interests of Wireless Facilities insiders,

23  particularly defendants Tayebi and Ashwill at the direct expense of the Company and its stockholders,

24  which could not have been an exercise of good faith business judgment.

25       c)    Defendant Tayebi is the co-founder of the Company.  The other co-founder is

26  Tayebi's brother who, while not a board member, continues to own over 10% of the stock of the

27  Company and whose businesses do extensive business with the Company.  Moreover, defendants

28  Carano, Jarvis, and Anderson are intertwined venture capitalists who have served on the Board since

-34-

1   the inception of the Company and who have invested significantly in the Company.  Clearly, the

2   Board is dominated by Tayebi and these financial backers.

3             d)        Defendant Jarvis is the co-founder of Cedar Grove Investments, LLC and, as

4   such, is the superior to defendant Anderson.  Cedar Grove Investments, LLC has a significant

5   financial investment in the Company and defendant Anderson will not authorize an action that is

6   against the interests of his employer.  Moreover, defendant Jarvis is a partner in Oak Investment

7   Partners, whose General Partner is defendant Carano.  Defendant Jarvis will not authorize an action

8   that would be detrimental to the significant investment that Oak Investment Partners has in the

9   Company.

10            e)        The principal professional occupations of defendants Tayebi and DeMarco

11  are their employment with Wireless Facilities.  They both receive and continue to receive substantial

12  monetary benefits due to their employment with Wireless Facilities, including, but not limited to,

13  hundreds of thousands of dollars in salary and cash bonuses, options to purchase shares of Wireless

14  Facilities common stock, and other compensation and benefits.  Accordingly, defendants Tayebi and

15  DeMarco are each incapable of considering a demand to initiate and prosecute this action.

16            f)        Despite their knowledge of the wrongdoing alleged herein, the directors of

17  Wireless Facilities have not taken action to seek recompense from the wrongdoers who have caused

18  harm to the Company, including, but not limited to, defendants Tayebi and Ashwill.

19            g)        The acts which are complained of herein constitute violations of fiduciary

20  duties owed to the Company and its shareholders and violations of law and these acts are incapable of

21  ratification.

22            h)        The members of the Audit Committee, defendants Hoglund, Jarvis, and

23  Anderson who comprise a majority of the purported "independent" members of the Board, exhibited

24  a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an

25  exercise of good faith business judgment.  There is a substantial likelihood that these defendants will

26  be held personally liable for their misconduct.

27            i)        Each of the Director Defendants knew of and/or directly benefitted from the

28  wrongdoing complained of herein.  Specifically, as a result of their access to and review of internal

1    corporate documents, conversations and connections with other corporate officers, employees, and

2    directors; defendants knew the adverse non-public information regarding the averments set forth

3    above.  While in possession of this material adverse non-public information regarding the Company,

4    defendant Tayebi sold 1,125,000 shares of his Wireless Facilities stock, realizing illicit gross proceeds

5    in excess of  $16 million and defendant Ashwill sold 233,351 shares of  Wireless Facilities stock,

6    realizing illicit gross proceeds in excess of $2.4 million dollars.  Accordingly, these selling defendants

7    are directly interested in the subject transactions and therefore are incapable of considering a demand

8    to initiate and prosecute this action.

9                  j)      In order to bring this suit, the Director Defendants would be forced to sue

10   themselves and persons with whom they have extensive business and personal entanglements, which

11   they will not do.  These inter-related business and personal relationships have developed debilitating

12   conflicts of interest which prevent the Board members of the Company from taking the necessary and

13   proper action on behalf of the Company as requested herein.

14                  k)      A majority of Wireless Facilities's Board own substantial amounts of the

15   Company stock and have personally profited from these wrongful acts.

16                  l)      To bring an action against themselves would subject the Defendants to

17   personal liability in the securities class action lawsuits pending, as well as additional liability in future

18   lawsuits that could result from such an action.

19                  m)      Wireless Facilities's officers and directors are protected against personal

20   liability by a directors' and officers' liability insurance policy.  They caused the Company to purchase

21   that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of

22   Wireless Facilities.   However, the directors' and officers' liability insurance policies covering

23   defendants contain provisions which eliminate coverage for any action brought directly by Wireless

24   Facilities against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a

25   result, if these directors were to sue themselves, no insurance protection would be provided for the

26   derivative claims.  Thus, this is a further reason why the Wireless Facilities Board will not bring such

27   a suit, for to do so would subject themselves and their colleagues and/or friends to a judgment of

28   millions of dollars that would have to be paid from their individual assets alone.  On the other hand, if

1   the claims are brought derivatively, such insurance coverage will provide a basis for the Company to

2   effectuate a recovery.

3   **Reasonable Doubt Exists that the Wireless Facilities Board is**
    **Entitled to the Business Judgment Protection**

4

5       99.     For the reasons set forth herein, a reasonable doubt exists that the Board's approval

6   and/or acquiescence to the Company's improper accounting methods and absence of appropriate

7   business controls was the product of a valid exercise of business judgment.

8       100.    As directors of the Company, the Director Defendants received, or should have

9   received, regular and detailed financial reports and were, or should have been, kept abreast and made

10  familiar with the current financial conditions of the Company.

11      101.    The directors of the Company served on committees for which they were

12  compensated by way of significant grants of stock options pursuant to which they were specifically

13  vested with duties to closely monitor the business and financial performance of the Company.

14      102.    As part of their fiduciary duties, the Director Defendants had an obligation to inform

15  themselves, prior to making a business decision, of all material information reasonably available to

16  them. Certainly, the preceding averments establish that the Wireless Facilities Board had and has

17  sufficient information to take action regarding the false and misleading statements being made to the

18  market and the investment community.

19      103.    Had the Board discharged its duty of reasonable inquiry, it would have been alerted

20  to the facts set forth above.

21      104.    The Wireless Facilities Board of Directors' failure to discharge its duty of inquiry

22  was a gross and reckless disregard of its fiduciary duties to Wireless Facilities and its shareholders,

23  and caused the Company harm.

24      105.    Accordingly, the defendants, together constituting a majority of the directors on the

25  Board, as of the filing of this complaint, face a substantial likelihood of liability if an action asserting

26  the claims alleged herein is brought against them, thus disabling the Director Defendants from being

27  capable of making a disinterested, independent decision about whether to prosecute this action.

28  Therefore, demand on the Board would have been futile.

106.     Under all of the circumstances, the defendants' actions were outrageous and were taken intentionally or, at a minimum, with reckless disregard for the legal rights of Wireless Facilities and the legal obligations and duties of the defendants.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties for Failure to Establish and Maintain Adequate Accounting Controls

107.     Plaintiff incorporates by reference each of the foregoing allegations.

108.     As alleged in detail herein, each of the defendants had a duty to Wireless Facilities and its shareholders to establish and maintain adequate internal accounting controls to ensure that the Company's financial results were recorded in compliance with GAAP.

109.     The Director Defendants did not establish and maintain adequate internal accounting controls at Wireless Facilities and did not make a good faith effort to do so; thus, they abdicated their fiduciary duty of good faith.

110.     As a direct and proximate result of the Director Defendants' foregoing breaches of fiduciary duties, the Company has suffered enormous damages, as alleged herein.

## SECOND CAUSE OF ACTION

### Unjust Enrichment

111.     Plaintiff incorporates by reference each of the foregoing allegations.

112.     As a result of the foregoing conduct, including the huge profits earned in illegal insider trading and the compensation received by the defendants, defendants have been unjustly enriched at the expense of Wireless Facilities and/or have aided and abetted the unjust enrichment of the other Director Defendants.

113.     Wireless Facilities and its shareholders have been injured by reason of this unjust enrichment.  Plaintiff, as a shareholder and representative of Wireless Facilities, seeks damages and other relief for the Company as hereinafter set forth.

## THIRD CAUSE OF ACTION

**Against the Insider Selling Defendants for Violation of
California Corporations Code Sections 25402 and 25502.5**

114.    Plaintiff incorporates by reference each of the foregoing allegations.

115.    At the time that defendants sold their Wireless Facilities common stock as set forth herein, by reason of their positions with Wireless Facilities, the defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Wireless Facilities's business and financial condition.

116.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Wireless Facilities shares at that time.

117.    The defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their Wireless Facilities common stock in violation of California Corporations Code § 25402.

118.    Wireless Facilities has total assets in excess of $1,000,000 and a class of equity securities held of record by 500 or more persons.

119.    Pursuant to California Corporations Code § 25502.5, the defendants, and each of them, are liable to Wireless Facilities for damages in an amount up to three times the difference between the price at which Wireless Facilities common stock was sold by the defendants, and each of them, and the market value which that Wireless Facilities common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

120.    Further, pursuant to California Corporations Code § 25502.5, the Defendants, and each of them, are liable to the derivative Plaintiff herein for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Wireless Facilities.

121.    Plaintiff, as a shareholder and representative of Wireless Facilities, seeks damages and other relief for the Company as hereinafter set forth.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment on behalf of Wireless Facilities as follows:

A.      Determining that this action is a proper derivative action maintainable under California law;

B.      Awarding damages and/or restitution in favor of plaintiff, on behalf of Wireless Facilities, and against defendants and awarding punitive and exemplary damages as appropriate, plus pre-judgment interest;

C.      Granting equitable and/or injunctive relief as permitted by applicable law and equity, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Wireless Facilities has an effective remedy;

D.      Awarding plaintiff reasonable attorneys' fees and costs, as well as all other recoverable litigation expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: August 16, 2004                STANLEY MANDEL & IOLA LLP
                                      MATTHEW J. ZEVIN


                                      MATTHEW J. ZEVIN

                                      550 West C Street, Suite 1600
                                      San Diego, CA  92101
                                      Telephone:    (619) 235-5306
                                      Facsimile:    (815) 377-8419

-40-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRODSKY & SMITH LLC
MARC L. ACKERMAN
EVAN J. SMITH
Two Bala Plaza, Suite 602
Bala Cynwyd, PA  19004
Telephone:     (610) 667-6200
Facsimile:     (610) 667-9029

Attorneys for Plaintiffs

## VERIFICATION

The undersigned verifies that said pleading is based on information which either I have furnished to counsel and/or upon which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel and not of signer. Signer verifies that he has read said pleading and that all averments therein are true and correct to the best of the signer's personal knowledge, information and belief. This verification is made subject to the penalties relating to unsworn falsifications to authorities and under penalty of perjury.

Rosario Pedicini

Dated: 17ᵗʰ Aug. 2004

Document: Wireless Facilities Verified Derivative Complaint.

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**ORIGINAL**

## I. (a) PLAINTIFFS

Rosario Pedicini, Derivatively on Behalf of Wireless Facilities, Inc.,

**DEFENDANTS**  04 AUG 17

Massod K. Tayebi, Eric M. DeMarco, Scott Anderson, Scot Jarvis, Bandel Carano, William Hogland, William A. Owens and Terry Ashwill.

DISTRICT COURT
OF CALIFORNIA
BY:

(b) County of Residence of First Listed Plaintiff    Frankfurt, Germany
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed    San Diego County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

(c) Attorney's (Firm Name, Address, and Telephone Number)
Matthew J. Zevin, Stanley, Mandel & Iola, L.L.P, 550 West C Street, Suite 1600, San Diego, CA 92101  Telephone: 619-235-5306

Attorneys (If Known)

**'04 CV 1663 L    (POR)**

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question (U.S. Government Not a Party)
- [x] 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                      and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [x] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [x] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury – Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury – Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 810 Selective Service |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | **SOCIAL SECURITY** | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | [ ] 861 HIA (1395ff) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 862 Black Lung (923) | [ ] 891 Agricultural Acts |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 730 Labor/Mgmt. Reporting & Disclosure Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 740 Railway Labor Act | [ ] 865 RSI (405(g)) | [ ] 894 Energy Allocation Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | *Habeas Corpus:* | [ ] 790 Other Labor Litigation | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 791 Empl. Ret. Inc. Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 245 Tort Product Liability | [ ] 440 Other Civil Rights | [ ] 540 Mandamus & Other | | | [ ] 890 Other Statutory Actions |
| [ ] 290 All Other Real Property | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |

## V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from another district (specify)
- [ ] 6  Multidistrict Litigation
- [ ] 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION  (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

**28:1332 fd**

Shareholder Derivative Action; Violations of California Corporations Code Sections 25402 & 25502.2, Breach of Fiduciary Duty, Unjust Enrichment

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY  (See instructions):

JUDGE  Hon. John A. Houston

DOCKET NUMBER  04cv1589 JAH(NLS)

DATE  08/17/2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

106312   8/17/04
150⁰⁰

