1  ROBBINS UMEDA & FINK, LLP
   BRIAN J. ROBBINS (190264)
2  KEVIN A. SEELY (199982)
   610 West Ash Street, Suite 1800
3  San Diego, CA 92101
   Telephone: (619) 525-3990
4  Facsimile: (619) 525-3991

5  FARUQI & FARUQI, LLP
   ADAM GONNELLI
6  LUBNA FARUQI
   320 East 39th Street
7  New York, NY 10016
   Telephone: (212) 983-9330
8  Facsimile: (212) 983-9331

9  Co-Lead Counsel for Plaintiffs

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12

| IN RE WIRELESS FACILITIES, INC. DERIVATIVE LITIGATION | ) ) ) | Lead Case No. 04-cv-01663-JAH-NLS (Derivative Action) |
|---|---|---|
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF CALIFORNIA CORPORATIONS CODE, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002, ACCOUTNING, RESCISSION AND CONSTRUCTIVE TRUST DEMAND FOR JURY TRIAL |

Plaintiffs, by their attorneys, submit this Verified Consolidated Amended Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, Unjust Enrichment, Violations of California Corporations Code, the Sarbanes-Oxley Act of 2002, Accounting, Rescission and Constructive Trust (the "Complaint") against the defendants named herein.  The allegations contained within the Complaint are based upon plaintiffs' information and belief gathered from public documents including but not limited to Wireless Facilities, Inc.'s ("WFI" or the "Company") filings with the Securities and Exchange Commission ("SEC"), Company press releases, news reports, court filings and confidential conversations with relevant witnesses.

## NATURE AND SUMMARY OF THE ACTION

### Defendants' Improper Financial Reporting and Accounting

1.      This is a shareholder derivative action brought by shareholders of WFI, on behalf of the Company, against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of California Corporations Code and the Sarbanes-Oxley Act of 2002 ("SOX"), arising out of the filing of false financial statements and the issuance of false and misleading press releases and inadequate internal controls during April 2000 through 2004 and the Company's restatement of its financial results for the years 2000 through 2003 to correct for the improper accounting.

2.      WFI is an independent provider of outsourced communications and security systems engineering and integration services and other technical services for the wireless communications industry, the United States government, and enterprise customers. The principal services WFI provides include the design, deployment, integration, and the overall management of wireless communications networks. WFI also provides communications systems engineering, systems integration, and the outsourcing of technical services such as operational test and evaluation and program management for the United States government and the design, deployment, and integration of security and other in-building systems including access control and intrusion detection for enterprise customers.

3.      WFI was co-founded and was controlled by two brothers, Masood K. Tayebi ("M.K. Tayebi") and Massih Tayebi ("M. Tayebi").  The Tayebi brothers have been intimately involved with the Company since its inception 10 years ago.  At times relevant, both brothers served as Chief Executive Officer ("CEO") and as Chairman of the Board of Directors ("Board").  M. Tayebi first took the reins as CEO from the Company's inception in 1994 and then passed the control to his brother, M.K. Tayebi in September 2000. M.K. Tayebi acted as CEO until April 2004.  M. Tayebi acted as Chairman of the Board from 2000 through April 2002, when he once again passed the gauntlet to his brother, M.K. Tayebi, who acted as Chairman until February 2007.  In 2003, the Tayebi family owned 40% of the outstanding stock.

4.      In November 2003, Eric M. DeMarco ("DeMarco") joined the Company as President and Chief Operating Officer ("COO").  In April 2004, DeMarco was appointed as a director and CEO.  Prior to coming to WFI, DeMarco was the President and COO at The Titan Corporation ("Titan"). DeMarco was also on the Titan Africa Board.  WFI also has foreign operations and, as noted *infra*, the recent restatement of fiscal years 2000-2003, was in large part due to a failure to account for foreign tax contingencies and other improper accounting practices. Currently, WFI has foreign offices in Brazil, Mexico, UK, Sweden, China and India.  During DeMarco's tenure at Titan, he obtained experience with foreign officials and foreign operations.

5.      Just nine months prior to starting at WFI, DeMarco signed a "mutual termination of employment" agreement with Titan in February 2003.  This "agreement" came during various government investigations (SEC, Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), etc.) regarding the bribery of foreign (African) officials, as well as privately initiated lawsuits involving Titan and DeMarco.  Recently, Titan admitted guilt and settled with the SEC and DOJ for $28 million, the largest combined criminal and civil penalty in the 28-year history of the Foreign Corrupt Practices Act.  It has been alleged that given his positions at Titan and acting in those positions, DeMarco routinely transferred funds to pay for the millions in unaccountable expenditures and attempted to cover up the bribes with false invoices.

6.      Despite these glaring "red flags" regarding DeMarco and his alleged involvement with bribing foreign officials, or possibly because of them, the Tayebi brothers hired DeMarco

- 2 -

1   and passed over the reins as CEO to a person they knew had a history of wrongdoing and would

2   be willing to perform in a manner to benefit them personally, but would be potentially

3   detrimental to the Company.

4        7.     Defendants' poor choice for a CEO evidenced a corporate culture of gross

5   mismanagement and seriously deficient internal control environment.  As a result, during times

6   relevant, the Company's financial reports were inaccurate and misleading while its shares traded

7   at artificially inflated levels.  Moreover, certain of the defendants engaged in a rampant insider

8   trading spree, netting ill-gotten insider trading proceeds of *over $123 million*.

9        8.     On August 4, 2004, the Individual Defendants caused the Company to issue a press

10  release titled "Wireless Facilities Reports Second Quarter Results."  The press release stated in part:

11       Wireless Facilities, Inc. today reported results for the second quarter of fiscal year
         2004.  In addition, the Company announced that it *intends to restate* its financial
12       statements filed on Form 10-K for the *years 2000 through 2003* to accrue for
         certain foreign tax contingencies.  The restatement is the result of an extensive
13       analysis by the Company that identified adjustments, which are required to properly
         state prior period financial statements.  The restatement will not affect the Company's
14       reported current year operating results.

15       9.     On August 5, 2004, the trading day following the Company's disclosure that it

16  would restate four years worth of financial results, the value of WFI plunged 28%.  On this day,

17  WFI was one of the most active stocks and among the biggest percentage losers of the day.  First

18  Albany Capital immediately cut its rating on WFI to "neutral" from "strong buy" on near-term

19  uncertainties surrounding the restatements, and slashed its price target to $7 from $18.

20       10.    The following month, in September of 2004, the defendants admitted that

21  numerous financial and accounting errors had been made at times relevant requiring WFI to

22  restate four years of financial statements to account for *an additional $35 million in previously*

23  *unrecorded expenses*. The defendants knew or should have known that the Company's financial

24  statements filed with the SEC and disseminated to the investing public were materially

25  inaccurate and failed to disclose the following material adverse facts:

26       (a)    the Company failed to properly recognize income tax liabilities related to

27  foreign income tax and domestic sales and use tax contingencies;

28

(b)     the Company prematurely recognized revenue on fixed-price contracts by unjustifiably using the percentage of completion method when it did not possess sufficient objective evidence to support its estimated percentage of completion;

(c)     the Company prematurely recognized revenue by unjustifiably manipulating costs between different contracts and by duplicating billings;

(d)     the Company improperly overstated its reported revenues by unjustifiably establishing and adjusting its allowance for doubtful accounts;

(e)     the Company improperly recognized revenue when collectibility was not reasonably assured and in some cases when persuasive evidence of an arrangement did not exist—certain contracts *were not even signed*;

(f)     the Company ignored impairment indicators and failed to impair the carrying value of an investment in a privately-held wireless network planning and development company that was significantly impaired at the time of financing;

(i)     the Company overstated its earnings by improperly capitalizing as goodwill amounts that should have been recognized as compensation expense because the purchase agreements required continuous employment as a condition of receiving the earn-out amounts;

(j)     the Company overstated its earnings by improperly classifying amounts in connection with its purchase accounting as goodwill instead of recognizing the amounts as intangible assets apart from goodwill that were required to be amortized;

(k)     the Company failed to properly adopt SFAS 142 as of January 1, 2002 by using erroneous assumptions and calculation errors that unjustifiably allowed the Company to recognize approximately $16.1 million that had to be subsequently written-off; and

(l)     the Company failed to recognize the compensation expense related to the stock options granted to certain former employees.

11.     The Company restated its financials for the years 2000 through 2003 to reflect a reduction in net income of approximately $42.9 million.  The restatement wiped out every penny

of profit WFI ever made turning its total loss in net income for 2000-2003 from a $68.7 million loss to a $111.6 million loss.  The results in fiscal years 2001-2003 were as follows:

### FISCAL YEAR 2001

|  | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $207.2 | (9.8) | 197.4 |
| Gross Profit | 66.2 | (12.0) | 54.2 |
| Income (Loss) Before Minority Interest in Income of Subsidiary and Income Taxes | (75.00) | (12.7) | (87.7) |
| Net Income (Loss) | (60.1) | (9.7) | (69.8) |
| Net Income (Loss) per Share |  |  |  |
| Basic | (1.31) | (0.21) | (1.52) |
| Diluted | (1.31) | (0.21) | (1.52) |

### FISCAL YEAR 2002

|  | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $187 | 5.1 | 192.1 |
| Gross Profit | 48.3 | (3.1) | 45.2 |
| Income (Loss) Before Minority Interest in Income of Subsidiary and Income Taxes | (53.7) | 6.2 | (47.5) |
| Net Income (Loss) | (63.9) | (9.9) | (73.8) |
| Net Income (Loss) per Share |  |  |  |
| Basic | (1.33) | (0.20) | (1.53) |
| Diluted | (1.33) | (0.20) | (1.53) |

### FISCAL YEAR 2003

|  | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|
| Revenue | $262.2 | (1.2) | 261.0 |
| Gross Profit | 71.3 | (1.1) | 70.2 |

- 5 -

| | | | |
|---|---|---|---|
| Income (Loss) Before Minority Interest in Income of Subsidiary and Income Taxes | 23.5 | (14.3) | 9.2 |
| Net Income (Loss) | 23.5 | (14.0) | 9.5 |
| Net Income (Loss) per Share | | | |
| Basic | (0.44) | (0.26) | (0.18) |
| Diluted | (0.32) | (0.19) | (1.13) |

12.     By restating its financial results, WFI has admitted that its publicly-issued financial statements for each of the restated periods were not prepared in conformity with Generally Accepted Accounting Principles ("GAAP"), and that WFI materially misstated its financial condition and results of operations.   Under Accounting Principles Board Opinion ("APB") No. 20, Accounting Changes, restatements are required to correct material accounting errors or irregularities that existed at the time the financial statements were prepared and issued. Thus, the restatement is an admission that each of the press releases and the quarterly reports filed with the SEC on Form 10-Q and each of the year-end reports filed with the SEC on Form 10-K at times relevant contained untrue statements of material fact.   As members of the Company's Board and/or its senior management team, defendants are responsible for ensuring WFI complies with the law, its financial reporting is accurate and information disclosed to the public concerning the Company is accurate.

13.     The improper accounting practices that defendants were responsible for caused WFI's shares to trade at artificially inflated prices and allowed certain defendants to improperly sell their personally held shares for total proceeds of ***over $123 million*** for their own personal gain.

14.     The effect of defendants' mismanagement of WFI, including the approximately $43 million reduction to net income as part of WFI's restatement, was devastating to the Company. For example, for the years 2000 through 2003, the Company failed to account for $10 million related to foreign tax contingencies and $25 million in additional expenses.

15.     The defendants' actions have caused the Company to: (i) be subjected to multiple class action lawsuits for violating federal securities laws; (ii) be temporarily delisted by

- 6 -

1  NASDAQ; (iii) restate four years of financial results; and (iv) delay listing of its Second Quarter

2  10-Q for the year 2004. As a result, the Company has suffered severe, irreparable, injury and

3  damages, particularly to its reputation and goodwill in the investment and business community.

4  At the same time, certain of the defendants fared much better, reaping **over $123 million** in

5  illegal insider trading proceeds.

6                    **Defendants' Illegal Backdating and Springloading Activities**

7            16.     September 11, 2001 marks the date of one of the worst terrorist attacks in

8  American history.  The economic aftermath of this attack was both immediate and far reaching.

9  The Dow Jones Industrial Average stock market index ("Dow Jones Index") fell 684 points, or

10  7.1%, its biggest-ever one-day point decline.  By the end of the week, the Dow Jones Index fell

11  1369.7 points, or 14.3%, its largest one-week point drop in history.  In total, stocks traded in the

12  U.S. stock markets lost over $1.2 trillion in value.

13            17.     WFI's stock was similarly affected.  As of October 1, 2001, the Company's stock

14  had plummeted by over 39%.  On that precise day, defendants David Garrison ("Garrison"),

15  Farzad Ghassemi ("Ghassemi"), William Mazilly ("Mazilly"), Thomas A. Munro ("Munro") and

16  Laura L. Siegal ("Siegal")—WFI's top executives—purportedly decided to grant themselves

17  852,500 options.

18            18.     Defendants' timing was extremely fortuitous because within weeks WFI's shares

19  would recover and defendants' spectacularly-well-timed options grants would appreciate by over

20  $1.9 million.  These options grants and WFI's stock price following the September 11th attack

21  are illustrated by the following graph:

22

23

24

25

26

27

28



19.     Defendants' dating of their 852,500 options on October 1, 2001 was not luck, however.  It was part of a grander scheme dating back to at least 1998, whereby defendants caused or allowed WFI insiders to manipulate their stock-option grants dates so as to secretly maximize their profits from the stock options.  Specifically, certain WFI insiders—with the benefit of hindsight—cherry-picked their respective stock-option grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The price of WFI shares on the reported option-grant date, therefore, was lower than the share price on the actual day options were issued.  Thus, this illegal practice known as backdating brought WFI insiders an instant paper gain.  By engaging in this scheme, defendants were able to conceal from investors that the Company was not recording material compensation expenses and materially overstating WFI's net income and earnings per share.

20.     In short, the October 1, 2001 grants were yet another opportunity for defendants to make a quick buck at the Company's expense.  Indeed, by 2006, these defendants and others had allowed themselves to sell over $123 million worth of WFI stock—many of which was gained from the exercise of backdated options—and realize millions of dollars in illicit

compensation through the exercise of backdated option grants and subsequent sale of the Company's stock.

21.     Defendants' illegal backdating practices, however, would remain hidden until a March 18, 2006 *Wall Street Journal* article titled, "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck – or something else?" heightened public scrutiny of options granting practices.  The article was based upon prior academic research into the timing of option grants at various public companies.  That research theorized that wildly improbable option grants—such as defendants' October 1, 2001 grants—could only be explained by backdating.

22.     In the months that followed, hundreds of public companies fell under the scrutiny of the SEC, Department of Justice and internal investigators.  Nearly a year later, WFI announced that an internal investigation was being conducted.  That investigation has already uncovered erroneous grants between 1998 and 2003.  Although the investigation has not yet issued a final conclusion, WFI announced that there is a "strong likelihood" that the Company's prior financial statements for its fiscal 2003 to 2005 and earlier periods will have to be restated. Apparently, the 2003 financial results will be *re-restated*.

23.     Not only were defendants engaged in illegal backdating, but they were also padding their substantial equity compensation by springloading their options.  Springloading is the illegal misappropriation of inside information to time option grants before a significant increase in the Company's shares.  Similar to backdating, springloading brings an immediate profit to the option holders.

24.     Currently, WFI is facing exorbitant costs from directing corporate resources to investigate defendants' illegal backdating practices and to potentially re-restate its past financial statements.  Further, WFI's business reputation has been severely damaged as demonstrated by its hemorrhaging share price.  Accordingly, this action is necessary to end defendants' illegal option-backdating and springloading practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

**JURISDICTION AND VENUE**

25.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiffs and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     This court also has jurisdiction over this action pursuant to 28 U.S.C §1331 in that plaintiffs' claims arise in part out of the laws of the United States, including SOX.

27.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28.     Venue is proper in the Court because nominal defendant WFI conducts business in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District.  One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

29.     This Court has *quasi in rem* jurisdiction over backdated and springloaded stock options held by defendants Ghassemi and Greg Jacobsen ("Jacobsen").  Plaintiffs allege on information and belief that documents evidencing Ghassemi's and Jacobsen's stock option grant contracts are kept at WFI's headquarters in San Diego, California along with the Company's other public records.  Ghassemi's and Jacobsen's stock option grants are directly related to the subject matter of plaintiffs' claims against them.  Further, Ghassemi and Jacobsen have sufficient minimum contacts with this forum.  Because this Court has *quasi in rem* jurisdiction over defendants Ghassemi and Jacobsen in connection with plaintiffs' backdating and springloading claims it is reasonable to compel defendants Ghassemi and Jacobsen to answer plaintiffs' remaining claims.

30.     This Court has specific personal jurisdiction over defendants William A. Hoglund ("Hoglund"), Scott I. Anderson ("Anderson") and Scot B. Jarvis ("Jarvis") because these defendants intentionally approved backdated and springloaded options to purchase WFI stock—a

1  Company headquartered in California—to California citizens as members of the Compensation

2  Committee, Audit Committee and/or Board of Directors (the "Board"), as alleged in detail

3  below.  Plaintiffs' claims against these defendants arise directly from their approval of the

4  backdated and springloaded WFI options.  Additionally, the exercise of jurisdiction over these

5  defendants is reasonable.  Because this Court has specific personal jurisdiction over defendants

6  Hoglund, Anderson and Jarvis in connection with plaintiffs' backdating and springloading claims

7  it is reasonable to compel these defendants to answer plaintiffs' remaining claims.

**THE PARTIES**

8

9  31.    Plaintiffs Michael Roth and Rosario Pedicini are, and were at times relevant

10  hereto, owners and holders of WFI common stock.  Roth is a citizen of New York.  Pedicini is a

11  citizen of Italy.

12  32.    Nominal defendant WFI is a corporation organized and existing under the laws of

13  the state of Delaware with its headquarters located at 4810 Eastgate Mall, San Diego, California

14  92121.  WFI is an independent provider of outsourced communications and security systems

15  engineering and integration services and other technical services for the wireless

16  communications industry, the United States government and enterprise customers.

17  33.    Defendant M.K. Tayebi was a WFI director from 1994 to March 2007.  M.K.

18  Tayebi was also Executive Chairman from April 2002 to March 2007; President from 1994 to

19  September 2000; and CEO from September 2000 to April 2004.  M.K. Tayebi co-founded WFI

20  in 1994.  Because of M.K. Tayebi's positions, he knew the adverse non-public information about

21  the business of WFI, specifically its failure to record its tax liabilities and its failure to account

22  for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances,

23  markets and present and future business prospects, via access to internal corporate documents,

24  conversations and connections with other corporate officers and employees, attendance at Board

25  meetings and committees thereof and via reports and other information provided to him in

26  connection therewith.  At times relevant, defendant M.K. Tayebi participated in the issuance of

27  false and/or misleading statements, including the preparation of the false and/or misleading press

28  releases and SEC filings.  Because of M.K. Tayebi's positions, he also knew, consciously

- 11 -

disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springlaoding stock option grants to maximize their personal profits.  WFI paid M.K. Tayebi the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | All Other Compensation |
|---|---|---|---|---|
| Tayebi, M.K. | 2004 | $208,767 | $55,490 | - |
| | 2003 | $267,684 | - | - |
| | 2002 | - | - | $3,250 |
| | 2001 | $54,168 | - | - |
| | 2000 | $224,000 | - | - |
| | 1999 | $220,410 | - | - |
| | 1998 | $216,749 | - | - |

Defendant M.K. Tayebi, at times when he was a member of the Board, intentionally approved backdated and springloaded stock option grants.  M.K. Tayebi sold 625,000 of his personally held shares for $35,099,430 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  M.K. Tayebi is a citizen of California.

34.     Defendant M. Tayebi was a WFI director and Chairman of the Board from 1994 to April 2002.  M. Tayebi was also CEO from 1994 to September 2000.  M. Tayebi co-founded WFI in 1994.  Because of M. Tayebi's positions, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant, M. Tayebi participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of M. Tayebi's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Defendant M. Tayebi, at times when he was a member of the

- 12 -

Board, intentionally approved backdated and springloaded stock option grants.  M. Tayebi sold 1,707,037 of his personally held shares for $38,830,642 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  M. Tayebi is a citizen of California.

35.     Defendant DeMarco is WFI's CEO and a director and has been since April 2004.  DeMarco was President and COO from November 2003 to April 2004.  Because of DeMarco's positions, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant, DeMarco participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of DeMarco's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  WFI paid DeMarco the following compensation:

| Defendant | Fiscal Year | Salary | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------------------------------|------------------------|
| DeMarco | 2005 | $293,561 | 225,000 | $14,000 |
| | 2004 | $280,288 | 500,000 | $2,996 |
| | 2003 | $27,520 | 1,250,000 | - |

DeMarco is a citizen of California.

36.     Defendant Siegal is WFI's Vice President and Corporate Controller and has been since April 2006.  Siegal was Treasurer from December 2003 to April 2006; Vice President, Finance and Risk Management from September 2004 to April 2006; and held various positions from August 2000 to December 2003.  Because of Siegal's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI

- 13 -

insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.  Siegal received at least 41,088 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Siegal backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  WFI paid Siegal the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Siegal | 2004 | $159,900 | $56,000 | 26,500 | $1,284 |
| | 2003 | $119,998 | - | 20,000 | - |
| | 2002 | $119,998 | - | 36,000 | - |

Siegal is a citizen of California.

37.     Defendant James R. Edwards ("Edwards") is WFI's Senior Vice President, General Counsel, and Secretary and has been since April 2004.  Because of Edwards' positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  WFI paid Edwards the following compensation:

| Defendant | Fiscal Year | Salary | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| Edwards | 2005 | $212,755 | 70,000 | $14,000 |
| | 2004 | $137,980 | 270,000 | $10,289 |

Edwards is a citizen of California.

38.     Defendant Deanna Hom Lund ("Lund") is WFI's Senior Vice President, Chief Accounting Officer and Chief Financial Officer ("CFO") and has been since April 2004.  Because of Lund's positions, she knew, consciously disregarded, was reckless and grossly

- 14 -

negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.  WFI paid Lund the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| Lund | 2005 | $221,146 | - | 100,000 | $14,000 |
| | 2004 | $145,385 | $30,000 | 300,000 | $1,817 |

Lund is a citizen of California.

39.     Pursuant to this Court's March 20, 2007 order dismissing defendant Jarvis for lack of personal jurisdiction in connection with the improper financial reporting and accounting claims, defendant Jarvis is named as a defendant in this action in connection with plaintiffs' claims arising from the illegal backdating and springloading of WFI stock options.  Because this Court has *quasi in rem* jurisdiction over this defendant in connection with plaintiffs' backdating and springloading claims it is reasonable to compel defendant Jarvis to answer plaintiffs' remaining claims.  Defendant Jarvis is a WFI director and has been since February 1997.  Jarvis is Chairman of the Compensation Committee and has been since 2004 and has been a member of the Compensation Committee since 2000. Jarvis is also a member of the Audit Committee and has been since 2000. Because of Jarvis' positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Jarvis, at times when he was a member of the Board, Compensation Committee and Audit Committee, intentionally approved backdated and springloaded stock option grants.  Jarvis sold 408,885 of his personally held shares for $12,244,262.70 in proceeds while in possession of material, non-public

- 15 -

1  information concerning the illegally undisclosed backdating stock option grant practices.  Jarvis

2  is a citizen of Washington.

3       40.     Pursuant to this Court's March 20, 2007 order dismissing defendant Anderson for

4  lack of personal jurisdiction in connection with the improper financial reporting and accounting

5  claims, defendant Anderson is named as a defendant in this action in connection with plaintiffs'

6  claims arising from the illegal backdating and springloading of WFI stock options.  Because this

7  Court has *quasi in rem* jurisdiction over this defendant in connection with plaintiffs' backdating

8  and springloading claims it is reasonable to compel defendant Anderson to answer plaintiffs'

9  remaining claims.  Defendant Anderson is a WFI director and has been since February 1997.

10 Anderson is Chairman of the Audit Committee and has been since 2000. Anderson was a

11 member of the Compensation Committee in 2000 and 2002.  Because of Anderson's positions, he

12 also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should

13 have known that WFI insiders were improperly backdating and springloading stock option grants

14 to maximize their personal profits, via access to internal corporate documents, conversations and

15 connections with other corporate officers and employees, attendance at Board meetings and

16 committees thereof and via reports and other information provided to him in connection

17 therewith.  Defendant Anderson, at times when he was a member of the Board, Compensation

18 Committee and Audit Committee, intentionally approved backdated and springloaded stock

19 option grants.  Anderson sold 408,885 of his personally held shares for $12,233,762.58 in

20 proceeds while in possession of material, non-public information concerning the illegally

21 undisclosed backdating stock option grant practices.  Anderson is a citizen of Washington.

22      41.     Defendant Bandel L. Carano ("Carano") is a WFI director and has been since

23 October 2001.  Carano was also a director from August 1998 to June 2001.  Carano is a member

24 of the Compensation Committee and has been since February 2002 and previously served on the

25 Compensation Committee in 2000.  Carano was a member of the Audit Committee in 2001.

26 Because of Carano's positions, he knew the adverse non-public information about the business of

27 WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25

28 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and

present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant, Carano participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Carano's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Defendant Carano, at times when he was a member of the Board, Compensation Committee and Audit Committee, intentionally approved backdated stock option grants.  Carano sold 95,144 of his personally held shares for $4,980,543.51 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Carano is a citizen of California.

42.     Pursuant to this Court's March 20, 2007 order dismissing defendant Hoglund for lack of personal jurisdiction in connection with the improper financial reporting and accounting claims, defendant Hoglund is named as a defendant in this action in connection with plaintiffs' claims arising from the illegal backdating and springloading of WFI stock options.  Because this Court has specific personal jurisdiction over this defendant in connection with plaintiffs' backdating and springloading claims it is reasonable to compel defendant Hoglund to answer plaintiffs' remaining claims.  Defendant Hoglund is a WFI director and has been since February 2001.  Hoglund is a member of the Audit Committee and has been since 2001.  Hoglund was a member of the Compensation Committee from 2005 to 2006.  Because of Hoglund's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Defendant Hoglund, at times when he was a member of the Board and

Audit Committee, intentionally approved backdated and springloaded stock option grants. Hoglund is a citizen of Washington.

43.     Defendant Scott Fox ("Fox") was WFI's President of Network Management and Operations from 2000 to at least 2002.  Fox was also President of Network Management from 1999 to 2000.  Because of Fox's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Fox received at least 1,393 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Fox backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  WFI paid Fox the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------------|------------------------|
| Fox | 2001 | $138,577 | $120,186 | - | - |
| | 2000 | $225,000 | - | 1,393 | - |
| | 1999 | $141,346 | $112,500 | 623,334 | $49,244 |

Fox sold 90,000 of his personally held shares for $5,251,679.50 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Fox is a citizen of California.

44.     Defendant Munro was WFI's President from September 2000 to early 2003. Munro was also CFO from July 1997 to September 2000.  Because of Munro's position, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other

- 18 -

information provided to him in connection therewith.  At times relevant, Munro participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.   Because of Munro's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Munro received at least 640,890 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Munro backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  WFI paid Munro the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|---|---|---|---|---|
| Munro | 2002 | $193,838 | - | 200,890 |
| | 2001 | $223,000 | $7,686 | 440,000 |
| | 2000 | $189,000 | - | 350,000 |
| | 1999 | $132,516 | - | 115,000 |
| | 1998 | $132,502 | - | 159,000 |

Munro sold 110,666 of his personally held shares for $4,328,679.50 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Munro is a citizen of California.

45.    Defendant George Wozencraft ("Wozencraft") was WFI's Vice President, Telecom Consulting Services from July 1999 to at least 2001.  Because of Wozencraft's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Wozencraft received at least 712 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Wozencraft backdated these stock options and received illegal compensation from

1   WFI that was not disclosed to the Company's shareholders.  Wozencraft sold 46,750 of his

2   personally held shares for $3,464,319.10 in proceeds while in possession of material, non-public

3   information concerning the illegally undisclosed backdating stock option grant practices.

4   Wozencraft is a citizen of California.

5        46.    Defendant Terry Ashwill ("Ashwill") was WFI's CFO from September 2000 to at

6   December 2003.  Ashwill was also Executive Vice President from March 2001 to at least

7   November 2003.  Because of Ashwill's position, he knew the adverse non-public information

8   about the business of WFI,  specifically its failure to record its tax liabilities and its failure to

9   account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its

10  finances, markets and present and future business prospects, via access to internal corporate

11  documents, conversations and connections with other corporate officers and employees,

12  attendance at management meetings and via reports and other information provided to him in

13  connection therewith.  At times relevant, Ashwill participated in the issuance of false and/or

14  misleading statements, including the preparation of the false and/or misleading press releases

15  and SEC filings.  Because of Ashwill's positions, he also knew, consciously disregarded, was

16  reckless and grossly negligent in not knowing or should have known that WFI insiders were

17  improperly backdating and springloading stock option grants to maximize their personal profits.

18  Ashwill received at least 562,330 options that were dated at or very close to the lowest stock

19  price for the month during which options were granted.  Accordingly, on information and belief,

20  plaintiffs allege that Ashwill backdated these stock options and received illegal compensation

21  from WFI that was not disclosed to the Company's shareholders.   WFI paid Ashwill the

22  following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
|-----------|-------------|--------|-------|-------------------------------|------------------------|
| Ashwill | 2003 | $237,838 | - | 60,000 | $2,020,519 |
| | 2002 | $200,942 | - | 191,944 | $349,411 |
| | 2001 | $202,692 | $54,486 | 310,000 | $470,805 |
| | 2000 | $52,500 | - | 400,386 | $4,010 |

1    Ashwill sold 244,151 of his personally held shares for $2,558,412.09 in proceeds while in

2    possession of material, non-public information concerning the illegally undisclosed backdating

3    stock option grant practices.  Ashwill is a citizen of California.

4           47.    Pursuant to this Court's March 20, 2007 order dismissing defendant Ghassemi for

5    lack of personal jurisdiction in connection with the improper financial reporting and accounting

6    claims, defendant Ghassemi is named as a defendant in this action in connection with plaintiffs'

7    claims arising from the illegal backdating and springloading of WFI stock options.  Because this

8    Court has specific personal jurisdiction over this defendant in connection with plaintiffs'

9    backdating and springloading claims it is reasonable to compel defendant Ghassemi to answer

10   plaintiffs' remaining claims.  Defendant Ghassemi was WFI's President of the WFI Network

11   Services Division in 2004.  Ghassemi was also Executive Vice President in 2004; Senior Vice

12   President, WFI Network Services from July 2002 to 2004; Senior Vice President of Engineering

13   from October 2000 to at least 2004; and Vice President of Radio Frequency Engineering from

14   February 1999 to October 2000.  Because of Ghassemi's positions, he knew, consciously

15   disregarded, was reckless and grossly negligent in not knowing or should have known that WFI

16   insiders were improperly backdating and springloading stock option grants to maximize their

17   personal profits, via access to internal corporate documents, conversations and connections with

18   other corporate officers and employees, attendance at management meetings and via reports and

19   other information provided to him in connection therewith.  Ghassemi received at least 211,582

20   options that were dated at or very close to the lowest stock price for the month during which

21   options were granted.  Accordingly, on information and belief, plaintiffs allege that Ghassemi

22   backdated these stock options and received illegal compensation from WFI that was not

23   disclosed to the Company's shareholders.  Additionally, defendant Ghassemi received 9,600

24   springloaded options timed immediately before the release of positive-previously-undisclosed

25   material information.  WFI paid Ghassemi the following compensation:

26

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options |
|-----------|-------------|--------|-------|-------------------------------|
| Ghassemi | 2004 | $195,960 | $140,000 | 65,000 |

| | 2003 | $221,558 | - | 80,000 |
| | 2002 | $302,391 | - | 104,000 |
| | 2001 | $132,302 | $61,633 | 130,591 |

Ghassemi sold 92,222 of his personally held shares for $1,544,852 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Ghassemi is a citizen of Virginia.

48.    Defendant Farhad "Frankie" Farjood ("Farjood") was WFI Executive Vice President and President of the Enterprise Network Services Division from July 2002 to January 2004.  Farjood was also Vice President, Project Management from November 1999 to October 2000 and Senior Vice President, U.S. Development from October 2000 to July 2002.  Because of Farjood's positions, he  knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  At times relevant, Farjood participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Farjood's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Farjood received at least 337,743 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Farjood backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  Additionally, defendant Farjood received 10,000 springloaded options timed immediately before the release of positive-previously-undisclosed material information. WFI paid Farjood the following compensation:

| Defendant | Fiscal Year | Salary | Bonus | Securities Underlying Options | All Other Compensation |
| --- | --- | --- | --- | --- | --- |

- 22 -

| | | | | | |
|---|---|---|---|---|---|
| Farjood | 2004 | $137,283 | $123,500 | - | - |
| | 2003 | $222,442 | - | 80,000 | - |
| | 2002 | $143,653 | - | 112,000 | - |
| | 2001 | $159,231 | $7,686 | 145,000 | - |
| | 2000 | $120,000 | $20,000 | 30,743 | $46,022 |
| | 1999 | $18,000 | - | 75,000 | - |

Farjood sold 85,000 of his personally held shares for $1,183,100 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Farjood is a citizen of California.

49.     Pursuant to this Court's March 20, 2007 order dismissing defendant Jacobsen for lack of personal jurisdiction in connection with the improper financial reporting and accounting claims, defendant Jacobsen is named as a defendant in this action in connection with plaintiffs' claims arising from the illegal backdating and springloading of WFI stock options.  Because this Court has specific personal jurisdiction over this defendant in connection with plaintiffs' backdating and springloading claims it is reasonable to compel defendant Jacobson to answer plaintiffs' remaining claims.  Defendant Jacobsen was WFI's Executive Vice President, Business Development & Sales, Marketing and Outsourcing in 2003.  Jacobsen was also President of the Outsourcing business unit from August 2002 to March 2003.  Because of Jacobsen's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.   Jacobsen received at least 60,000 options that were dated at or very close to the lowest stock price for the month during which options were granted. Accordingly, on information and belief, plaintiffs allege that Jacobsen backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.   WFI paid Jacobsen the following compensation:

| Defendant | Fiscal Year | Salary | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| Jacobsen | 2003 | $214,596 | 60,000 | $478,200 |

- 23 -

2002      $120,000          200,000                    -

Jacobsen sold 55,000 of his personally held shares for $721,824.45 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Jacobsen is a citizen of Colorado.

50.    Defendant Garrison was WFI's Secretary from December 2002 to at least 2004. Garrison was also Associate General Counsel from June 2000 to at least 2004.  Because of Garrison's positions, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  At times relevant, Garrison participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Garrison's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Garrison received at least 72,781 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Garrison backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  Garrison sold 50,000 of his personally held shares for $563,020 in proceeds while in possession of material, non-public information concerning the illegally undisclosed backdating stock option grant practices.  Garrison is a citizen of California.

51.    Defendant Daniel G. Stokely ("Stokely") was WFI's Corporate Controller and Vice President from August 2001 to at least September 2004.  Stokely was interim CFO from about December 2003 to March 2004.  Because of Stokely's positions, he knew the adverse non-public information about the business of WFI,  specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as

- 24 -

well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  At times relevant, Stokely participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Stokely's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Stokely is a citizen of California.

52.     Defendant Bradford Weller ("Weller") was WFI's General Counsel and Vice President of Legal Affairs from September 1999 to August 2002.  Weller was also Secretary from September 2000 to August 2002.  Because of Weller's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Because of Weller's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Weller received at least 64,680 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Weller backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  Additionally, defendant Weller received 19,400 springloaded options timed immediately before the release of positive-previously-undisclosed material information.  WFI paid Weller the following compensation:

| Defendant | Fiscal Year | Salary | Bonus |
|-----------|-------------|--------|-------|
| Weller | 2001 | $172,000 | $7,686 |

- 25 -

|      | 2000 | $154,654 | - |
|------|------|----------|---|
|      | 1999 | $43,077  | - |

Weller is a citizen of California.

53.     Defendant Naomi D. Whitacre ("Whitacre") was WFI's Vice President of Human Resources from October 2000 to at least 2002.  Because of Whitacre's position, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith.  Whitacre received at least 165,555 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Whitacre backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  Whitacre is a citizen of California.

54.     Defendant Mazilly was WFI's Senior Vice President, Managing Director of Mexico from December 2001 to at least 2002.  Mazilly was Managing Director of Mexico from October 2000 to December 2001.  Because of Mazilly's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  Mazilly received at least 246,431 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Mazilly backdated these stock options and received illegal compensation from WFI that was not disclosed to the Company's shareholders.  Mazilly is a citizen of Louisiana.

55.     Defendant David Lee ("Lee") was a WFI director from June 2001 to February 2003.  Lee was also a member of the Compensation Committee in 2002.  Because of Lee's

position, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2000-2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant, Lee participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Lee's positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits.  Defendant Lee, at times when he was a member of the Board and Compensation Committee, intentionally approved backdated stock option grants.  Lee is a citizen of California.

56.    Defendant William Arthur Owens ("Owens") was a WFI director from February 2003 to May 2004.  Because of Owens' position, he knew the adverse non-public information about the business of WFI, specifically its failure to record its tax liabilities and its failure to account for up to $25 million in expenses in its 2003 financial reports, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  At times relevant, Owens participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Because of Owens' positions, he also knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known that WFI insiders were improperly backdating and springloading stock option grants to maximize their personal profits. Owens received at least 150,000 options that were dated at or very close to the lowest stock price for the month during which options were granted.  Accordingly, on information and belief, plaintiffs allege that Owens backdated these stock options and received illegal compensation

1   from WFI that was not disclosed to the Company's shareholders.  Defendant Owens, at times

2   when he was a member of the Board, intentionally approved backdated stock option grants.

3   Owens is a citizen of Washington.

4          57.    Defendant Andrew M. Leitch ("Leitch") was a WFI director from April 2005 to

5   May 2006.  Leitch was also a member of the Audit Committee from April 2005 to May 2006.

6   Because of Leitch's positions, he knew, consciously disregarded, was reckless and grossly

7   negligent in not knowing or should have known that WFI insiders were improperly backdating

8   and springloading stock option grants to maximize their personal profits, via access to internal

9   corporate documents, conversations and connections with other corporate officers and

10  employees, attendance at Board meetings and committees thereof and via reports and other

11  information provided to him in connection therewith.  Leitch is a citizen of California.

12         58.    The defendants identified in ¶¶33-35, 39-42, 55-57 are referred to herein as the

13  "Director Defendants."  The defendants identified in ¶¶33-38, 43-54 are referred to herein as the

14  "Officer Defendants."  The defendants identified in ¶¶33-34, 39-41, 43-50 are referred to herein

15  as the "Insider Selling Defendants."  The defendants identified in ¶¶36, 43-50, 52-54, 56 are

16  collectively referred to as the "Options Recipient Defendants."  Collectively, the Director

17  Defendants, the Officer Defendants, the Options Recipient Defendants and the Insider Selling

18  Defendants are referred to herein as the "Individual Defendants."

19                     **DUTIES OF THE INDIVIDUAL DEFENDANTS**

20         59.    By reason of their positions as officers, directors and/or fiduciaries of WFI and

21  because of their ability to control the business and corporate affairs of WFI, the Individual

22  Defendants owed WFI and its shareholders fiduciary obligations of trust, loyalty, good faith and

23  due care, and were and are required to use their utmost ability to control and manage WFI in a

24  fair, just, honest and equitable manner.  The Individual Defendants were and are required to act

25  in furtherance of the best interests of WFI and its shareholders so as to benefit all shareholders

26  equally and not in furtherance of their personal interest or benefit.

27         60.    Each director and officer of the Company owes to WFI and its shareholders the

28  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to WFI's officers, directors and employees—including stock option compensation—and the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

61.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of WFI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.   Because of their advisory, executive, managerial and directorial positions with WFI, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of WFI.

62.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of WFI, and was at all times acting within the course and scope of such agency.

63.    To discharge their duties, the officers and directors of WFI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of WFI were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    (c)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (d)  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    (e)  ensure that WFI was properly handling its tax liabilities;

    (f)  ensure that WFI's internal controls were sufficient to prevent backdating, springloading or other manipulations of stock options granted to WFI insiders;

    (g)  remain informed as to how WFI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    (h)  ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

  64.  Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of WFI, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of

the Company at times relevant has been ratified by the remaining Individual Defendants who collectively comprised all of WFI's Board at times relevant.

**THE BOARD AND ITS COMMITTEES' DUTIES CONCERNING WFI'S STOCK OPTION PLANS AND OPTION GRANT PRACTICES**

65. The granting of stock options to WFI insiders, at times relevant hereto, was controlled by three stock options plans: (i) the Wireless Facilities, Inc. 1997 Stock Option Plan ("1997 Plan"); (ii) the Wireless Facilities, Inc. 1999 Equity Incentive Plan ("1999 Plan"); and (iii) the Wireless Facilities, Inc. 2000 Nonstatutory Stock Option Plan ("2000 Plan"). Each of these plans contained restrictions on the exercise price of options granted under the plans.

**The 1997 Plan**

66. The 1997 Plan provides that "the exercise price of each Incentive Stock Option shall be not less than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option on the date such Option is granted, (ii) the exercise price of each Nonstatutory Stock Option shall be not less than eighty-five percent (85%) of the Fair Market Value of the Common Stock subject to the Option on the date such Option is granted …."

67. The 1997 Plan was administered by the Board and/or Compensation Committee. The 1997 Plan specifically provides that "[t]he Plan shall be administered by the Board unless and until the Board delegates administration to a Committee …."

68. The Board had the following authority and responsibility under the 1997 Plan:

> (i) To determine from time to time (A) *which of the persons* eligible under the Plan shall be granted Options, (B) *when and how* the Options shall be granted, (C) whether an Option will be an Incentive Stock Option or a Nonstatutory Stock Option, (D) the provisions of each Option granted (which need not be identical), including the time or times such Option may be exercised in whole or in part, and (E) the *number of shares* for which an Option shall be granted to each such person.

> (ii) To *construe and interpret* the Plan and Options granted under it, and to establish, amend and revoke rules and regulations for the Plan's administration. The Board, in the exercise of its power, may correct any defect, omission or inconsistency in the Plan or in any Option Agreement in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

**The 1999 Plan**

69.    The 1999 Plan provides that "the exercise price of each Incentive Stock Option shall be not less than one hundred percent (100%) of the Fair Market Value of the stock subject to the Option on the date the Option is granted."  As to nonstatutory stock option, the 1999 Plan provides that "[t]he exercise price of each Nonstatutory Stock Option shall be not less than eighty-five percent (85%) of the Fair Market Value of the stock subject to the Option on the date the Option is granted."

70.    The 1994 Plan was administered by the Board and/or Compensation Committee. The 1999 Plan specifically provides that:"[t]he Board will administer the Plan unless and until the Board delegates administration to a Committee …."

71.    The Board had the following authority and responsibility under the 1999 Plan:

> (i)    To determine from time to time: **which of the persons** eligible under the Plan shall be granted Stock Awards; **when and how** each Stock Award shall be granted; what type or combination of types of Stock Award shall be granted; the provisions of each Stock Award granted (which need not be identical), including the time or times when a person shall be permitted to receive stock pursuant to a Stock Award; and the **number of shares** with respect to which a Stock Award shall be granted to each such person.

> (ii)    To **construe and interpret** the Plan and Stock Awards granted under it, and to establish, amend and revoke rules and regulations for its administration. The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Stock Award Agreement, in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

**The 2000 Plan**

72.    The 2000 Plan provides that "[t]he exercise price of each Nonstatutory Stock Option shall be not less than eighty-five percent (85%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted."

73.    The 2000 Plan was administered by the Board and/or Compensation Committee. The 2000 Plan specifically provides that "[t]he Board shall administer the Plan unless and until the Board delegates administration to a Committee …."

74.    The Board and/or Compensation Committee had the following authority under the 2000 Plan:

- 32 -

(i)     To determine from time to time **which of the persons** eligible under the Plan shall be granted Options; **when and how** each Option shall be granted; what type or combination of types of Option shall be granted; the provisions of each Option granted (which need not be identical), including the time or times when a person shall be permitted to receive Common Stock pursuant to an Option; and the number of shares of Common Stock with respect to which an Option shall be granted to each such person.

(ii)     To **construe and interpret** the Plan and Options granted under it, and to establish, amend and revoke rules and regulations for its administration. The Board, in the exercise of this power, may correct any defect, omission or inconsistency in the Plan or in any Option Agreement, in a manner and to the extent it shall deem necessary or expedient to make the Plan fully effective.

### The Compensation Committee's Duties

75.     The Compensation Committee was specifically responsible for approving stock options grants to WFI's executives and directors.  This duty was specifically stated in WFI's 2003 annual proxy: "The Compensation Committee approves the compensation of the Company's officers, administers the **1997 Stock Option Plan**, **the 1999 Equity Incentive Plan**, **the 2000 Non-Qualified Stock Option Plan,** and the Employee Stock Purchase Plan, and has overall responsibility for the Company's compensation policies for senior management."

### The Audit Committee's Duties

76.     The Audit Committee also played a role.  According to WFI's 2003 annual proxy: "The Audit Committee ... review[s] ... and discuss[es] … procedures in connection with audit and financial controls; and reviews compliance with all corporate policies that have been approved by the Board of Directors …."  WFI's internal controls, however, were deficient and its corporate polices were not being complied with as demonstrated by defendants' repeated grants of stock options to themselves at monthly and close to monthly share price lows, as well as WFI's improper accounting and financial reporting.

77.     According to the Charter of the Audit Committee contained in the Proxy Statement filed with the SEC on April 26, 2004:

The primary purpose of the Committee is to oversee the accounting and financial reporting processes of the Company ... and review[] and report[] to the Board on the integrity of the financial reports and other financial information provided by the Company to any governmental body or to the public, and on the Company's compliance with legal and regulatory requirements as they may relate to the Company's external direct and indirect financial reporting requirements.

- 33 -

> The Committee shall also ... review the performance of the Company's internal audit controls and prepare any reports required of the Committee under rules of the Securities and Exchange Commission ("SEC").

78.     For FY:00, the Audit Committee was composed of defendants Carano, Anderson and Jarvis.  The Audit Committee met five times in FY:00.  For FY:01, the Audit Committee was composed of defendants Carano, Hoglund, Anderson and Jarvis.  In FY:01 defendant Carano resigned effective February 16, 2001 with defendant Hoglund being appointed effective the same day.  For FY:01 the Audit Committee met five times with each member attending 75% or more of the aggregate number of meetings.  For FY:02, the Audit Committee was composed of defendants Hoglund, Anderson and Jarvis and met eight times with each member attending 75% or more of the aggregate number of meetings.  In FY:03 defendant Hoglund was designated the Audit Committee financial expert.

79.     The most glaring and unambiguous result of at least eighteen Audit Committee meetings during the FY:00-FY:02, is that defendants Carano, Hoglund, Anderson and Jarvis failed to competently execute the duties which they were elected to carry out as the Company's Audit Committee.  Defendant Hoglund as the designated financial expert, consciously and intentionally disregarded his duties to oversee the accuracy and integrity of the Company's financial reports and other financial information as well as prevent the authorization of illegally backdated and springloaded stock options. The requirement of restating four years of financial reports and the prevalence of defendants' backdated and springloaded options, does not reflect having a properly controlled environment with adequate supervisory activities and monitoring techniques. In addition, the Individual Defendants caused the Company to pay its outside auditing firm, KPMG LLP, over $1.9 million at times relevant for audit fees and "audit related fees," reviewing the Company's interim consolidated financial statements including its quarterly reports in connection with statutory and regulatory filings or engagements.

### The Board and its Committees Violated WFI's Stock Option Plans

80.     Defendants' backdated stock options were granted below fair market value in the case of incentive options and below 85% of fair market value in the case of non-statutory stock options.  Thus, the Board and Compensation Committee members who had the authority and

1   responsibility to approve the backdated option grants violated the 1997, 1999 and 2000 Plans.

2   Further, defendants' backdating practices resulted in truncated stock-option vesting periods—a

3   further violation of these plans.  In turn, because the plans were violated, the backdated options

4   granted under these plans must be cancelled and declared void.

5       81.     Accordingly, defendants Jarvis, Anderson, Carano, Hoglund, M.K. Tayebi, M.

6   Tayebi, Lee and Owens, who were directors on the Board or members of the Compensation and

7   Audit Committees between 1998 and 2003 were directly responsible for the stock-option

8   backdating improprieties.  Thus, these defendants are just as liable to WFI as the defendants who

9   received backdated options.  The following chart details the defendants who held positions on

10  the Board, Compensation and Audit Committees when WFI granted stock options that were

11  suspiciously dated at or near monthly low stock prices or before significant appreciations in

12  stock price:

| Suspicious Options Grant Date | Compensation Committee Members | Audit Committee Members | Members of the Board |
|---|---|---|---|
| December 1, 2000[1] | Carano, Anderson, Jarvis | Anderson, Jarvis | Anderson, Carano, Jarvis, M. Tayebi, M.K. Tayebi |
| April 5, 2001 | Jarvis, Anderson | Anderson, Hoglund, Jarvis | Anderson, Hoglund Jarvis, M. Tayebi, M.K. Tayebi, Carano |
| July 11, 2001 | Jarvis, Anderson, Lee | Anderson, Hoglund, Jarvis | Anderson, Hoglund Jarvis, Lee, M. Tayebi, M.K. Tayebi |
| October 1, 2001 | Jarvis, Anderson, Lee | Anderson, Hoglund, Jarvis | Anderson, Hoglund Jarvis, Lee, M. Tayebi, M.K. Tayebi |
| April 30, 2002 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis, Lee, M.K. Tayebi |
| February 12, 2003 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis, M.K. Tayebi, Owens |
| March 31, 2003 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis, M.K. Tayebi, Owens |

---

[1]  WFI has not disclosed the membership of the Board or its committees before 2000 because the Company has only been publicly traded since November 1999.

82.     The Director Defendants who joined the Board after 2003 are also liable to the Company for their improprieties in connection with concealing or failing to uncover defendants' illegal backdating practices.  These defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing and should have known about the illegal backdating practices due to their fiduciary duties outlined above.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

83.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

84.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) conceal that the fact that Company insiders were improperly backdating and springloading their stock option grants; (iii) conceal the fact that as a result of the improperly backdated and springloaded stock options grants, the Company's financial statements were inaccurate; (iv) maintain the Individual Defendants' executive and directorial positions at WFI and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; (v) dispose of **_over $123 million_** in inflated stock at times relevant to the improper financial reporting, accounting and illegal backdating and springloading; and (vi) deceive the investing public, including shareholders of WFI, regarding the Individual Defendants' management of WFI's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants at times relevant.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

85.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct. At times relevant, the Individual Defendants caused the Company to conceal the true fact that WFI was misrepresenting its financial results and that WFI insiders were improperly backdating their stock option grants.

86.     In addition, defendants also made, or caused to be made, other specific, false statements about WFI's financial performance and future business prospects, as alleged herein.

87.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the California Corporations Code; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of WFI common stock so they could: (i) dispose of *over $123 million* of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; (iii) use the artificially inflated Company stock to complete a $45 million private placement and obtain a $100 million credit facility; and (iv) backdate and springload stock options at the Company's expense to obtain illicit profits.

88.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that

1  wrongdoing, and was aware of his or her overall contribution to and furtherance of the

2  wrongdoing.

3

4  **THE INDIVIDUAL DEFENDANTS CAUSED OR ALLOWED WFI TO ENGAGE IN
   IMPROPER FINANCIAL REPORTING AND ACCOUNTING**

5  **Background**

6  90.   At times relevant, the Individual Defendants were experiencing a tremendously

7  difficult time making the Company profitable despite the fact the wireless telecommunications

8  industry was going through a period of rapid growth.  The Company was faced with a weakening

9  economy, tightening capital markets and fierce competition.  Technological innovations and the

10  requirement for constant upgrades and future compatibility issues with networks also contributed

11  to the difficulty in maintaining the Company's financial health and attractiveness to investors.

12  **Improper Statements Concerning WFI's Financial Results**

13  91.   On April 26, 2000, the Individual Defendants caused or allowed the Company to

14  issue a press release titled "Wireless Facilities Reports Record First Quarter Revenue and Profit;

15  WFI Delivers 188 Percent Revenue Growth."  The press release stated in part:

16  Wireless Facilities, Inc., a global leader in the design, deployment and
17  management of wireless telecommunications networks, today reported record
    revenues and earnings for its first quarter ended March 31, 2000.

18  Revenue for the quarter increased 188 percent to a record $43.3 million,
19  compared to $15.0 million in the first quarter of 1999.  Revenue growth reflects
    continued strong worldwide demand for mobile voice and personal
20  communications services (PCS) as well as increased capital investment by
    network operators and equipment suppliers to establish Wireless Facilities data
21  networks.

22  Net income for the quarter rose 267 percent to a record $5.8 million, or
    $0.12 per diluted share, compared to $1.6 million in net income, or $0.05 per
23  diluted share in the corresponding quarter a year ago.  The number of shares used
    in the calculation of Earnings Per Share in the current period increased 54 percent
24  from the first quarter of 1999.  Also, the impact of goodwill from acquisitions was
    approximately two cents per share.  Without goodwill, the Company would have
25  reported $0.14 per share in the first quarter.

26  92.   On July 26, 2000, the Individual Defendants caused the Company to issue a press

27  release titled "Wireless Facilities Reports Record Second Quarter Revenue and Profit; Quarterly

28  Revenue Increased 229 Percent to $59.4 Million."  The press release stated in part:

- 38 -

Wireless Facilities Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced outstanding financial results with record revenues and earnings reported for the second quarter and six months ended June 30, 2000.

Revenue for the second quarter increased 229 percent to a record $59.4 million, compared to $18.1 million in the second quarter of 1999. Sequentially, revenue grew 37 percent over the company's first quarter of 2000. Revenue growth continues to reflect very strong worldwide demand for mobile voice and personal communications services as well as increased capital investment by network operators and equipment suppliers to establish Wireless Facilities Internet and broadband networks.

Excluding the effects of goodwill charges related to acquisitions, net income, rose 632 percent to a record $9.3 million, or $0.18 per diluted share, compared to net income of $1.3 million, or $0.04 per diluted share in the corresponding quarter a year ago. The number of shares used in the calculation of earnings per diluted share in the current period increased 52 percent from the second quarter of 1999.

93. On October 25, 2000, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Record Third Quarter Revenue and Profit; Quarterly Revenue Increases 207 Percent to $73.1 Million." The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results with record revenues and record earnings reported for the third quarter and nine months ended September 30, 2000.

Revenue for the third quarter increased 207 percent to $73.1 million, compared to $23.8 million in the third quarter of 1999. Sequentially, revenue grew 23 percent over the Company's second quarter of 2000. Revenue growth continues to reflect strong worldwide demand for mobile voice, personal communications services, mobile wireless Internet access and fixed broadband networks.

Excluding the effects of goodwill and other charges related to acquisitions, net income rose 238 percent to $10.8 million, or $0.21 per diluted share, compared to net income of $3.2 million, or $0.10 per diluted share in the corresponding quarter a year ago.

94. On February 14, 2001, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Record Fourth Quarter Revenue and Profit; Quarterly Revenue Increases 124 Percent to $80.1 Million." The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results for the fourth quarter and fiscal year ended December 31, 2000.

- 39 -

Revenue for the fourth quarter increased 124 percent to $80.1 million, compared to $35.8 million in the fourth quarter of 1999.  Excluding the effects of goodwill and other charges related to acquisitions, net income rose 164 percent to $12.1 million, or $0.24 per diluted share, compared to net income of $4.6 million, or $0.11 per diluted share, in the corresponding quarter a year ago.

For the full year, revenues rose 176 percent to $255.9 million, compared to $92.7 million in 1999.  Excluding the effects of goodwill and other charges related to acquisitions, net income increased 251 percent to $38.9 million, or $0.77 per diluted share, compared to net income of $11.1 million, or $0.31 per share, for the full year in 1999.

"We are pleased to report our fifth consecutive quarter of increased revenues and earnings since our initial public offering in November of 1999," said Thomas Munro, President of WFI. "Our financial performance this past year was driven by strong demand for our planning and deployment offerings for voice and data services and the excellent execution of our plan by our worldwide employee team."

95.     On May 9, 2001, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports First Quarter."  The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results for its first quarter ended March 31, 2001.

Revenue for the first quarter increased 22 percent to $52.7 million, compared to $43.3 million in the first quarter of 2000, but declined sequentially from the fourth quarter of 2000.  Quarterly revenue was impacted by a global slowdown in wireless telecommunications spending.

Excluding the effects of goodwill and other charges related to acquisitions, net loss for the quarter totaled $4.9 million, or $0.11 per diluted share, compared to net income of $6.7 million, or $0.14 per diluted share, in the corresponding quarter a year ago.  The quarterly loss includes pre-tax charges of $4.6 million for losses related to a single broadband wireless customer that filed for bankruptcy protection.  Excluding this charge and excluding the effects of goodwill and other charges related to acquisitions, the Company would have reported a net loss of $3.3 million, or $0.07 per diluted share.

96.     On August 8, 2001, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Results for Second Quarter 2001; Revenue Improves 4% Sequentially from First Quarter 2001; Gross Profit Margin Improves to 41% of Revenues from 26% in Q1 01; Pro Forma EBITDA Improves to $1.7 Million Compared to ($18.0) Million in Q1 01."  The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results for the second quarter and six months ended June 30, 2001.

Revenue for the second quarter increased sequentially by four percent from the first quarter of 2001 to $54.7 million, but decreased eight percent compared to the $59.4 million reported in the second quarter of 2000. The increase in sequential quarterly revenue reflects increases in both the Company's domestic and international operations.

The net reported loss for the second quarter totaled $38.3 million, or $0.87 per diluted share. Financial results for the second quarter include a number of unusual charges, a change in the effective tax rate and amortization of goodwill and other charges related to acquisitions. Excluding the effects of these charges and the change in effective tax rate, net income would have been $1.8 million, or $0.04 per diluted share compared to a net loss of $4.9 million, or $0.11 per diluted share in the first quarter of 2001.

97. On November 7, 2001, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Results for Third Quarter 2001; Revenue of $54.8 Million in Line with Q2; Net Cash Positive Quarter; EBITDA Improves 53% to $2.6 Million Compared to Pro Forma 2Q 01." The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results for the third quarter and nine months ended September 30, 2001.

Revenue for the third quarter totaled $54.8 million, an increase of $0.1 million sequentially from the second quarter of 2001, but a decrease of 25 percent compared to the $73.1 million reported in the third quarter of 2000.

Excluding the effects of amortization of goodwill and intangibles, net income was $0.8 million, or $0.02 per diluted share, compared to pro forma net income of $1.8 million, or $0.04 per diluted share, in the second quarter of 2001. Pro forma net income in the second quarter excluded a number of unusual charges, which were highlighted in the Company's second quarter press release. There were no unusual charges in the third quarter.

98. On February 13, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Results for Fourth Quarter 2001." The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today announced financial results for the fourth quarter and full year ended December 31, 2001.

Revenue for the fourth quarter totaled $45.0 million, a decrease of 18 percent compared to the $54.8 million reported in the third quarter of 2001 and a decrease of 44 percent compared to the $80.1 million reported in the fourth quarter of 2000.

Including charges for amortization of goodwill and other intangibles resulting from prior acquisitions ($3.3 million), severance costs ($1.5 million) and a revision in the annual effective tax rate ($4.4 million), the reported net loss for the fourth quarter totaled $10.4 million, or $0.22 per diluted share.

- 41 -

99.    On May 8, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Results for First Quarter 2002."  The press release stated in part:

> Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today released financial results for the first quarter ended March 31, 2002.
>
> The results for first quarter 2002 reflect the continued weakness in the telecommunications market, specifically the level of Wireless Facilities telecom infrastructure spending during the quarter.  During this period, the Company experienced a continuation of customer slowdowns and project scope reductions and postponements related to Wireless Facilities network deployment, which were highlighted in its recent Annual Report on Form 10-K filed with the SEC on March 19, 2002.
>
> As announced on April 30, 2002, the Company's revenue for the first quarter totaled $40.1 million, a decrease of 11 percent compared to the $45.0 million reported in the fourth quarter of 2001, and a decrease of 24 percent compared to the $52.7 million reported in the first quarter of 2001.

100.    On August 7, 2002, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Strong Results for Second Quarter 2002."  The press release stated in part:

> Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today released financial results for the second quarter and six months ended June 30, 2002.
>
> Revenue for the second quarter totaled $46.8 million, an increase of 17 percent compared to the $40.1 million reported in the first quarter of 2002 and a decrease of 14 percent compared to the $54.7 million reported in the second quarter of 2001.
>
> Reported net income for the second quarter of 2002 was $2.2 million, or $0.04 per diluted share, compared to a reported net loss of $71.7 million, or $1.52 per diluted share, for the first quarter of 2002, and a reported net loss of $38.3 million, or $0.87 per diluted share, for the second quarter of 2001.  Had Statement of Financial Accounting Standards (SFAS) 142 been adopted in the prior year, net loss and net loss per diluted share would have been $36.0 million and $0.82, respectively, reflecting the exclusion of amortization of goodwill and indefinite lived intangibles.

101.    On November 6, 2002, the Individual Defendants caused the Company to issue a press release titled "Wireless Facilities Reports Solid Results for Third Quarter 2002; Revenue up 5%; Sequential Profitability; Continued Strong Cash Flow from Operations; Cash and Cash Equivalents Increased to $83 million."  The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today released financial results for the third quarter and nine months ended September 30, 2002.

Revenue for the third quarter totaled $49.1 million, an increase of 5 percent compared to the $46.8 million reported in the second quarter of 2002 and a decrease of 10 percent compared to the $54.8 million reported in the third quarter of 2001.

Net income reported for the third quarter of 2002 was $2.5 million, or $0.04 per diluted share, compared to net income of $2.2 million, or $0.04 per diluted share in the second quarter of 2002, and net loss of $2.9 million, or $0.06 per diluted share, for the third quarter of 2001.  If Statement of Financial Accounting Standards (SFAS) 142 had been adopted at the beginning of 2001, the "As Adjusted" prior year third quarter net loss and net loss per diluted share would have been $0.8 million and $0.02, respectively, reflecting the exclusion of amortization expense related to goodwill and indefinite life intangible assets.

102.   On February 12, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports the 3rd Consecutive Quarterly Increase in Revenue and Net Income; Net Income up 24%; Cash and Cash Equivalents Increased to $99.1 million."  The press release stated in part:

Wireless Facilities, Inc. a global leader in the design, deployment and management of wireless telecommunications networks, today released financial results for the fourth quarter and full year ended December 31, 2002.

Revenue for the fourth quarter of 2002 totaled $51.0 million, an increase of 3.9 percent compared to the $49.1 million reported in the third quarter of 2002 and an increase of 13.3 percent compared to the $45.0 million reported in the fourth quarter of 2001.

Net income reported for the fourth quarter of 2002 was $3.1 million, or $0.05 per diluted share, compared to net income of $2.5 million, or $0.04 per diluted share in the third quarter of 2002, and net loss of $10.4 million, or $0.22 per share, for the fourth quarter of 2001.

103.   On May 5, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports the 4th Consecutive Quarterly Increase in Revenue and Net Income; Net Income up 29%; Cash and Cash Equivalents Increased to $102.3 Million."  The press release stated in part:

Wireless Facilities, Inc., a global leader in the design, deployment and management of wireless telecommunications networks, today released financial results for the first quarter ended March 31, 2003.

Revenue for the first quarter of 2003 totaled $53.9 million, an increase of 5.7 percent compared to the $51.0 million reported in the fourth quarter of 2002 and an increase of 34.4 percent compared to the $40.1 million reported in the first quarter of 2002.

- 43 -

> Net income for the first quarter of 2003 increased 29.0 percent to $4.0 million, or $0.06 per diluted share, compared to net income of $3.1 million, or $0.05 per diluted share in the fourth quarter of 2002.

104.    On August 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Announces Sequential and Year-Over-Year Increases in Revenue and Net Income."  The press release stated in part:

> Wireless Facilities, Inc., a global leader in the design, deployment, integration and management of wireless telecommunications networks and security systems, today released financial results for the second quarter ended June 30, 2003.
>
> Revenue for the second quarter of 2003 totaled $56.8 million, an increase of 5.4 percent compared to the $53.9 million reported in the first quarter of 2003 and an increase of 21.4 percent compared to the $46.8 million reported in the same quarter last year.
>
> Net income for the second quarter of 2003 increased 20.0 percent to $4.8 million, or $0.07 per diluted share, compared to net income of $4.0 million, or $0.06 per diluted share for the first quarter of 2003.  Net income for the second quarter of 2003 was 118.2% higher than the $2.2 million, or $0.04 per diluted share for the second quarter of 2002.

105.    On October 30, 2003, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities, Inc. Posts Third Quarter Earnings of $0.09 per Diluted Share with Year Over Year Net Income Growth of 164%; Revenue Increased 39.7% Year Over Year to $68.6 Million."  The press release stated in part:

> Wireless Facilities, Inc., a global leader in the design, deployment, integration and management of wireless telecommunications networks and security systems, today released financial results for the third quarter ended September 30, 2003.
>
> Revenue for the third quarter of 2003 totaled $68.6 million, an increase of $19.5 million or 39.7 % compared to the $49.1 million reported in the same quarter last year and an increase of $11.8 million or 20.8 % compared to the $56.8 million reported in the second quarter of 2003.
>
> Net income of $6.6 million for the third quarter of 2003 was 164.0% higher than the $2.5 million for the third quarter of 2002. Net income for the third quarter of 2003 increased $1.8 million or 37.5 % compared to net income of $4.8 million sequentially.

106.    On December 5, 2003, defendant Ashwill, the Company's CFO, abruptly resigned.

107.    On February 19, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Fourth Quarter and Full Year 2003

Results; Fourth Quarter Revenues Reach a Record $82.9 Million; Operating Income Increases 216% to $7.9 Million; EPS Increases 120% to $.11 (diluted)."  The press release stated in part:

> Wireless Facilities, Inc. today reported results for the fourth quarter and full year ending December 31, 2003.
>
> Revenues for the fourth quarter of fiscal 2003 increased 63% to $82.9 million from $51.0 million in the fourth quarter of fiscal 2002.  Operating income increased 216% to $7.9 million from $2.5 million in the fourth quarter of fiscal 2002.  Net income increased 161% to $8.1 million from $3.1 million in the fourth quarter of fiscal 2002, and EPS increased 120% to $.11 (diluted) from $.05 (diluted) in the fourth quarter of fiscal 2002.
>
> For full fiscal year 2003, revenues increased 40% to $262.2 million from $187.0 million in fiscal 2002.  Operating income increased to $22.2 million from a loss of $54.7 million in fiscal 2002.  Net income increased to $23.5 million from a loss of $63.9 million in fiscal 2002, and EPS increased to $.32 (diluted) from a loss per common share of $1.33 (diluted and basic) in fiscal 2002.

108.   On April 27, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports First Quarter Results; First Quarter Revenues Increase 82% to $98.0 Million; EPS Increases 33% to $.08 (diluted)."  The press release stated in part:

> Wireless Facilities, Inc. today reported results for the first quarter of fiscal year 2004.
>
> Revenues for the first quarter of fiscal 2004 increased 82% to $98.0 million from $53.9 million in the first quarter of fiscal 2003.  Operating income increased 106% to $6.6 million from $3.2 million in the first quarter of fiscal 2003.  Net income increased 48% to $5.9 million from $4.0 million in the first quarter of fiscal 2003, and EPS increased 33% to $.08 (diluted) from $.06 (diluted) in the first quarter of fiscal 2003.
>
> Increased revenues in the first quarter of fiscal 2004 were a result of significant increases in WFI's Mexico and European operations, as well as increases in deployment and engineering activities for Western Wireless, Sprint, and T-Mobile in the U.S.  In addition, the acquisitions that created both the enterprise network services and government network services divisions in 2003 and January 2004 contributed to first quarter year over year revenue growth.

### The Truth Begins to Emerge as to WFI's Improper Financial Reporting

109.   On August 4, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Reports Second Quarter Results; Second Quarter Revenues Total $102.3 Million; Adjusted EPS from Continuing Operations of $.10 (Diluted);

1  GAAP EPS of $.02 (Diluted) Including Discontinued Operations and Asset Impairment

2  Charges." The press release stated in part:

> Wireless Facilities, Inc. today reported results for the second quarter of fiscal year 2004. In addition, the Company announced that it intends to restate its financial statements filed on Form 10-K for the years 2000 through 2003 to accrue for certain foreign tax contingencies. The restatement is the result of an extensive analysis by the Company that identified adjustments, which are required to properly state prior period financial statements. The restatement will not affect the Company's reported current year operating results.
>
> Revenues for the second quarter of fiscal 2004 increased 84% to $102.3 million from $55.5 million in the second quarter of fiscal 2003. Increased revenues in the second quarter were the result of significant increases in the Company's international operations as well as increases in activity with Western Wireless, T-Mobile, and Sprint in the US. In addition, the acquisition that created the government network services division in the first quarter of 2004 also contributed to second quarter year over year revenue growth.
>
> Operating income for the second quarter of 2004 was $8.9 million. Adjusted net income from continuing operations, excluding the impact of an investment asset impairment charge of $3.1 million, was $7.3 million and adjusted EPS from continuing operations was $.10 (diluted). Net income from continuing operations including the impact of the asset impairment charge was $4.2 million or $.06 per share (diluted). Net income including the impact of both the asset impairment charge and the discontinued operations charge of $2.5 million was $1.7 million or $.02 per share (diluted).
>
> * * *
>
> The restatement of prior year financial statements is the result of the Company's recent analysis of contingent tax liabilities primarily in foreign jurisdictions. These tax contingencies were generated in prior years and require adjustments to properly state prior year financial statements. The preliminary estimate of the impact of the adjustments is approximately between 3-8% of net income or loss for any given year from 2000 to 2003 for an aggregate increase of expenses of $10 million to $12 million. In addition, the Company intends to consider recording other adjustments related to various financial statement accounts that were identified in prior years but not recorded at the time based on the judgment that such amounts were immaterial. Since the restatement will change the opening balances of certain balance sheet accounts for 2004 and the restatement process is not yet complete, the Company is currently unable to present prior year comparative data. Accordingly, the Company intends to delay the filing of its Form 10-Q for the period ending June 30, 2004 until the amended Form 10-K/A for 2003 is filed. The Company expects to make such filings within two months. All other normal closing procedures have been completed for the quarter ended June 30, 2004. The adjustments referred to in this announcement are preliminary estimates and the Company expects to report final results when it files Form 10-K/A. A detailed description of the restatement and other adjustments and amounts will be contained in the Form 10-K/A.

110. On August 5, 2004, the value of WFI plunged 28% a day after the Company said it would restate four years of financial results. On this day, WFI was one of the most active

1  stocks and among the biggest percentage losers.  First Albany Capital cut its rating on WFI to

2  "neutral" from "strong buy" on near-term uncertainties surrounding the restatements, and slashed

3  its price target to $7 from $18.

4        111.   On August 16, 2004, the Individual Defendants caused or allowed the Company

5  to issue a press release titled "Wireless Facilities Receives Expected Nasdaq Notice Related to

6  Late Filing of Q2 FY 2004 Form 10-Q."  The press release stated in part:

7           As a result of the failure to file the 10-Q, the Company is currently not in
             compliance with the filing requirements for continued listing on NASDAQ as
8           required by NASDAQ Marketplace Rule 4310(c)(14). The Company has
             appealed the delisting notification to the NASDAQ Listings Qualifications Panel
9           and is currently in the appeals process. WFI's securities will remain listed pending
             a decision. In addition, the Company is continuing to work diligently to complete
10          the restatement process and to comply with applicable NASDAQ rules. As a
             result of the Company's intention to file by September 3, the Company expects to
11          become compliant with these rules prior to the completion of the appeals process.

12       112.   On September 7, 2004, the Individual Defendants caused or allowed the Company

13  to issue a press release titled "Wireless Facilities Provides Update on Filing of Second Quarter

14  10-Q and Restated Financials." The press release stated in part:

15          Wireless Facilities Inc. today announced that the Company intends to file its
             restated financial statements and its Form 10-Q for the second quarter of 2004 by
16          the close of business Friday, September 10, 2004. Upon the filing of these
             documents, the Company will request that the Nasdaq declare the delisting notice
17          no longer applicable and terminate the delisting process. The Company
             anticipates that as a result of the termination of the delisting process, the
18          Company will shortly resume trading on the NASDAQ under the WFII ticker
             symbol.
19
         113.   On September 13, 2004, the Individual Defendants caused or allowed the
20
    Company to issue a press release titled "Wireless Facilities Provides Update on Filing of Second
21
    Quarter 10-Q and Restated Financials." The press release stated in part:
22
            Wireless Facilities, Inc. today announced that it has not yet completed the process
23          of restating the Company's financial statements or compiling its Form 10-Q for
             the second quarter of 2004. The Company's financial restatement process has
24          taken longer than expected due to the complexities of compiling and auditing
             information needed to record the identified adjustments primarily related to the
25          years 1999 and 2000. The Company is working to complete the process as
             quickly as possible and believes the process will be completed shortly at which
26          time the restated financials and Form 10-Q for the second quarter of 2004 will be
             filed.
27

28

**The First Restatement**

114.   On September 20, 2004, defendants caused WFI to issue a restatement of its financial statements for the years 2000-2003.  The magnitude of the restatement shocked WFI's shareholders.   Rather than the $10-$12 million restatement which the Company previously estimated on August 4, 2004 regarding its failure to accrue for a contingent foreign tax liability, the restatement included not only approximately $11 million for the foreign tax contingency, but also over $30 million additional accounting errors due to a number of improper accounting practices including but not limited to improper revenue recognition, improper purchase accounting, failure to properly impair investments, and employee stock option compensation expenses.  ***The combination of the restated losses and the anticipated third quarter 2004 charge wiped out every penny of profit recorded by WFI during the prior four reporting years.***

115.   In an analyst report issued by Punk Ziegel & Co. on September 21, 2004, Seth Potter emphasized that the size of the restatement was "significantly larger than our expectations," and that the restated losses and third quarter 2004 charge would "wipe out the profit recorded by WFIIE during the past four years":

> [T]he size of the restatement for the years 2000 to 2003 was significantly larger than our expectations ($42.9 million versus our expectation of $10-$12 million). Furthermore, management indicated that it would record an additional $10-$14 million charge in 3Q04 related to the remaining purchase consideration of previous acquisitions in its enterprise business while the disclosure of additional investments increases our concern regarding management's focus on its core business.
>
> The restatement from 2000 to 2003 totaled $42.9 million consisting of approximately $11 million related to the foreign tax contingency with the remainder due to the combination of asset impairment charges, additional employee option expenses and expense reclassification.
>
> The combination of the restated losses and anticipated 3Q:04 charge will wipe out the profit recorded by WFIIE during the past four years.
>
> We believe that the Company could incur at minimum an additional $1.0 million in legal expenses ... during the next year related to the current class action lawsuits filed.

116.   On September 20, 2004, the Individual Defendants caused or allowed the Company to issue a press release titled "Wireless Facilities Files Second Quarter 10-Q and Restated Financials." The press release stated in part:

- 48 -

Wireless Facilities, Inc. today announced that the Company has filed its restated financial statements and its Form 10-Q for the second quarter of 2004. The Company will now request that the NASDAQ declare the delisting notice no longer applicable and terminate the delisting process. The Company anticipates that as a result of the termination of the delisting process, the Company will shortly resume trading on the NASDAQ under the WFII ticker symbol.

The Company also announced that as part of the restatement process, it learned that certain clauses within the purchase agreements of two of the companies acquired in its Enterprise Network Services business in 2003 require, in accordance with Generally Accepted Accounting Principles (GAAP), that any future earn-out consideration be treated as compensation expense as opposed to additional purchase price consideration. The Company had previously been incorrectly treating additional earn-out consideration as purchase price consideration, reflected as an increase to goodwill as opposed to compensation expense.

The Company is in the process of amending the purchase agreements to more accurately reflect the intent of the acquisition transactions. The amending of these agreements will constitute a triggering event under GAAP which will result in the Company incurring a one time charge in the third quarter for the estimated remaining amount of the contingent purchase consideration based upon the original earn-out provisions. This charge will be a separate line item on the income statement and will reflect an estimate of future earn-out consideration likely to be paid over the next two years. The Company will be performing the estimation calculations over the next few weeks. The Company's preliminary estimate is that charge will total approximately $10 to $14 million. There is no change in the potential additional cash outlays to be made by WFI if these companies achieve their earn-outs, or to the timing of these payments as a result of the modifications to the purchase agreements.

117.    On November 4, 2004, WFI released its results for the third quarter ended September 30, 2004.  WFI's shareholders were again shocked because the third quarter 2004 charge that it previously estimated to be $10-$14 million on September 20, 2004 would actually be *$23.7 million*, approximately double what had been projected.  Approximately $12.4 million was related to future earnout considerations likely to be paid over the next two years for companies in their enterprise division which was acquired in 2003.  The balance was associated with the costs associated with the restatement totaling approximately $1.5 million, as well as just under $10 million in charges identified as a result of improvements in their contract administration and program management processes.

118.    WFI has admitted to the above manipulations which misstated WFI's financial information for 2000-2003 by the following amounts:

| (Millions) | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Revenue as Restated | n/a | 197.4 | 192.1 | 261.0 |

- 49 -

| | | | | |
|---|---|---|---|---|
| Net Income as Originally Reported | 31.8 | (60.1) | (63.9) | 23.5 |
| Adjustment | (9.3) | (9.7) | (9.9) | (14.0) |
| Net Income as Restated | 22.5 | (69.8) | (73.8) | 9.5 |
| (Decrease in % of Net Income)/Increase in % of Net Loss | (29.2%) | 16.1% | 15.5% | (59.6%) |

119.    In fact, WFI has admitted to issuing false financial statements for four out of the first five years it has been a publicly traded company.   In total, WFI's GAAP violations artificially inflated its income for 2000-2003 by $42.9 million. ***The restatement wiped out every penny of profit WFI ever made turning its total loss in net income for 2000-2003 from a $68.7 million loss to a $111.6 million loss.***   A breakdown of WFI's hodge podge accounting machinations is provided below:

| Correcting Entries (millions of $) | 2000[2] | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Foreign tax contingencies | (4.3) | (2.8) | (5.0) | (1.4) |
| Domestic sales and use tax contingencies | n/a | (0.7) | (0.3) | (0.2) |
| Prior year unrecorded adjustments[3] | -- | (3.7) | 3.7 | (0.5) |
| Cost misclassifications and duplicate billings on a particular contract | -- | -- | (0.1) | (1.4) |
| Adjust measurement of progress toward completion | (5.0) | (1.7) | 7.9 | (1.2) |
| Reclassification of bad debt write-off and allowances to revenues[4] | -- | -- | -- | -- |

---

[2]   The restatement also involved the FY:00 financial statements and resulted in FY:00 net income being inflated by $9.3 million.  However, WFI was only required to restate its financial statements for three years under the applicable accounting guidance.  Accordingly, WFI has not provided a break down of the $9.3 million from FY:00.  Therefore, the amounts shown on the charts are approximations based upon the information provided by Wireless in its restatement.

[3]   In addition to the many accounting violations that WFI has admitted to in its restatement, WFI also admitted that it restated its financial statements to correct errors that the Company had identified earlier, but failed to correct as they deemed them to be immaterial at the time of discovery.  These adjustments related to a variety of topics, including period cut-off errors, reclassifications and reconciling differences that impacted asset and liability carrying values, and the timing of revenue recognition. Due to these other items, WFI over-recognized income in FY:01 and FY:03 by $3.7 million and $0.5 million, respectively, and under recognized income in FY:02 by $3.7 million.

[4]   Although this accounting manipulation did not involve a charge to bottom line net income it did result in an overstatement of revenue as WFI improperly classified certain items as expenses rather than a reduction in revenue.  Typically, analysts focus on a company's reported revenues as the most important metric of a company's business prospects.

- 50 -

| | | | | |
|---|---|---|---|---|
| Impairment of cost method investment | -- | (4.1) | -- | -- |
| Stock-based compensation expense | -- | (0.1) | -- | -- |
| Reclassification of purchased intangibles & related amortization expense | -- | -- | -- | (0.8) |
| Impairment of Goodwill | -- | -- | (16.1) | -- |
| Record contingent earn-out as compensation expense | -- | -- | -- | (2.9) |

### Reasons WFI's Financial Reporting Was Improper

120.     In violation of GAAP and SEC Rules, the Individual Defendants caused the Company to falsely report its results for FY:00, FY:01, FY:02 and FY:03 through failing to disclose the following certain material facts *inter alia*:

(a)     the Company failed to properly recognize income tax liabilities related to foreign income tax and domestic sales and use tax contingencies;

(b)     the Company prematurely recognized revenue on fixed-price contracts by unjustifiably using the percentage of completion method when it did not possess sufficient objective evidence to support its estimated percentage of completion;

(c)     the Company prematurely recognized revenue by unjustifiably manipulating costs between different contracts and by duplicating billings;

(d)     the Company improperly overstated its reported revenues by unjustifiably establishing and adjusting its allowance for doubtful accounts;

(e)     the Company improperly recognized revenue when collectibility was not reasonably assured and in some cases when persuasive evidence of an arrangement did not exist—certain contracts ***were not even signed***;

(f)     the Company ignored impairment indicators and failed to impair the carrying value of an investment in a privately-held wireless network planning and development company that was significantly impaired at the time of financing;

(i)     the Company overstated its earnings by improperly capitalizing as goodwill amounts that should have been recognized as compensation expense because the

purchase agreements required continuous employment as a condition of receiving the earn-out amounts;

(j)     the Company overstated its earnings by improperly classifying amounts in connection with its purchase accounting as goodwill instead of recognizing the amounts as intangible assets apart from goodwill that were required to be amortized;

(k)     the Company failed to properly adopt SFAS 142 as of January 1, 2002 by using erroneous assumptions and calculation errors that unjustifiably allowed the Company to recognize approximately $16.1 million that had to be subsequently written-off; and

(l)     the Company failed to recognize the compensation expense related to the stock options granted to certain former employees.

**The Individual Defendants' Mismanagement and Violations of GAAP that Contributed to WFI's Improper Accounting**

121.    The 2000-2003 results were included in WFI's Form 10-Qs and Form 10-Ks filed with the SEC.  Defendants M. Tayebi and Munro signed the 10-Q filed for FY:00.  Defendants M. Tayebi and Ashwill signed the 10-Q for the first quarter of FY:01.  Defendants M.K. Tayebi and Ashwill signed the 10-Q for the second quarter 2001.  M.K. Tayebi and Stokely signed the 10-Qs for the fourth quarter FY:01 until the fourth quarter FY:03.  Defendant DeMarco signed the first and second quarter 10-Q for FY:04.  Defendant DeMarco signed the 10-Q/A for the second quarter 2004.  Defendants M. Tayebi, M.K. Tayebi, Anderson, Carano and Jarvis signed the 10-K for FY:00.  Defendants M. Tayebi, M.K. Tayebi, Ashwill, Anderson, Carano, Jarvis and Hoglund singed the 10-K for the FY:01.  Defendants M.K. Tayebi, Ashwill, Stokely, Anderson, Carano, Jarvis, Hoglund and Lee signed the 10-K's for FY:02.  Defendants M.K. Tayebi, Ashwill, Garrison, Stokely, Anderson, Carano, Jarvis, Hoglund and Owens signed the 10-K for the FY:03.  Defendants DeMarco, M.K. Tayebi, Anderson, Carano, Jarvis and Hoglund signed the 10-K/A filed September 20, 2004. The results were also included in press releases disseminated to the public.

122.    The Individual Defendants caused WFI to admit that it inappropriately failed to record its tax liabilities included in its 2000-2003 results and approximately $10 million of

1   additional expenses relate to these foreign tax contingencies, additional expenses of $25 million

2   related to improper revenue recognition, improper purchase accounting, failure to properly

3   impair investments, and employee stock option compensation expenses.

4        123.   The Individual Defendants caused WFI to include its false financial statements

5   and results in press releases and in its SEC filings.  The SEC filings represented that the financial

6   information presented therein was a fair statement of WFI's financial results and that the results

7   were prepared in accordance with GAAP. These representations were false and misleading as to

8   the financial information reported, as such financial information was not prepared in conformity

9   with GAAP, nor was the financial information a "fair representation" of WFI's' financial

10  condition and operations, causing the financial results to be presented in violation of GAAP and

11  SEC rules.

12       124.   GAAP are those principles recognized by the accounting profession as the

13  conventions, rules and procedures necessary to define accepted accounting practice at a

14  particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements

15  filed with the SEC which are not prepared in compliance with GAAP are presumed to be

16  misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that

17  interim financial statements must also comply with GAAP, with the exception that interim

18  financial statements need not include disclosure which would be duplicative of disclosures

19  accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

20       125.   Defendants, who were responsible for making sure WFI's financial reports were

21  in compliance with GAAP, had several "red flags" which should have notified them that

22  accounting improprieties were running rampant throughout the Company.

23                     **Tax Liability Accounting Improprieties**

24       126.   Pursuant to GAAP, as set forth in SFAS No. 109, which describes the accounting

25  for income taxes, current tax liability should be recognized for estimated federal, foreign, state

26  and local income taxes payable for the current year, adjusted for temporary differences.

27       127.   At times relevant, WFI improperly failed to record contingent tax liabilities,

28  primarily foreign taxes, understating its tax liability in violation of GAAP.

- 53 -

128.    It has been alleged that senior management was aware of their foreign tax obligations in 2001.  Rather than have the Company pay its tax obligations, however, defendants decided to conceal this information from the investing public in order to hide the effect of the market crash, cash flow problems and to hold the stock price up so the Insider Selling Defendants could unload **over $123 million** of their WFI stock.

129.    The fact that WFI restated its financial statements for the 2000-2003 is an admission that the financial statements originally issued were false and that the overstatement of revenues and income was material.  Pursuant to GAAP, as set forth in APB No. 20, the type of restatement announced by WFI was to correct for material errors in its previously issued financial statements.  *See* APB No. 20, 7-13.  The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20, 14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances, i.e., when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements.  WFI's restatement was not due to a change in reporting entity or a change in accounting principle, but rather to errors in previously issued financial statements.  Thus, the restatement is an admission by WFI that its previously issued financial results and its public statements regarding those results were false.

**Improper Revenue Recognition**

130.    One method of recognizing revenue under a long-term contract under GAAP is the percentage of completion method of accounting, as set forth in American Institute of Certified Public Accountants ("AICPA") Statement of Position 81-1 ("SOP 81-1"), titled *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*. Under this method, revenue from a contract is recognized as a contract progresses based on the ratio of total costs incurred to date compared to estimated total costs to complete the contract. The Individual Defendants caused WFI to use this method for its fixed price contracts.

131.    Done properly, percentage of completion accounting records revenue as it is earned, which is a fundamental requirement under GAAP.  In a contract involving multiple deliverables or elements, as set forth in SEC Staff Accounting Bulletin ("SAB") 101, titled *Revenue Recognition in Financial Statements*, as revised by SAB 104, revenue is recognized when it is realized or realizable and earned.  Revenue is recognized when services are rendered at contracted labor rates, when materials are delivered and when other direct costs are incurred. The Individual Defendants caused WFI to use this method for its time and materials contracts.

132.    Here, the Individual Defendants caused WFI to admit it improperly recognizing revenue by classifying items as costs incurred in connection with these two contracts, and by double-billing a customer for separate contracts.  These actions caused WFI to prematurely recognize revenue.

133.    The Individual Defendants also caused the Company to improperly recognize revenue using the percentage of completion revenue recognition method.  This method requires supporting documentation and a basis for estimating collectibility.  For example, the Company had a contract with Siemens to perform work in Brazil, however, Siemens did not timely pay for that work.  Nevertheless, the Company booked revenue on this contract on the percentage of completion revenue recognition method despite the lack of payment and the knowledge that such payment was unlikely.

134.    It has been alleged that defendant M.K. Tayebi ***knew revenue*** from the Siemens contract was being ***improperly booked*** and that Siemens' delinquent payments were discussed with defendant M.K. Tayebi, defendant Stokely, and others during a number of conference calls which were held monthly to discuss and review the numbers for the Brazilian operation, as well as other activities in Mexico and Latin America.

135.    Moreover, it has been alleged that defendants frequently recognized revenue even when there was no signed contract with the customer and also that WFI frequently performed work, billed customers and booked revenue even though it had never received signed contracts from the customers.  Under GAAP, it is blatantly improper to recognize revenue on an unsigned contract because there no evidence of an arrangement.  In addition, it has been alleged that rather

- 55 -

1  than write-off uncollectible receivables, the defendants would typically show them as current

2  receivables for as long as a year before actually writing them off. [5]

3       136.    The Individual Defendants caused WFI to now admit that at times relevant it

4  improperly calculated revenue under two of its contracts by $1.5 million.   The Company's

5  Amended Form 10-K filed on September 20, 2004 stated in part:

6          ***A correction was necessary to adjust improper cost classifications between two***
7          ***particular contracts for the same customer*** that changed the percentage of
        completion computation on a fixed price contract and the cost incurred on a time
8          and expense contract, all of which required the Company to record revenue and
        profit reductions in 2003. ***Additionally, duplicate billing errors were corrected***
9          ***on this contract*** at the end of 2002 and 2003.

10                **Additional Percentage of Completion Accounting Improprieties**

11       137.    The Individual Defendants also caused WFI to improperly recorded revenue

12  under the percentage of completion method of accounting even though it did not have adequate

13  support for estimates, which is a prerequisite for using the percentage of completion method.

14       138.    GAAP, as set forth in SOP 81-1, states that the percentage of completion method

15  of accounting may only be used when an entity is able to make reasonably dependable estimates

16  as to total revenues, total costs and the extent of progress toward completion.   SOP 81-1.23.

17  Where an entity cannot make reasonable estimates it should use the completed contract method

18  of accounting, where income is recorded once the contract has been completed.   SOP 81-1.25

19  states in part:

20          An entity using the percentage-of-completion method as its basic accounting
21          policy should use the completed-contract method for a single contract or a group
        of contracts for which reasonably dependable estimates cannot be made or for

---

22  [5]  Even in cases where WFI actually had signed contracts, those contracts were still suspect.  It has
23  also been alleged that defendants engaged in certain deals in Mexico with companies that had
connections to the Tayebis even though these deals did not always result in WFI getting the best
24  terms, and even when WFI personnel were being fired in Mexico because there was not enough work
to keep them employed.  Specifically, WFI used JFR Business Corporation International S. De R.L.
de C.V. and JFR de Brasil Ltda. (collectively "JFR") to do some of these deals.  Rosio de los Cobos,
25  Jay Tayebi's girlfriend, was a principal in JFR, and Jay Tayebi holds a majority ownership in JFR.
Jay Tayebi is a brother of M.K Tayebi and M. Tayebi.  It has further been alleged that WFI "had no
26  choice" but to use JFR for certain technical work, even though JFR charged WFI "too much for the
services rendered."  Further, it has been alleged that in some instances JFR charged WFI for services
27  that had not been performed and for JFR's payroll for personnel who were not even working on
projects for WFI yet defendants nevertheless paid for these services and personnel given the special
28  relationship JFR enjoyed as a result of Jay Tayebi.

1  which inherent hazards make estimates doubtful.  Such a departure from the basis policy should be disclosed.

2  139.  The Individual Defendants caused WFI to now admit that it did not have the

3  ability to make reasonable estimates of the components for which it recognized revenue under

4  the percentage of completion method, such that it should have used the completed contract

5  method.  The effect of the restatement for this GAAP violation of overstating income from this

6  contract in 2000, 2001 and 2003 by approximately $5.0 million, $1.7 million and $1.2 million,

7  respectively, and under recognized its 2002 income by $7.9 million.  The Company's Amended

8  Form 10-K filed on September 20, 2004 stated in part:

9  A correction was necessary to adjust revenue recognition on a particular fixed price contract in which the measurement of progress toward completion had insufficient documentation or objective evidence in the prior years to support the estimated percentage of completion related to units of work performed as of December 31, 2000.  The application of the unsupported percentage to the contract value resulted in the over recognition of revenue in 2000, 2001 and 2003 and the under recognition of revenue in 2002.  The correction was made to record the revenue earned on this contract based upon the units of delivery method which represents the measurement of progress toward completion using actual results.

**Improper Revenue Recognition When Collectibility Was Not Assured**

140.  At times relevant, the Individual Defendants caused WFI to record revenue

related to several customers where collectibility was not probable.  GAAP, as described by

Financial Accounting Standards Board ("FASB") Statement of Concepts ("FASCON") No. 5,

requires that revenue be both earned and realizable (collectible) prior to recognition.  *See*

FASCON No. 5, 83-84.

141.  At times relevant, the Individual Defendants caused WFI to improperly record

revenue when collectibility was not probable.  Rather than reducing revenue up front, WFI

instead inappropriately recognized revenue related to these uncollectible amounts and recorded

the uncollectible amounts as bad debt expense.  This served to overstate WFI's revenue at times

relevant.

142.  In 2001 and 2002, certain of WFI's customers declared bankruptcy or faced

serious financial challenges.  Nonetheless, the Individual Defendants caused WFI to

inappropriately continue to record revenue related to these customers, despite the fact that they

were either in bankruptcy and/or facing serious financial and operating problems and collectibility was not probable at the time.

143.    The Individual Defendants caused WFI to now admit that at times relevant it improperly reported bad debts as an expense rather than as a reduction in revenue, the effect of which overstated revenue in 2000 and 2002 by $4.1 million and $9.1 million, respectively, and understated revenue in 2003 by $3.9 million due to this GAAP violation.[6]   The Company's Amended Form 10-K filed on September 20, 2004 stated in part:

> A correction was necessary to recognize adjustments to properly record the write-off or establishment of allowances of accounts receivable balances as a reduction to revenue rather than an increase to bad debt expense. Accordingly, any subsequent reductions to these previously established allowances were adjusted as an increase to revenue rather than as a reduction to bad debt expense.

**Impairment of Cost Method Investment**

144.    The Individual Defendants also improperly failed to cause WFI to timely take an impairment charge on an investment it had in an unconsolidated affiliate.  Under the cost method of accounting for an investment in an unconsolidated affiliate, a company records an investment in the stock of an investee at cost and thereafter recognizes as income dividends received from the investee.  When the investee suffers a series of operating losses, or other factors indicate a decline in the value of the investment has occurred which is other than temporary, a company should recognize an impairment charge.  APB No. 18, 6(a).

145.    On July 21, 2000, WFI acquired 1.2 million shares of Class B convertible preferred stock in CommVerge for $5 million.  A variety of factors, including the capital raised by CommVerge in a financing transaction in January of 2002 prior to the issuance of WFI's 2001 Form 10-K, indicated that a substantial portion of WFI's investment in CommVerge was other than temporarily impaired.  Indeed, evidence indicated that over 82% of WFI's investment in CommVerge was impaired by year end 2001.  Despite its investment in CommVerge being

---

[6]   During 2003, WFI was able to bill and collect on amounts owed from certain of these customers and, hence, in its restatement WFI revenue increased for 2003.  Nonetheless, WFI was required to wait until collectibility was probable in 2003 before recognizing revenue associated with these customers.

1  impaired, the Individual Defendants failed to cause WFI to timely take a write-down as required

2  by GAAP.

3      146.    Furthermore, in WFI's Form 10-K filed on March 8, 2004, the Company made the

4  following representation about its investment in CommVerge:

> On at least a quarterly basis, the Company obtains and reviews the financial statements and most recent forecasts of CommVerge Solutions, Inc. Based on that review and inquiries with CommVerge's management, the Company determines whether there has been other than a "temporary" impairment of its investment. ***Based on the periodic evaluations, the Company has concluded that the carrying value of its investment in CommVerge Solutions, Inc. has not been impaired***.

9      147.    The Individual Defendants caused WFI to now admit that at times relevant it

10  should have taken an impairment charge regarding its investment in CommVerge.   The

11  Company's Amended Form 10-K filed on September 20, 2004 stated in part:

> ***A correction was necessary*** to recognize an other than temporary impairment of the carrying value of an investment in a privately-held WFI network planning and deployment company.   The impairment was based upon a variety of factors including the capital raised in the investee's financing transaction in a year subsequent to the Company's investment, which indicated that ***the value of the Company's investment had significantly declined and should have been recorded as an impairment at the time of that financing***.

16      148.    Regarding this GAAP violation and its $4.1 million overstatement, in a

17  conference call with analysts held on September 20, 2004, DeMarco, the current President and

18  CEO of WFI, admitted:

> [R]elated to 2001, the ***Company recorded an impairment of 4.1 million or approximately 75 percent of the carrying value of its investment*** in a privately held WFI network planning and deployment company.   The impairment was based upon various factors, most importantly of which was the investees' financing transaction in a year subsequent to WFI's investment.
>
> The subsequent valuation at which capital was raised indicated that WFI's carrying value of its investment had significantly declined, and there should have been an impairment recorded at the time of that financing. ***Again, as with the impairment charge of goodwill discussed previously, for the purposes of these restatements the proper test is not to look at the business as it stands today, but to look at the information that was available to the Company in 2001. And this analysis showed that an impairment charge in '01 was appropriate***.

**Stock Based Compensation Expense for Former Employees**

27      149.    The Individual Defendants also failed to properly account for WFI's stock-based

28  compensation related to stock options that had previously been granted to employees who

- 59 -

1   thereafter terminated their employment with WFI.  The Company accounts for its stock option

2   plans using the intrinsic value-based method.  Under the intrinsic value method, as prescribed by

3   APB No. 25 and related interpretations including FASB Interpretation ("FIN") No. 44,

4   compensation expense is measured at the date of grant only if the then-current market price of

5   the underlying stock exceeds the amount the employee is required to pay (*i.e.*, the exercise price

6   of the option).  Compensation expense is recorded on a straight-line basis over the applicable

7   vesting period.  APB No. 25, 10-15.  APB No. 25 applies only to stock-based compensation

8   plans to employees.  FIN No. 44, 2-5.

9        150.   A modification to the terms of a fixed stock option or award may result in an

10  accounting consequence if the modification provides for a change in one of the following terms:

11   the life of the award; the exercise or purchase price of the award; or the number of shares the

12  employee is entitled to receive.  Under the intrinsic value method, if the modification renews a

13  fixed award or extends the award's life, then the compensation expense is re-measured at the date

14  of the modification.  Any intrinsic value at the modification date in excess of the compensation

15  expense at the original grant date is recognized as income either on a straight-line basis over the

16  remaining future service period if the award is unvested or immediately if the award is vested.

17  FIN No. 44, ¶¶30-37.

18        151.   Under EITF 00-23, if a former employee is no longer providing any substantive

19  services to the company following his or her termination but in connection with that termination

20  the employee's outstanding awards are modified to provide for their continuation, then the

21  awards should continue to be accounted for under APB No. 25 and the modification should be

22  accounted for under FIN No. 44.  EITF, 67-68.  Under the intrinsic value method, the

23  compensation cost is re-measured at the modification date and is recognized in full at the change

24  in status because no remaining services are required by the employee (*i.e.*, the award is

25  substantively vested).

26        152.   Here, the Individual Defendants failed to properly account for the Company's

27  stock awards granted to its former employees at the date of their separation as they failed to re-

28

measure the awards and take the related compensation expense into income during the appropriate period as required by GAAP.

153.    The Individual Defendants caused WFI to now admit that at times relevant it improperly failed to record compensation expense related to stock options granted to former employees.  The Company's Amended Form 10-K filed on September 20, 2004 stated in part:

> A correction was necessary to recognize compensation expense related to the stock options granted to certain employees that had a change in employment status.  This change resulted in a modification to existing stock option grants and remeasurement of stock-based compensation expense using the intrinsic value method. The adjustment is reflected as an increase to SG&A expense.

154.    Regarding this GAAP violation of under-recognized stock option compensation expense in 2003 of $5.7 million, in a conference call with analysts held on September 20, 2004, DeMarco, the current President and CEO of WFI, admitted:

> [I]n 2003, the Company recorded compensation expense of $5.6 million related to the stock options that had been granted to certain employees who had a change in employment status during that year. What this means is that we had a few employees who left the Company in 2003 who were allowed to keep their options as part of their separation agreement. The accounting rules that cover this circumstance requires that a remeasurement of the value of the stock option be made since we allowed the options to remain outstanding. A onetime, non-cash stock compensation expense should have been recorded at that time to reflect the value of these options, and as a result the restated numbers include this non-cash expense.

155.    Defendants' stock option related chicaneries did not end with accounting for options granted to former employees, however.  Defendants also engaged in illegal backdating and springloading practices that resulted in further accounting problems as alleged in further detail below.  As a result, WFI will again likely restate its historical financial statements for additional compensation expense to account for defendants' illegally backdated and springloaded stock options.

### Improper Classification of Purchased Tangibles

156.    The Individual Defendants caused WFI to overstate its income by improperly classifying intangible assets as goodwill in order to avoid taking amortization charges as required by GAAP.  GAAP, as set forth in SFAS No. 141, governs the accounting in a business combination such as an acquisition.  In allocating a purchase price, a company first assigns

- 61 -

values to tangible and intangible assets and assumed liabilities.  The excess amount of the cost over the amounts allocated to the assets acquired and liabilities assumed is assigned to goodwill.  SFAS No. 141, 35-43.  An intangible asset should be recognized apart from goodwill if it arises from contractual or other legal rights or is capable of being separated or divided from the acquired entity and sold, transferred, licensed, rented or exchanged.  SFAS No. 141, ¶39.

157.    During 2003, WFI acquired three privately held companies.  In its 2003 Form 10-K, the Individual Defendants caused the Company to make the following representation about its allocation of the purchase price associated with these acquisitions:

> The excess purchase price paid over the fair value of tangible and identifiable intangible net assets acquired was recorded as goodwill and other identifiable finite-life intangible assets.

158.    The Individual Defendants caused WFI to now admit that in violation of GAAP at times relevant, it improperly classified assets as goodwill instead of intangible assets and as a result failed to properly amortize these amounts thereby understating expenses by $800,000 in 2003.  The Company's Amended Form 10-K filed on September 20, 2004 stated in part:

> A correction was necessary to recognize the value of purchased identifiable intangible assets in the acquisitions that were made in 2003. Accordingly, the Company has made a reclassification from goodwill to other intangible assets for the value of these purchased intangibles.  In addition, the Company has recorded the amortization expense related to these intangible assets as an increase to operating expense.

**Improper Treatment of Goodwill**

159.    In violation of GAAP, the Individual Defendants also caused WFI to overstate its goodwill and income by failing to timely record a charge for impairment.

160.    GAAP, as set forth in SFAS No. 142, requires a company to review its goodwill and intangible assets to determine if the assets are impaired.  SFAS No. 142, 18-29.  Goodwill is not amortized, whereas intangible assets are required to be amortized, resulting in a quarterly charge against earnings.  Goodwill should be tested annually or more frequently if events or changes in circumstances indicate that the asset might be impaired.  SFAS No. 142, 26-28. According to SFAS No. 142, 28:

> Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce

- 62 -

the fair value of a reporting unit below its carrying amount.  Examples of such events or circumstances include:

(a)     a significant adverse change in legal factors or in the business climate;

(b)     an adverse action or assessment by a regulator;

(c)     unanticipated competition;

(d)     a loss of key personnel;

(e)     a more-likely-than-not expectation that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of;

(f)     the testing for recoverability under Statement 144 of a significant asset group within a reporting unit; and

(g)     recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

161.    In 1998, WFI created a Mexican Subsidiary (WFIM) in which it retained an 88% ownership interest.  The remaining 12% was held by the following individuals: defendant M.K. Tayebi and defendant M. Tayebi and Jay Tayebi (General Manager of WFIM).[7]  M.K. Tayebi, M. Tayebi and Jay Tayebi are brothers.

162.    At the creation of WFIM, the subsidiary purchased all the assets of Cable and WFI Services, a Mexican WFI communications company, for $75,000.  Further, at the creation of the Mexican Subsidiary, Jay Tayebi was granted the right to exchange his 6% interest in WFIM for 430,000 shares of WFI pursuant to a Restricted Stock Agreements.  The Restricted Stock Agreements required WFI to repurchase and transfer the shares upon the occurrence of certain events.

163.    On January 21, 2000, the Individual Defendants caused WFI to acquire all but 2.5% of the minority ownership interest in WFIM.  Pursuant to the terms of the Restricted Stock Agreements, Jay Tayebi's election was exercised, forcing WFI to purchase Jay Tayebi's 6% interest for $18.2 million through the issuance of 430,000 shares of its common stock.  Of the $18.2 million purchase price, $17.9 million or 98% of the total purchase price was allocated to goodwill.  The remaining $0.3 million or 2% was charged to reduce Jay Tayebi's minority

---

[7]  Jay Tayebi continued to serve as General Manager for WFIM at times relevant deriving a salary from WFIM.

interest in WFIM as held on WFI balance sheet.  The $17.9 million of goodwill was originally amortized over a period of 20 years.  Accordingly, as of December 31, 2001, the balance of the goodwill from this acquisition was $16.1 million.

164.   The Individual Defendants failed to cause WFI to take any write-down for its impaired goodwill associated with WFIM at times relevant.  Indeed, in WFI's 2002 Form 10-K, the Individual Defendants made the following representation concerning WFI's goodwill associated with WFIM:

> The remaining net book value of goodwill was $16.1 million as of December 31, 2001 and 2002. This goodwill was subjected to evaluation for impairment under the transitional and annual provisions of SFAS No. 142 effective January 1, 2002. Based on such evaluation and related analysis, the Company determined that no impairment existed during the transitional and annual impairment tests. Furthermore, there existed no triggering events as of December 31, 2002, indicating impairment.

165.   WFI has now admitted that the goodwill associated with WFIM was impaired at least as early as January 1, 2002 and ***took a $16.1 million charge to write down 100% of the goodwill associated with WFIM in 2002***.[8]   The Company's Amended Form 10-K filed on September 20, 2004 stated in part:

> A correction was necessary to record an impairment charge as of January 1, 2002 of the carrying value of the goodwill of a reporting unit in the design and deployment segment [WFIM] in accordance with the transition rules pertaining to the adoption of SFAS No. 142.  This charge was identified as a result of the Company's review of its original impairment analysis prepared in 2002 in accordance with SFAS No. 142, for which erroneous assumptions and calculation errors were discovered.

---

[8]   Given that SFAS No. 121 — the predecessor to SFAS No. 142 — also required a company to write-down its impaired goodwill, WFI should have taken a charge for the goodwill associated with WFIM at the time of the acquisition itself in January of 2000.  The acquisition of the 6% interest in WFIM was a transaction designed solely to enrich an insider, Jay Tayebi, and did not provide the Company with a substantial benefit to justify the value of the transaction. WFIM was created in 1998 with WFI taking an 88% interest in the subsidiary which held approximately $75,000 of assets.  Two years later, WFI purchased approximately 6% of WFIM's stock from a related party for $18.2 million.  Moreover, at the time of this acquisition, WFI purchased Jay Tayebi's 6% minority interest in WFIM at more than 60 times his current interest in the subsidiary.  An asset, by definition, is an item that will likely provide a company with a future economic benefit as a result of past transactions or events (*i.e.,* an item of economic value).  FASCON No. 6, 25-31.  Nonetheless, this excessive payment to Jay Tayebi to acquire another 6% interest in a majority owned subsidiary will not provide WFI with any future economic benefit.

- 64 -

166.    In WFI's conference call held on September 20, 2004, DeMarco, the current President and CEO, further admitted:

> In 2002, we also recorded an impairment charge of $16.1 million with a carrying value of the goodwill of a reporting unit within our design and deployment segment, which is now our WFI network services segment. This charge was required as a result of our review of the original impairment analysis prepared in 2002 for which a calculation error was discovered. When this error in the valuation analysis was corrected the impairment test resulted in a required non-cash asset impairment charge.  While this reporting unit today is performing strongly, *the impairment test must be conducted using the forecasts and related information that existed in 2002, and that information indicated that the asset's carrying value at that time was not realizable*.

167.    In its restatement, WFI took a charge of $16.1 million, writing off 100% of the remaining balance of the goodwill associated with the 2000 acquisition of WFIM.  This single GAAP violation by itself caused WFI's net loss of $63.9 million for 2002 to be understated by over 25%.

## Improper Capitalization of Compensation Expenses as Goodwill

168.    The Individual Defendants caused WFI to overstate its assets and income at times relevant by improperly recording compensation expense as goodwill.  GAAP, as set forth in SFAS No. 141, states that in a business combination:

> If the substance of the agreement for contingent consideration is to provide compensation for services or use of property or profit sharing, the additional consideration given shall be recognized as an expense of the appropriate periods.

SFAS No. 141, 34.

169.    If a portion of the consideration is contingent on continuous employment, then it must be classified as compensation expense rather than as an adjustment to purchase price via the recording of goodwill.  SFAS No. 141, 34 and EITF 95-8, 1-3.  Here, in 2003, the Individual Defendants caused WFI to make two acquisitions within its Enterprise Network Solutions segment.   In each of these acquisitions, there was an earnout agreement with the selling shareholders.  As a result of continued employment provisions in the agreements, a portion of the earnout consideration required the selling shareholder to remain as an employee as a condition to receiving the payments.   Nevertheless, the Individual Defendants caused WFI to improperly

categorize the entire earnout consideration as goodwill and classified it as an asset instead of treating the portion related to the continued employment as compensation expense.

170.   The Individual Defendants caused WFI to now admit at times relevant it improperly classified compensation expense as goodwill.  WFI's Amended Form 10-K filed on September 20, 2004 stated in part:

> A correction was necessary to properly reflect certain earn-out consideration amounts for its acquisitions made in 2003 within its Enterprise Network Solutions segment.  The adjustments resulted in a reduction to purchase consideration, or goodwill, and increases to expense.  These adjustments were a result of certain clauses that required continuous employment as a condition of receiving earn-out consideration.

171.   Regarding this GAAP violation, which overstated assets and the Company's earnings by $2.9 million for 2003, in WFI's conference call held on September 20, 2004, DeMarco, the current President and CEO, admitted:

> [I]n 2003, the Company adjusted the classification of earnout consideration of 2.9 million for acquisitions made in '03 within its enterprise **network solutions business. These adjustments reduce goodwill and increase expense. These adjustments were a result of clauses within the purchase agreements of two of the ENS acquisitions that require certain selling shareholders to remain as employees as a condition of receiving the earnout payments. The accounting standards that cover these circumstances require that such payments be categorized as expense and not as an asset as previously reflected in the financial statements**.

> The Company's intent at the time the agreements were drafted was to treat subsequent payments, if earned, as additional purchase price consideration, not as compensation expense. However, the portion of future payments that is contingent on continuous employment must be appropriately classified as an expense.

**Admission of Inadequacy of Accounting Disclosure Controls and Procedures**

172.   In WFI's 2002 Form 10-K filed on March 21, 2003, the Company made the following representation:

> Under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company has evaluated the effectiveness of the design and operation of its disclosure controls and procedures pursuant to Exchange Act Rule 13a-14(c) within 90 days of the filing date of this annual report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective.*** There were no significant changes (including corrective actions with regard to significant deficiencies or material weaknesses) in the Company's internal controls or in other factors that

- 66 -

1    could significantly affect internal controls subsequent to the date of their
     evaluation.

2        173.    The Individual Defendants caused WFI to make substantially similar

3    representations in its Form 10-Qs and 10-Ks at times relevant.  Beginning with the third quarter

4    of 2002 and continuing through the first quarter of 2004, WFI represented in each SEC filing that

5    its "disclosure controls and procedures were effective."

6        174.    The Individual Defendants caused WFI to now admit that its disclosure controls

7    and procedures as of December 31, 2003 were inadequate.  The Company's Amended Form 10-K

8    filed on September 20, 2004 stated in part:

9        Our current management, with the participation of our principal executive officer
         and principal financial officer, has evaluated the effectiveness of our disclosure
10       controls and procedures (as defined in Rules 240.13a-15(e) and 240.15d-15(e) of
         the Securities Exchange Act of 1934) as of December 31, 2003, which included
11       an evaluation of disclosure controls and procedures applicable to the period
         covered by the filing of this periodic report. As noted below, *we and our*
12       *independent auditors have identified material weaknesses in our internal*
         *controls and procedures, as they existed as of December 31, 2003*.

13
         In connection with the restatement of our financial statements for the
14       fiscal years 2001, 2002 and 2003, our independent auditors, KPMG LLP, issued a
         letter to our Audit Committee in which they noted certain matters involving our
15       internal controls and operation that they consider to be "reportable conditions", as
         defined under standards established by the American Institute of Certified Public
16       Accountants, or AICPA. Reportable conditions are matters coming to the
         attention of our independent auditors that, in their judgment, relate to significant
17       deficiencies in the design or operation of internal controls and could adversely
         affect our ability to record, process, summarize and report financial data
18       consistent with the assertions of management in the financial statements. In
         addition, KPMG has advised us that they consider these matters to be "material
19       weaknesses" that, by themselves or in combination, result in a more than remote
         likelihood that a material misstatement in our financial statements will not be
20       prevented or detected by our employees in the normal course of performing their
         assigned functions. *The material weaknesses reported by our auditors include*
21       *the following: our control activities in place during the periods impacted by the*
         *restatement were insufficient to ensure (i) that various tax exposures were*
22       *accrued for on a timely basis; (ii) the proper allocation of costs on a particular*
         *fixed price contract; (iii) the appropriate classification of changes in estimates*
23       *of revenues and bad debt expense on various contracts; (iv) that we identified*
         *the accounting events associated with the continuation of employee stock*
24       *options following termination of certain employees; (v) that we identified the*
         *risks associated with measuring progress toward completion on a particular*
25       *turnkey contract; (vi) that the carrying value of a cost method investment was*
         *reevaluated in light of changed circumstances at the investee; (vii) that a*
26       *goodwill impairment charge was identified and recorded in accordance with the*
         *adoption of the new accounting standard for goodwill; (viii) that certain earn-*
27       *out consideration should have been recorded as compensation expense instead*
         *of goodwill; and, (ix) that identifiable intangible assets purchased in a business*
28       *combination should have been allocated amortizable value.*

- 67 -

Based on the evaluation of the effectiveness of our disclosure controls and procedures as of December 31, 2003, which included an evaluation of the effectiveness of our disclosure controls and procedures applicable to the periods covered by the filing of this periodic report, and subject to the information set forth in this Item 9A, ***our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were inadequate as of December 31, 2003***, as further described in this Item 9A.

175.    The lack of adequate internal controls rendered WFI's financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.   Nonetheless, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

176.    Due to these accounting improprieties, the Individual Defendants caused the Company to present its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.   To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

- 68 -

1  responsibilities for accountability to prospective investors and to the public in general (FASB

2  Statement of Concepts No. 1, 50);

3         (e)   The principle that financial reporting should provide information about an

4  enterprise's financial performance during a period was violated.  Investors and creditors often use

5  information about the past to help in assessing the prospects of an enterprise.  Thus, although

6  investment and credit decisions reflect investors' expectations about future enterprise

7  performance, those expectations are commonly based at least partly on evaluations of past

8  enterprise performance (FASB Statement of Concepts No. 1, 42);

9         (f)   The principle that financial reporting should be reliable in that it

10  represents what it purports to represent was violated.  That information should be reliable as well

11  as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

12         (g)   The principle of completeness, which means that nothing is left out of the

13  information that may be necessary to insure that it validly represents underlying events and

14  conditions was violated (FASB Statement of Concepts No. 2, 79); and

15         (h)   The principle that conservatism be used as a prudent reaction to

16  uncertainty to try to ensure that uncertainties and risks inherent in business situations are

17  adequately considered was violated.  The best way to avoid injury to investors is to try to ensure

18  that what is reported represents what it purports to represent (FASB Statement of Concepts No.

19  2, 95, 97).

20      177.   Further, the undisclosed adverse information concealed by defendants at times

21  relevant is the type of information which, because of SEC regulations, regulations of the national

22  stock exchanges and customary business practice, is expected by investors and securities

23  analysts to be disclosed and is known by corporate officials and their legal and financial advisors

24  to be the type of information which is expected to be and must be disclosed.

25      178.   As a result of the Individual Defendants' actions, WFI's market capitalization has

26  been damaged by over $5 billion.  At the same time that the defendants were causing WFI to

27  suffer such devastation of its market capitalization, the Insider Selling Defendants fared much

28  better by selling **over $123 million** of their personally held stock while also funneling

1  approximately $20 million in WFI's money to Jay Tayebi, the brother of defendants M. Tayebi

2  and M.K. Tayebi.

3  **BACKDATING AND SPRINGLOADING OF OPTIONS AT WFI**

4       179.   At times contemporaneous to the Individual Defendants' mismanagement of WFI,

5  which caused the financial reporting and accounting improprieties described above, the

6  Individual Defendants were also engaged in illegal practices referred to as "backdating" and

7  "springloading."  Backdating involves the use of hindsight to cherry-pick favorable option grant

8  dates at monthly and annual lows to circumvent restrictions in WFI's stock option plans.  These

9  restrictions required that WFI's stock option grants be granted at no less than fair market value.

10      180.   Springloading, like backdating, involves the opportunistic timing of option grants

11  to circumvent a company's stock option plan restrictions. This egregious practice involves the

12  timing of option grants before the release of positive material information that is expected to

13  have a significant effect on the Company's stock price.

14  **The Stock Option Backdating Scandal**

15      181.   The traditional rationale behind the granting of stock options is to align a

16  company's officers, directors and employees with the interests of the company.  When an option

17  is granted at or below full market value, that option is worthless until the grantee builds value in

18  the option by building value in the company.  Thus, the company and the insider both share in

19  the value created.   The backdating of options, however, subverts this principle because the

20  instant paper gain of a backdated stock option only benefits the insider.

21      182.   On March 18, 2006, the *Wall Street Journal* published an article titled "The

22  Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable.

23  Luck – or something else?"  The article stated in pertinent part:

24       On a summer day in 2002, shares of Affiliated Computer Services Inc. sank to
         their lowest level in a year. Oddly, that was good news for Chief Executive
25       Jeffrey Rich.

26          His annual grant of stock options was dated that day, entitling him to buy
         stock at that price for years. Had they been dated a week later, when the stock was
27       27% higher, they'd have been far less rewarding. It was the same through much of
         Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from

28

1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky?  A Wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote -- around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

The Journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.

The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

* * *

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

183.    Lynn Turner, former Chief Accountant of the SEC, has described stock option backdating as follows: "It's like allowing people to place bets on a horse race after the horses have crossed the finish line ...."  In a recent article published by the *Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option backdating "represents the ultimate in greed."  Further, Levitt stated: "It is stealing, in effect.  It is ripping off shareholders in an unconscionable way."  San Diego analyst Michael Cohen later made similar comments published by *Bloomberg*: "Stockholders are hit twice … first you're stolen from, then the stock goes down when the theft is uncovered."  Senator Chuck Grassley,

- 71 -

1   Chairman of the Senate Finance Committee, concurs.  He referred to stock-option backdating as

2   "disgusting and repulsive."  Grassley stated: "It is behavior that ignores the concept of an 'honest

3   day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today,

4   'I'm going to get mine.'  Even worse in this situation, most of the perpetrators had already gotten

5   'theirs' in the form of six and seven-figure compensation packages of which most working

6   Americans can only dream."

7        184.   On May 5, 2006, President George W. Bush stated in an interview on the *Kudlow*

8   *& Company* show airing on CNBC that "overcompensating or trying to backdate things is bad

9   for America, and there ought to be consequences when people don't tell the truth and are not

10  transparent."

11       185.   On July 20, 2006, the SEC announced it had filed civil charges against two

12  former Brocade Communications Systems, Inc. executives for illegally manipulating stock-

13  option grant dates.  Criminal charges were brought simultaneously, indicating the serious view

14  taken by governmental agencies with respect to improperly backdated options.

15       186.   In a news conference detailing the charges, SEC Chairman Christopher Cox

16  proclaimed that "the full weight of the federal government is being put behind this effort to

17  stamp out fraudulent stock-option backdating."  He disclosed that additional cases likely would

18  be brought in the "coming weeks and months."  In later testimony before a Senate committee,

19  Cox indicated that the SEC is currently investigating more than 100 companies, a large

20  percentage of which are tech companies, meaning many more executives could face criminal

21  charges related to manipulating options.

22       187.   Government disgust at stock-option backdating reached a new level on July 31,

23  2006, when the FBI issued an arrest warrant for Kobi Alexander ("Alexander")—former CEO of

24  Comverse Technology, Inc. ("Comverse").  Alexander was charged with conspiracy related to

25  backdated stock options.  Not surprisingly, on August 9, 2006, he and fellow company cohorts

26  David Kreinberg ("Kreinberg") (former CFO of Comverse) and William F. Sorin ("Sorin")

27  (Comverse's former General Counsel) were criminally charged by the New York U.S. Attorney's

28  Office for allegedly orchestrating a decade-old scheme to fraudulently backdate option grants

1   and for operating a secret stock options slush fund.  After transferring more than $57 million

2   from the U.S. to accounts in the Middle East, Alexander fled the country.

3        188.    Emphasizing the importance that the U.S. government has placed on dealing with

4   the backdating options scandal, Alexander was placed on the FBI's most wanted list.   On

5   September 27, 2006, after an international manhunt, Alexander was captured in Namibia, and is

6   expected to be extradited to the U.S. to stand trial with his alleged co-conspirators Kreinberg and

7   Sorin.  On October 24, 2006, Kreinberg (Comverse's former CFO) pled guilty to securities fraud

8   charges in federal court, and faces up to 15 years in prison.  He was reportedly the first person to

9   plead guilty in the widening stock option backdating scandal.

10       189.    Also on October 24, 2006, Kreinberg agreed to settle SEC charges for $2.4

11  million in disgorgement and interest and is permanently barred from serving as an officer or

12  director of any company that has a class of securities registered pursuant to §12 of the Securities

13  Exchange Act of 1934 (the "Exchange Act") or that is required to file reports pursuant to §15(d)

14  of the Exchange Act.   Shortly thereafter, on November 6, 2006, Sorin (Comverse's former

15  General Counsel) pled guilty to a federal criminal conspiracy charge related to the backdating

16  scheme at Comverse.  The charge carries a maximum penalty of five years in prison.  Kreinberg

17  and Sorin are the first two executives succumbing to criminal charges in the widening

18  backdating scandal, which now encompasses well over 100 companies under investigation by the

19  SEC.

20  **Defendants' Illegal Options Backdating Practices**

21       190.    Dating back to at least 1998, the Individual Defendants have caused or allowed

22  WFI insiders to manipulate their stock option grant dates so as to illegally maximize their profits

23  from the stock options.   Specifically, Company insiders cherry-picked their respective stock

24  option grant dates to take advantage of lower exercise prices than the price on the actual grant

25  date.  The price of WFI shares on the reported option-grant date, therefore, was lower than the

26  share price on the actual day the options were issued, thus providing defendants with more

27  favorably priced options.  The WFI Board, in turn, approved the grants of the options to WFI

28  insiders even though those options were improperly backdated.

191.   The following charts identify the most egregious instances between 2000 and 2003 in which options granted to certain defendants were purportedly dated at or very near the lowest share price for the month, quarter or year in which they were granted:







July 2001 Stock Option Grants

On July 11, 2001, defendants purportedly granted the following options at an exercise price of $5.62 per share - the lowest share price for the period beginning May 11, 2001 through September 17, 2001 - to the following Wireless Facilities insiders:

| | | | |
|---|---|---|---|
| Terry Ashwill (1) | 40,000 | William B. Weller (2) | 18,751 |
| Farhad Farjood (2) | 60,000 | Naomi D. Whitacre (3) | 32,000 |

(1) No disclosure located.
(2) On February 28, 2002, defendants Farjood and Weller disclosed these grants on Form 5s.
(3) On February 20, 2003, defendant Whitacre disclosed this grant on a Form 3.



October 2001 Stock Option Grants

On October 1, 2001, defendants purportedly granted the following options at an exercise price of $4.47 per share - within $0.20 of the lowest share price for the period beginning April 10, 2001 through February 13, 2002 - to the following Wireless Facilities insiders:

| | | | |
|---|---|---|---|
| David Garrison (1) | 30,390 | Thomas Munro (2) | 440,000 |
| Farzad Ghassemi (2) | 130,591 | Laura Siegel (3) | 5,088 |
| William Mazilly (2) | 246,431 | | |

(1) On March 4, 2003, defendant Garrison disclosed this grant on a Form 3. (3) On September 20, 2004, defendant Siegel disclosed this grant on a Form 3.
(2) On February 14, 2002, defendants Ghassemi, Mazilly, and Munro disclosed these grants on Form 5s.

- 75 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28







192.    The following table provides an estimate as to the illegal paper profit that—the defendants identified in the prior charts—gained as a result of their stock option manipulations:

| Defendants | Reported Grant Date | Number of Securities Underlying Options | Price of Stock on Reported Date | Estimated Actual Exercise Price Range | | | Estimated Paper Profit Average |
|---|---|---|---|---|---|---|---|
| | | | | Low | | High | |
| Ashwill | 12/1/2000 | 386 | $31.94 | $33.94 | - | $51.00 | $3,215.38 |
| Farjood | 12/1/2000 | 743 | $31.94 | $33.94 | - | $51.00 | $6,189.19 |
| Fox | 12/1/2000 | 1,393 | $31.94 | $33.94 | - | $51.00 | $11,603.69 |
| Ghassemi | 12/1/2000 | 991 | $31.94 | $33.94 | - | $51.00 | $8,255.03 |
| Weller | 12/1/2000 | 929 | $31.94 | $33.94 | - | $51.00 | $7,738.57 |
| Whitacre | 12/1/2000 | 15,646 | $31.94 | $33.94 | - | $51.00 | $130,331.18 |
| Wozencraft | 12/1/2000 | 712 | $31.94 | $33.94 | - | $51.00 | $5,930.96 |
| Ashwill | 4/5/2001 | 270,000 | $3.69 | $3.93 | - | $7.61 | $680,400.00 |
| Farjood | 4/5/2001 | 85,000 | $3.69 | $3.93 | - | $7.61 | $214,200.00 |
| Weller | 4/5/2001 | 45,000 | $3.69 | $3.93 | - | $7.61 | $113,400.00 |
| Whitacare | 4/5/2001 | 39,975 | $3.69 | $3.93 | - | $7.61 | $100,737.00 |
| Ashwill | 7/11/2001 | 40,000 | $5.62 | $5.74 | - | $9.69 | $63,600.00 |
| Farjood | 7/11/2001 | 60,000 | $5.62 | $5.74 | - | $9.69 | $95,400.00 |
| Weller | 7/11/2001 | 18,751 | $5.62 | $5.74 | - | $9.69 | $29,814.09 |
| Whitacare | 7/11/2001 | 32,000 | $5.62 | $5.74 | - | $9.69 | $50,880.00 |
| Garrison | 10/1/2001 | 30,390 | $4.47 | $4.71 | - | $6.80 | $41,938.20 |
| Ghassemi | 10/1/2001 | 130,591 | $4.47 | $4.71 | - | $6.80 | $180,215.58 |
| Mazilly | 10/1/2001 | 246,431 | $4.47 | $4.71 | - | $6.80 | $340,074.78 |
| Munro | 10/1/2001 | 440,000 | $4.47 | $4.71 | - | $6.80 | $607,200.00 |

- 77 -

| Siegal | 10/1/2001 | 5,088 | $4.47 | $4.71 | - | $6.80 | $7,021.44 |
|---|---|---|---|---|---|---|---|
| Ashwill | 4/30/2002 | 191,944 | $4.23 | $4.45 | - | $5.50 | $149,716.32 |
| Farjood | 4/30/2002 | 112,000 | $4.23 | $4.45 | - | $5.50 | $87,360.00 |
| Garrison | 4/30/2002 | 112,000 | $4.23 | $4.45 | - | $5.50 | $87,360.00 |
| Munro | 4/30/2002 | 200,890 | $4.23 | $4.45 | - | $5.50 | $156,694.20 |
| Siegal | 4/30/2002 | 36,000 | $4.23 | $4.45 | - | $5.50 | $28,080.00 |
| Whitacare | 4/30/2002 | 77,934 | $4.23 | $4.45 | - | $5.50 | $60,788.52 |
| Owens | 2/12/2003 | 150,000 | $5.16 | $5.80 | - | $6.48 | $150,000.00 |
| Ashwill | 3/31/2003 | 60,000 | $5.76 | $5.80 | - | $6.48 | $24,000.00 |
| Farjood | 3/31/2003 | 80,000 | $5.76 | $5.80 | - | $6.48 | $32,000.00 |
| Ghassemi | 3/31/2003 | 80,000 | $5.76 | $5.80 | - | $6.48 | $32,000.00 |
| Jacobsen | 3/31/2003 | 60,000 | $5.76 | $5.80 | - | $6.48 | $24,000.00 |
| **Total** | | **2,624,794** | | | | | **$3,530,144.13** |

193.   The following charts compare the returns on stock options realized by the defendants to the returns realized by average WFI investors during 2000 through 2003. The "Defendant Option Grant Date" column lists the various dates on which defendants were granted suspiciously dated stock options. The "Defendant 20-Day Return" column shows the return realized by defendants in the twenty days following the option grant date. This amount is compared to the "Investor Average 20-Day Return" column, which lists the average return realized by average WFI investors over a typical twenty-day period in the year of the grant date. The percentage difference between these two returns is shown in the "Defendant Excess Return" column.

| Defendant Option Grant Date | Defendant 20-Day Return | Investor Average 20-Day Return | Defendant Excess Return |
|---|---|---|---|
| 1/27/2000 | 122.0% | -0.9% | 122.9% |
| 12/1/2000 | 13.5% | -0.9% | 14.4% |
| 4/5/2001 | 89.4% | -4.5% | 93.9% |
| 7/11/2001 | 41.8% | -4.5% | 46.3% |
| 10/1/2001 | 39.8% | -4.5% | 44.3% |
| 4/30/2002 | 13.2% | -0.6% | 13.8% |
| 2/12/2003 | 17.4% | 8.1% | 9.3% |
| 3/31/2003 | 12.3% | 8.1% | 4.3% |

- 78 -

**The Truth Comes to Light Regarding Defendants' Illegal
Backdating Practices**

194.    On March 12, 2007, WFI disclosed for the first time that an internal investigation was being conducted concerning the Company's prior options grant practices.   The internal investigation reviewed options granted by WFI since 1998.

195.    On that same day, WFI also announced that the internal investigation had identified "grants issued between 1998 and 2003 that require further review because their historical measurement dates *appear incorrect* and are expected to result in adjustments affecting previously issued financial statements."   Further, WFI admitted that there is "a *strong likelihood*" that WFI's financial statements for fiscal 2003 through 2005 and earlier periods would need to be restated.

196.    Six days earlier, on March 6, 2007, WFI announced that defendant M.K. Tayebi had resigned from the Board effective on that date.   M.K. Tayebi was a WFI director throughout the illegal backdating that occurred between at least 1998 and 2003.

**Defendants' Illegal Springloading**

197.    Springloading is the illegal misappropriation of inside information to time option grants before a significant increase in the Company's shares.    Similar to backdating, springloading brings an immediate profit to the option holders.

198.    On January 27, 2000, defendants granted 39,000 options to defendants Farjood, Ghassemi and Weller.   Five trading days later, on February 3, 2000, WFI announced record revenues and earnings for its fiscal year 1999.   This positive news effected a *296%* increase in the Company's stock price over the following 20 trading days—from $42.63 per share to over $126 per share.   In other words, Farjood's, Ghassemi's and Weller's options, which were worth nothing at the time they were granted, were now worth more than $3.2 million.

199.    Defendants' springloaded options grant is illustrated by the following chart:

- 79 -



200.    The granting of these options to defendants Farjood, Ghassemi and Weller involved the misappropriation of the positive material information concerning WFI's record fiscal 1999 earnings.  Further, defendants issued the springloaded options with the intent to circumvent WFI's stock option plans, which required that WFI options be granted at fair market value.  Defendants authorized the springloaded grants at times at which they knew the options were worth more than the exercise price due to the unreleased record fiscal 1999 earnings.  Accordingly, defendants' approval, authorization and/or receipt of springloaded options was a breach of their fiduciary duties of loyalty and good faith.

201.    Further, defendants' springloading practices are equivalent to insider trading in that they utilized material, non-public information to benefit themselves in breach of their fiduciary duties owed to WFI.

**Improper Financial Reporting Relating to Defendants' Stock Option Manipulations**

202.    Between 1998 and the present, the Individual Defendants caused or allowed WFI to file proxies Form 10-Qs, Form 10-Ks and other filings that presented the Company's financial results in violation of GAAP, due to improper accounting for backdated or otherwise

- 80 -

manipulated stock option grants.  Specifically, WFI's compensation expenses were understated and its net earnings were overstated.

203.   Further, defendants have caused or allowed WFI: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share; and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed WFI's options as having been granted at exercise prices equal to the fair market value of WFI's common stock on the date of the grant.  Under, GAAP the instant paper gain received from backdated stock options was equivalent to paying extra compensation and should have been recorded as a cost to WFI.  These costs were also not properly recorded.  In turn, since these costs were not properly recorded, WFI's profits were overstated.

204.   Specifically, since 1998, the Individual Defendants have caused or allowed WFI to report improper financial results—materially overstating its earnings—as follows:

| Fiscal Year (Ending in December 30) | Reported Earnings (in millions) | Reported Shares | Reported Diluted EPS |
|---|---|---|---|
| 1998 | $4.70 | 30.70 | $0.15 |
| 1999 | $9.60 | 35.20 | $0.27 |
| 2000 | $22.50 | 50.50 | $0.45 |
| 2001 | ($69.80) | 45.90 | ($1.52) |
| 2002 | ($73.80) | 48.10 | ($1.53) |
| 2003 | $9.50 | 73.30 | $0.13 |
| 2004 | $5.00 | 67.70 | $0.07 |
| 2005 | $3.70 | 75.30 | $0.05 |

205.   In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences.  While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment.  In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants.  For example, for performance-based stock options (generally granted to the five highest-paid executives), a company is allowed to take a tax deduction on that full amount *provided that the options were granted at the market price*. Backdating, however, automatically disqualifies those options from receiving the tax break—

- 81 -

1   instead, a company's tax deduction would be capped at $1 million for each of the top five

2   executives.

3       206.    In light of these serious potential tax-related ramifications, the IRS is now

4   examining as many as 40 companies, which are being investigated for backdating stock options,

5   to determine whether they owe millions of dollars in unpaid taxes.  On July 28, 2006, the *New*

6   *York Times* published an article titled "I.R.S. Reviewing Companies in Options Inquiries," which

7   stated:

8           The Internal Revenue Service is examining as many as 40 companies
            ensnared in various stock options investigations to determine whether they owe
9           millions of dollars in unpaid taxes.

10          In the last few weeks, the agency has directed its corporate auditors to
            start reviewing the tax returns of dozens of executives and companies, which may
11          have improperly reported stock option grants. These preliminary investigations
            are expected to take months, but if there is early evidence of widespread tax
12          trouble, I.R.S. officials said they were prepared to step up their effort.

13          "Where there are indications of mischief, we want to now look at those
            cases and see if they complied with tax laws," said Bruce Ungar, the agency's
14          deputy commissioner for large and midsize businesses. "It is possible that they are
            compliant, but the early indication is that there is a good likelihood there is some
15          noncompliance.

16          "If this is a big problem, we will apply more resources," he added.

17          The I.R.S. auditors are focusing on the potential tax obligations from
            backdated stock options that have been cashed out since 2002. Federal rules bar
18          the I.R.S. from opening cases that are more than three years old. Still, tax lawyers
            estimate the agency could reap hundreds of millions of dollars from civil
19          penalties, unpaid taxes and interest payments if widespread wrongdoing is found.

20          The agency appears to be taking aim both at companies that took improper
            tax deductions, and at executives who received favorable tax treatment and might
21          have misreported income.

22          So far, rank-and-file employees who simply received potentially
            backdated stock options are not in the agency's cross hairs.
23
            "If you were involved in the mischief, you would want to be worried," Mr.
24          Ungar said. "If you weren't involved in it, then you are not in the same situation."

25          The tax scrutiny is the latest twist in what is perhaps the biggest financial
            scandal of the year and comes as the agency cracks down on misreported
26          executive pay. The I.R.S. follows several other federal agencies that have begun
            investigations into the myriad problems that arise from improperly reported or
27          backdated stock option grants.

28

- 82 -

The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executive compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating — effectively granting stock options with a discount — automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dozens of companies have come forward. In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the S.E.C.'s enforcement division. She indicated that

- 83 -

1    there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.

2           For now, I.R.S. officials are reviewing the files of 30 to 40 of the
3    companies that have publicly disclosed problems, including some already facing
     scrutiny on other tax issues. Mr. Ungar said it could take months to more than a
4    year before these initial cases are resolved. Much of the information will need to
     be supplied by the companies themselves, not taken from tax returns. I.R.S.
5    officials have not yet been in touch with the Justice Department about potential
     tax fraud.

6           207.   WFI is or will be added to the list of companies currently being investigated by

7    the IRS because of defendants' rampant backdating practices and the millions of dollars worth of

8    improper deductions taken by the Company.

9           208.   WFI's 1999 through 2006 Forms 10-Q and Forms 10-K were reviewed, prepared

10   and/or endorsed by the Individual Defendants.   Specifically, the following chart details the

11   defendants and other individuals who signed filings before the enactment of SOX:

12

| Date | Filing | Person(s) Who Signed |
|------|--------|----------------------|
| 12/15/1999 | 10-Q | Massih Tayebi (Chief Executive Officer), Thomas A. Munro (Chief Financial Officer) |
| 3/30/2000 | 10-K405 | Massih Tayebi (Chief Executive Officer and Director), Masood K. Tayebi (President and Director), Thomas Munro (Chief Financial Officer), Scott Anderson (Director), Bandel Carano (Director), Scot Jarvis (Director) |
| 5/15/2000 | 10-Q | Massih Tayebi (Chief Executive Officer and Director), Thomas A. Munro (Chief Financial Officer) |
| 8/14/2000 | 10-Q | Massih Tayebi (Chief Executive Officer and Director), Thomas A. Munro (Chief Financial Officer) |
| 11/14/2000 | 10-Q | Massih Tayebi (Chairman), Thomas A. Munro (President) |
| 3/29/2001 | 10-K | Massih Tayebi (Chairman and Director), Masood K. Tayebi (Chief Executive Officer and Director (Principal Executive Officer)), Terry Ashwill (Chief Financial Officer (Principal Financial and Accounting Officer)), Scott Anderson (Director), Bandel Carano (Director), Scot Jarvis (Director), William Hoglund (Director) |
| 5/15/2001 | 10-Q | Massih K. Tayebi (Chairman), Terry Ashwill (Executive Vice President and Chief Financial Officer) |
| 8/10/2001 | 10-Q | Masood K. Tayebi (Chief Executive Officer), Terry Ashwill (Executive Vice President and Chief Financial Officer) |
| 11/13/2001 | 10-Q | Masood K. Tayebi (Chief Executive Officer), Dan Stokely (Vice President Corporate Controller and Principal Accounting Officer) |
| 3/19/2002 | 10-K | Massih Tayebi (Chairman and Director), Masood K. Tayebi (Chief Executive Officer and Director), Brad Weller (General Counsel, Vice President of Legal Affairs and Secretary), Terry Ashwill (Chief Financial Officer (Principal Financial and Accounting Officer)), Dan Stokely (Corporate Controller (Chief Accounting Officer)), Scott Anderson (Director), Bandel Carano (Director), Scot Jarvis (Director), William Hoglund (Director), David Lee (Director) |

- 84 -

| | | |
|---|---|---|
| 5/15/2002 | 10-Q | Masood K. Tayebi (Chairman and Chief Executive Officer), Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) |

209.    The following chart details the defendants who made certifications of WFI filings under SOX after its enactment:

| Date | Filing | Person(s) Who Signed and Certified |
|---|---|---|
| 8/13/2002 | 10-Q | Masood K. Tayebi (Chief Executive Officer); Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 11/13/2002 | 10-Q | Masood K. Tayebi (Chief Executive Officer); Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 3/21/2003 | 10-K | Masood K. Tayebi (Chairman, Chief Executive Officer and Director); Terry Ashwill (Chief Financial Officer); Dan Stokely (Vice President and Corporate Controller, Chief Accounting Officer); Dave Garrison (Associate General Counsel and Corporate Secretary); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director); William Owens (Director) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 5/9/2003 | 10-Q | Masood K. Tayebi (Chairman and Chief Executive Officer); Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 8/8/2003 | 10-Q | Masood K. Tayebi (Chief Executive Officer); Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 11/5/2003 | 10-Q | Masood K. Tayebi (Chief Executive Officer); Dan Stokely (Vice President, Corporate Controller and Chief Accounting Officer) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Terry Ashwill (CFO) |
| 3/8/2004 | 10-K | Masood K. Tayebi (Chairman, Chief Executive Officer and Director); Eric Demarco (President and Chief Operating Officer); Dan Stokeley (Interim Chief Financial Officer, Vice President and Corporate Controller); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director); William Owens (Director) **SOX CERTIFICATION:** Masood K. Tayebi (CEO); Dan Stokely (Interim CFO) |
| 5/10/2004 | 10-Q | Eric M. Demarco (Chief Executive Officer, President and Principal Financial Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Eric M. Demarco (Performing functions of the Principal Financial Officer) |
| 9/20/2004 | 10-K/A | Eric M. Demarco (Chief Executive Officer and President); Masood K. Tayebi (Chairman and Director); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 9/20/2004 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 9/20/2004 | 10-Q/A | Eric M. Demarco (Chief Executive Officer, President and Principal Financial Officer); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |

| | | |
|---|---|---|
| 11/10/2004 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 3/31/2005 | 10-K | Eric M. Demarco (Chief Executive Officer, President and Principal Executive Officer); Masood K. Tayebi (Executive Chairman and Director); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Principal Financial Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 4/29/2005 | 10-K/A | Eric M. Demarco (Chief Executive Officer, President and Principal Executive Officer); Masood K. Tayebi (Executive Chairman and Director); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Principal Financial Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director); Andrew Leitch (Director) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 5/11/2005 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President and Chief Financial Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 8/10/2005 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President and Chief Financial Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 11/9/2005 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer); Carol A. Clay (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 4/3/2006 | 10-K | Eric M. Demarco (President and Chief Executive Officer); Masood K. Tayebi (Chairman and Director); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Principal Accounting Officer); Scott Anderson (Director); Bandel Carano (Director); Scot Jarvis (Director); William Hoglund (Director); Andrew M. Leitch (Director) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 4/3/2006 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President, Chief Financial Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 4/3/2006 | 10-Q/A | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President, Chief Financial Officer and Chief Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 5/10/2006 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President and Chief Financial Officer); Laura L. Siegal (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |
| 8/9/2006 | 10-Q | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President and Chief Financial Officer); Laura L. Siegal (Vice President, Corporate Controller and Principal Accounting Officer) **SOX CERTIFICATION:** Eric M. Demarco (CEO); Deanna H. Lund (CFO) |

| | | Eric M. Demarco (Chief Executive Officer and President); Deanna H. Lund (Senior Vice President and Chief Financial Officer); Laura L. Siegal (Vice President, Corporate Controller and Principal Accounting Officer) |
|---|---|---|
| 11/9/2006 | 10-Q | **SOX CERTIFICATION**: Eric M. Demarco (CEO); Deanna H. Lund (CFO) |

210.     The SOX certifications signed in conjunction with the filing of WFI's Form 10-Ks and 10-Qs contained language that was substantially similar or identical to the following certification attached to WFI's 2003 Form 10-K that was signed by defendants M.K. Tayebi and Stokely:

I, [M.K. Tayebi/Dan Stokely], certify that:

1.     I have reviewed this annual report on Form 10-K of Wireless Facilities, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

- 87 -

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## ILLEGAL INSIDER SELLING

211.   While in possession of the undisclosed material adverse information concerning WFI's improper financial reporting and accounting and the defendants' illegal options backdating and springloading practies, the Insider Selling Defendants sold the following shares of WFI stock that they had obtained, often by cashing in backdated stock options:

| Defendant | Start Date | End Date | Shares | Proceeds |
|-----------|------------|----------|--------|----------|
| ANDERSON | 4/28/2000 | 8/12/2003 | 408,885 | $12,233,762.58 |
| ASHWILL | 11/27/2002 | 11/3/2003 | 244,151 | $2,558,412.09 |
| CARANO | 5/3/2000 | 11/10/2003 | 95,144 | $4,980,543.51 |
| FARJOOD | 6/3/2003 | 11/3/2003 | 85,000 | $1,183,100.00 |
| FOX | 4/28/2000 | 8/31/2000 | 90,000 | $5,251,679.50 |
| GARRISON | 5/8/2003 | 8/7/2003 | 50,000 | $563,020.00 |
| GHASSEMI | 11/13/2000 | 8/22/2003 | 92,222 | $1,544,852.00 |
| JACOBSEN | 8/7/2003 | 8/11/2003 | 55,000 | $721,824.45 |
| JARVIS | 4/28/2000 | 6/4/2004 | 408,885 | $12,244,262.70 |
| MUNRO | 4/28/2000 | 12/28/2001 | 110,666 | $4,328,725.26 |
| TAYEBI, M.K. | 4/28/2000 | 8/22/2000 | 625,000 | $35,099,430.00 |
| TAYEBI, M. | 4/28/2000 | 8/1/2003 | 1,707,037 | $38,830,642.00 |
| WOZENCROFT | 9/7/2000 | 9/7/2000 | 46,750 | $3,464,319.10 |
| **Total:** | | | **4,018,740** | **$123,004,573.19** |

## DAMAGES TO WFI

212.   The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct at times relevant, the Company is now the subject of several class action

- 88 -

law suits that allege violations of federal securities laws.  As a result, WFI has expended and will continue to expend significant sums of money.

213.    Moreover, these actions have irreparably damaged WFI's corporate image and goodwill.  For at least the foreseeable future, WFI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that WFI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

214.    As a further result of the defendants' improprieties, the Company has and will need to expend significant sums of money including the following:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     Costs incurred from increased Directors' & Officers' Insurance premiums as a result of the illegally manipulated stock option grants;

(c)     Costs incurred in investigating and defending WFI and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(d)     Enormous tax liabilities from improper deductions taken on backdated option grants;

(e)     Costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(f)     Costs incurred with paying taxes on behalf of rank and file employees and former employees who inadvertently exercised backdated option grants;

(g)     Costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)     Costs incurred from severance paid to employees who have resigned or have been terminated and costs incurred to hire persons to replace those employees;

(i)     Costs incurred from directing manpower to correct WFI's defective internal controls; and

(j)     Costs incurred from directing manpower to restate WFI's prior financial results for 2000 to 2003 due to improper financial reporting and accounting;

(k)     Costs incurred from directing manpower to potentially re-restate WFI's prior financial results to correct for the improperly dated stock option grants.

215.    A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 7%.  A similar 7% fall in WFI's market value would result in a decline of over $7.4 million.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### Demand Futility Allegations in Connection with Defendants' Improper Financial Reporting and Accounting

216.    Plaintiffs bring this action derivatively in the right and for the benefit of WFI to redress injuries suffered, and to be suffered, by WFI as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the SOX, as well as the aiding and abetting thereof, by the Individual Defendants. WFI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

217.    Plaintiffs will adequately and fairly represent the interests of WFI in enforcing and prosecuting its rights.

218.    Plaintiffs are and were owners of the stock of WFI during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remain shareholders of the Company.

219.    The Board of WFI at the time of the filing of the original complaint consisted of the following six individuals: defendants M.K. Tayebi, Anderson, Carano, DeMarco, Hoglund and Jarvis.  Plaintiffs have not made any demand on the present Board of WFI to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons.

- 90 -

220.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the improper accounting.  While in possession of this material adverse non-public information regarding the Company, the following current members of the WFI Board participated in the illegal insider selling:

       (a)     At times relevant, M.K. Tayebi sold 625,000 shares of WFI stock  for proceeds of $35,099,430;

       (b)     At times relevant, Anderson sold 408,885 shares of WFI stock for proceeds of $12,233,762.58;

       (c)     At times relevant, Jarvis sold 408,885 shares of WFI stock for proceeds of $12,244,262.70; and

       (d)     At times relevant, Carano sold 95,144 shares of WFI stock for proceeds of $4,980,543.51.   Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them would have been futile.

221.    Defendant M.K. Tayebi, co-founder of the Company, dominated and controlled the Company and the entire Board.  At times relevant, specifically in mid-2003, the Tayebi family owned over 40% of the stock.  He has been the CEO, a director and Chairman of the Board since its formation in 1994.  M.K. Tayebi has controlled the Company on a day to day basis for over 10 years.  Thus, demand on defendant M.K. Tayebi to take action against himself is futile.  Furthermore, none of the Board would take action against M.K. Tayebi because of his domination and control of WFI.  According to the 10-K/A filed with the SEC on September 20, 2004, defendant M.K. Tayebi owned 10% of the Company's outstanding common stock.  Defendant M.K. Tayebi's immediate family owned approximately 19% of the Company's outstanding stock.  Given that defendant M.K. Tayebi controlled almost 30% of the Company, further demonstrated that M.K. Tayebi dominated and controlled the Company and the entire Board. This domination and control is demonstrated by the longstanding history of the Board

providing rubber stamp approval of multiple transactions between WFI and M.K. Tayebi and members of his immediate family or business entities controlled by M.K. Tayebi and members of his immediate family, at terms favorable to M.K. Tayebi and members of his immediate family, including, but not limited to:

(a)     M.K. Tayebi has a 40% ownership interest in BridgeWest LLC and M. Tayebi held a greater than 10% membership interest in Bridgewest.  During FY:00 and FY:01, WFI entered into consulting agreements with BridgeWest and one of its majority owned subsidiaries, Nextreme Ventures, LLC, at terms favorable to BridgeWest and Nextreme. BridgeWest also holds an interest in SkyRiver Communications, Inc., which contracted with the Company in FY:00 and FY:01 for site acquisition services and radio frequency engineering work, also at terms favorable to SkyRiver.  These contracts and agreements were approved by the WFI Board;

(b)     Jay Tayebi, a brother of M.K. Tayebi and M. Tayebi, is the General Manager of WFIM, a subsidiary of the Company.  In FY:00, he was paid an annual base salary of $140,000 and options to purchase an aggregate of 397,640 shares of WFI stock.  The Company also granted him shares of restricted stock in WFIM equivalent to 6% of the equity of WFIM.  On January 21, 2000, Jay Tayebi exercised this election and received 430,000 shares of WFIM common stock.  Jay Tayebi's employment and the grant of options in WFI and WFIM common stock was approved by the WFI Board;

(c)     During FY:00, FY:01 and FY:02, two subsidiaries of the Company, WFIM and WFI Latin America Ltda., entered into certain transactions with JFR, which is majority owned and managed by Jay Tayebi.  Pursuant to these agreements, WFIM contracted with JFR for automobile leasing, computer leasing, and as a sub-contractor for certain of its customer contracts. During the years ended December 31, 2000 and 2001, WFIM paid JFR approximately $3.6 million, $2.7 million and $0.5 million, respectively, for all services rendered under these contracts.  During 2001, WFI Latin America Ltda. transacted business with JFR as a subcontractor providing services in connection with certain customer contracts. During the year ended December 31, 2001, WFI Latin America Ltda. paid JFR approximately $0.1 million for all

services rendered under these contracts. Also during 2001, JFR contracted with WFI Latin America Ltda. for subcontractor engineering services for certain of its customer contracts;

(d)     In June 1999, the Company sold to M.K. Tayebi and M. Tayebi, the Company's 25% ownership interest in Sierra Towers Investment Group, LLC, an early-stage tower company operating in Mexico and WFI financed their acquisition of the Company interest in Sierra Towers with the approval of the WFI Board;

(e)     Prior to June 30, 1999, the Company contracted with Total Outsourcing, Inc., a company owned by M. Tayebi's wife, for the leasing of computer equipment, apartments, vehicles and other items.  During 1997 and 1998, the total value of the Company's contracts with Total Outsourcing was $781,000 and $488,000, respectively. The Company terminated its contract and entered into a Settlement Agreement and Mutual General Release with Total Outsourcing effective as of June 30, 1999. Pursuant to this Settlement Agreement, the Company paid $258,091 to Total Outsourcing in February 2000.  These agreements and the settlement were approved by the WFI Board;

(f)     From April 1999 through March 2000, the Company subleased approximately 4,900 square feet of office space in its headquarters facility to QuantumThink Group, Inc. ("Quantum") a high technology outsourcing company which is majority-owned by the Tayebi family. Quantum's tenancy was month-to-month at rent and terms favorable to Quantum, the Tayebi's family's business.  This sublease was approved by the WFI Board; and

(g)     In April 2001, WFI entered into a Strategic Teaming Agreement with GlobTel Holdings, Ltd. ("GlobTel") to market telecommunications outsourcing services in the Middle East on a non-exclusive basis on terms that were favorable to GlobTel. GlobTel is significantly owned by defendant M. Tayebi, brother of M.K. Tayebi, and former Chairman of WFI.  Thus, a demand on defendant M.K. Tayebi and the rest of the WFI Board would have been futile.  According to the 10-K/A filed with the SEC on September 20, 2004, 25% of the Company's outstanding stock is beneficially owned by other officers, directors and their affiliates.  The officers' and directors' 25% ownership combined with defendant M.K. Tayebi's

1    10% and his family's 19% result in over half of the Company being under the direction and

2    control of defendant M.K. Tayebi.

3          222.    The Compensation Committee approves the compensation of the Company's

4    executive officers, administers the 1997 Stock Option Plan, the 1999 Equity Incentive Plan, the

5    2000 Non-Qualified Stock Option Plan and the Employee Stock Purchase Plan and has overall

6    responsibility for the Company's compensation policies for senior management. The

7    Compensation Committee is comprised of defendants Carano and Jarvis. As the members of the

8    Compensation Committee singularly control the other defendants' awards, the remaining

9    members of the Board will not institute this action against defendants Carano and Jarvis. To do

10    so would jeopardize each defendant's personal financial compensation. Thus, demand on

11    defendants M.K. Tayebi, Anderson, DeMarco and Hoglund would have been futile.

12          223.    The principal professional occupation of defendants M.K. Tayebi and DeMarco

13    was their employment with WFI, pursuant to which they receive and continue to receive

14    substantial monetary compensations and other benefits. For FY:03, FY:02, FY:01 and FY:00

15    WFI paid defendant M.K. Tayebi $267,684, $3,250, $54,168 and $224,000, respectively, in

16    salary, bonus and other compensation. Accordingly, defendants M.K. Tayebi and DeMarco lack

17    independence from defendants Carano and Jarvis, defendants who are not disinterested and/or

18    independent and who exert influence over defendants M.K. Tayebi and DeMarco's compensation

19    by virtue of their positions as members of the Compensation Committee. Pursuant to WFI's

20    proxy statement, decisions made by the Compensation Committee relating to executive officers'

21    compensation are reviewed by the full Board. This lack of independence rendered defendants

22    M.K. Tayebi and DeMarco incapable of impartially considering a demand to commence and

23    vigorously prosecute this action.

24          224.    The Audit Committee meets with the Company's independent auditors at least

25    annually to review the scope and results of the annual audit and to discuss the financial

26    statements; approves the engagement, retention and termination, if required, of the independent

27    auditors; oversees the independence of the independent auditors; evaluates the independent

28    auditors' performance; receives and considers the independent auditors' comments as to controls,

adequacy of staff and management performance and procedures in connection with audit and financial controls; and reviews compliance with certain corporate policies and discharges such other duties as may from time to time be assigned to it by the Board.  Defendants Anderson, Hoglund, Carano and Jarvis were, at times relevant, members of the Audit Committee. Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in WFI's Annual Report on Form 10-K's for the years ended December 31, 2000, 2001, 2002 and 2003 as filed with the SEC.  For a period of four years,[9] the Audit Committee failed to produce accurate and reliable financial statements. In the Company's 10-K/A filed with the SEC on September 20, 2004, the Individual Defendants go as far as to admit the Audit Committee did not exercise proper oversight or have adequate controls by stating: "That the assessment found and concluded that our finance and accounting personnel had made a number of accounting and arithmetic errors ...." Further, the Individual Defendants stated in part that significant resources were expended to discover and assess these errors and mistakes. Any competent and professional Audit Committee would have detected and corrected these errors and would not have caused improper financial statements to be filed or improper public statements be made. Having to restate four years of financial statements is clear evidence of the continuous and pervasive incompetent nature of the Company's Audit Committee.  By such actions, defendants Anderson, Hoglund and Jarvis breached their duties by causing or allowing the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them would have been futile.

225.    The entire WFI Board and senior management participated in the wrongs complained of herein and are liable for signing off on four years of the Company's false financial statements.  WFI's directors are not disinterested or independent due to the following: defendants M.K. Tayebi, Anderson, Carano, DeMarco, Hoglund and Jarvis served on the WFI Board. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced defendants

---

[9] WFI has only been publicly traded for five years.

breached the fiduciary duties that they owed to WFI and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the WFI Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected WFI to millions of dollars in liability for possible violations of applicable securities laws.

226.   The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.   In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)   ***Defendants Anderson and Jarvis Are Long-Time Business Associates***:

Defendant Anderson is a member of Cedar Grove Partners, LLC and has been since 1997.  Defendant Jarvis co-founded Cedar Grove Partners LLC, is a member, and has been since 1998.  Because of their long-standing and entangling business and professional relationships, neither defendant Anderson nor defendant Jarvis will take the action requested by plaintiffs herein against one another or the remainder of the Individual Defendants.

(ii)   ***Defendant DeMarco is Beholden to the Tayebis (and the Rest of the Board for Hiring Him)***:

DeMarco is beholden to the Tayebis (as well as the other Board members) who elected to employ him as an officer and director in November 2003, after nine months of being unemployed following his questionable departure from Titan. DeMarco was an officer and director at Titan.  DeMarco and Titan came to a "mutual termination agreement"during various government investigations (SEC, FBI, DOJ, etc.) regarding the bribery of foreign (African) officials, as well as privately initiated lawsuits involving Titan and DeMarco.   DeMarco's employment prospects were not overwhelming.   Given his predicament and joining WFI, DeMarco lacks independence and renders defendant DeMarco incapable of impartially considering a demand to commence and vigorously prosecute this action.

227.   In 2003, defendants Anderson, Carano, DeMarco and Hoglund received an option to purchase 20,000 shares of WFI Common Stock under the Company's 1999 Equity Incentive

Plan, which vests and becomes exercisable at the rate of 1/48 of the shares at the end of each month of continuous service as a director following the date of grant. Twenty-five percent of these options vest at the anniversary date of the agreement and the balance of the options become exercisable at the rate of 1/48 of the shares at the end of each month of continuous service as a director thereafter. Because of these options, defendants Anderson, Carano, DeMarco, Hoglund and Jarvis will not take the action plaintiffs request in fear of jeopardizing this highly lucrative compensation.

228.     The Director Defendants of WFI, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from WFI's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

229.     In order to bring this suit, all of the directors of WFI would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

230.     The acts complained of constitute violations of the fiduciary duties owed by WFI's officers and directors and these acts are incapable of ratification.

231.     Each of the Director Defendants of WFI authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

232.     Any suit by the current directors of WFI to remedy these wrongs would likely expose the Individual Defendants and WFI to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

233.    WFI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for WFI any part of the damages WFI suffered and will suffer thereby.

234.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile.

235.    If WFI's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of WFI.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by WFI against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of WFI, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause WFI to sue them, since they will face a large uninsured liability.

**Demand Futility Allegations in Connection with Defendants' Illegal Backdating and Springloading Activities**

236.    Plaintiffs are and were owners of the stock of WFI during times relevant to the Individual Defendants' illegal backdating and springloading and remain shareholders of the Company.

237.    The Board of WFI currently consists of the following five individuals: defendants DeMarco, Jarvis, Anderson, Carano and Hoglund.  Plaintiffs did not make any demand on the Board of WFI to institute this action because such a demand would have been a futile, wasteful and useless act.

238.    As alleged above, WFI's stock option plans vested the authority to administrate the plans upon the Board and its Committees.  Thus, the entire Board and its committees are responsible for approving the compensation awarded to WFI insiders.  This compensation includes the stock options that were secretly backdated and/or springloaded by WFI insiders. The following chart details the defendants, who are currently members of the Board, who approved or acquiesced in the approval of backdated options as directors and members of the Compensation and Audit Committees:

| Suspicious Options Grant Date | Compensation Committee Members | Audit Committee Members | Current Members of the Board |
|---|---|---|---|
| December 1, 2000 | Carano, Anderson, Jarvis | Anderson, Jarvis | Carano, Anderson, Jarvis |
| April 5, 2001 | Jarvis, Anderson | Anderson, Hoglund, Jarvis | Anderson, Hoglund, Jarvis, Carano |
| July 11, 2001 | Jarvis, Anderson | Anderson, Hoglund, Jarvis | Anderson, Hoglund, Jarvis |
| October 1, 2001 | Anderson | Anderson, Hoglund, Jarvis | Anderson, Hoglund, Jarvis |
| April 30, 2002 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis |
| February 12, 2003 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis |
| March 31, 2003 | Carano, Jarvis | Anderson, Hoglund, Jarvis | Anderson, Carano, Hoglund, Jarvis |

- 99 -

1   The Board and its Committees should have properly informed itself of the circumstances

2   surrounding the options granted to WFI insiders before approving them.  The fact that these

3   options were routinely approved by the Board and its Committees when they were dated at or

4   near the Company's lowest closing prices for the respective month in which the options were

5   granted or before the release of positive-non-disclosed-material information establishes that

6   these decisions were not informed.  Accordingly, there is reasonable doubt that defendants

7   Jarvis, Anderson, Carano and Hoglund are disinterested because they face sufficiently

8   substantial liability for their breaches of fiduciary duty to WFI.  The Board and its Committee's

9   decision to approve the options was not the product of valid business judgment.  Thus, demand

10  would have been futile as to defendants Jarvis, Anderson, Carano and Hoglund.

11          239.    The Compensation Committee was specifically responsible for approving stock

12  options grants to WFI's executive officers and directors including defendants Siegel, Fox,

13  Munro, Wozencraft, Ashwill, Ghassemi, Farjood, Jacobsen, Garrison, Weller, Whitacre, Mazilly

14  and Owens, who each received backdated and/or springloaded option grants.  This duty was

15  specifically stated in WFI's 2003 annual proxy: "The Compensation Committee approves the

16  compensation of the Company's officers, administers the *1997 Stock Option Plan*, *the 1999*

17  *Equity Incentive Plan*, *the 2000 Non-Qualified Stock Option Plan,* and the Employee Stock

18  Purchase Plan, and has overall responsibility for the Company's compensation policies for senior

19  management."   Defendants Anderson, Jarvis and Carano as members of the Compensation

20  Committee approved backdated and springloaded stock option grants.  Specifically, defendant

21  Anderson approved backdated option grants on December 1, 2000, April 5, 2001, July 11, 2001,

22  October 1, 2001 and a springloaded option grant on January 27, 2000.  Defendant Jarvis

23  approved backdated option grants on December 1, 2000, April 5, 2001, July 11, 2001, October 1,

24  2001, April 30, 2002, February 12, 2003 and March 31, 2003 and a springloaded option grant on

25  January 27, 2000.  Defendant Carano approved backdated option grants on December 1, 2000,

26  April 30, 2002, February 12, 2003, March 31, 2003 and a springloaded option grant on January

27  27, 2000.  WFI has admitted that its internal investigation discovered evidence of erroneous

28  options grants during 1998 through 2003.  These defendants breached their fiduciary duties to

WFI because they did not act to inform themselves of the circumstances surrounding these option grants, thereby causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the backdating and springloading of stock option grants. Specifically, these defendants willfully or recklessly ignored the following facts, among others:

- The January 27, 2000 grant was dated immediately before WFI announced record earnings for its fiscal year 1999;

- The December 1, 2000 grant was dated at the lowest share price for the 15 month period beginning November 4, 199 to February 7, 2001;

- The April 5, 2001 grant was dated at the lowest share price for the **28 month period** beginning November 4, 1999 through February 28, 2002;

- The July 11, 2001 grant was dated at the lowest share price for the 4 month period beginning May 11, 2001 to September 18, 2001;

- The October 1, 2001 grant was dated following the national tragedy of September 11, 2001 and was granted within $0.20 of the lowest share price for the 10 month period beginning April 10, 2001 to February 12, 2002;

- The April 30, 2002 grant was dated at the lowest share price for the period beginning March 5, 2002 through October 4, 2002;

- The February 12, 2003 grant was dated at the lowest share price for the period beginning October 11, 2002 through September 11, 2003; and

- The March 31, 2003 grant was dated at the lowest share price for the period beginning February 13, 2003 through December 31, 2003.

Accordingly, there is reasonable doubt that defendants Anderson, Hoglund, Jarvis and Carano are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to WFI.  The Compensation Committee's decision to approve the options was not the product of valid business judgment.  Thus, demand would have been futile as to defendants Anderson, Hoglund, Jarvis and Carano.

240.    Defendants Anderson and Jarvis were members of the Audit Committee during the approval of backdated option grants on December 1, 2000, April 5, 2001, July 11, 2001, October 1, 2001, April 30, 2002, February 12, 2003 and March 31, 2003 and when the January 27, 2000 springloaded option grant was approved.  Defendant Hoglund was a member of the

- 101 -

Audit Committee during the approval of backdated option grants on April 5, 2001, July 11, 2001, October 1, 2001, April 30, 2002, February 12, 2003 and March 31, 2003.  WFI has admitted that its internal investigation discovered evidence of erroneous options grants during 1998 through 2003.  According to WFI's 2003 annual proxy: "The Audit Committee ... review[s] ... and discuss[es] … procedures in connection with audit and financial controls; and reviews compliance with all corporate policies that have been approved by the Board of Directors …." WFI's internal controls, however, were deficient and its corporate polices were not being complied with as demonstrated by defendants' repeated grants of stock options to themselves at monthly and close to monthly share price lows.  Because defendants' illegally backdated options resulted in below fair market value grants, WFI must now restate its prior financials to record stock option compensation expenses.  Accordingly, there is reasonable doubt that defendants Anderson, Hoglund and Jarvis are disinterested because they face sufficiently substantial liability for their breaches of fiduciary duty to WFI.  Thus, demand would have been futile as to defendants Anderson, Hoglund and Jarvis.

241.   The principal professional occupation of defendant DeMarco is his employment with WFI, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, defendant  DeMarco was paid the following compensation at times relevant hereto:

| Defendant | Fiscal Year | Salary | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|
| DeMarco | 2005 | $293,561 | 225,000 | $14,000 |
| | 2004 | $280,288 | 500,000 | $2,996 |
| | 2003 | $27,520 | 1,250,000 | - |

Accordingly, defendant DeMarco lacks independence from defendants Jarvis and Carano, defendants who are not disinterested and/or independent and who exert influence over defendant DeMarco's compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee has the authority to review and approve DeMarco's base salary, bonus and equity compensation.  Moreover, DeMarco is especially dependent upon his employment at WFI due to his past involvement in illegal activities at Titan.  It has been

1  alleged that, while at Titan, DeMarco participated in a conspiracy to illegally bribe foreign

2  officials. DeMarco's employment prospects outside of WFI are tenuous at best. Thus, defendant

3  DeMarco is incapable of impartially considering a demand to commence and vigorously

4  prosecute this action because of his lack of independence.

5      242.   Each of the key officers and directors knew of and/or directly benefited from the

6  wrongdoing complained of herein.

7      243.   The Director Defendants of WFI, as more fully detailed herein, participated in,

8  approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts

9  to conceal or disguise those wrongs from WFI's stockholders or recklessly and/or negligently

10  disregarded the wrongs complained of herein, and are therefore not disinterested parties.

11      244.   In order to bring this suit, all of the directors of WFI would have been forced to

12  sue themselves and persons with whom they have extensive business and personal

13  entanglements, which they would not have done, thereby excusing demand.

14      245.   The acts complained of constitute violations of the fiduciary duties owed by

15  WFI's officers and directors and these acts are incapable of ratification.

16      246.   WFI has been and will continue to be exposed to significant losses due to the

17  wrongdoing complained of herein, yet the Individual Defendants and Board have not filed any

18  lawsuits against themselves or others who were responsible for the wrongful conduct in an

19  attempt to recover for WFI any part of the damages the Company suffered and will suffer

20  thereby.

21      247.   If WFI's current and past officers and directors are protected against personal

22  liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged

23  in this Complaint by directors' and officers' liability insurance, they caused the Company to

24  purchase such insurance for their protection with corporate funds, *i.e.*, monies belonging to

25  WFI's stockholders. However, due to certain changes in the language of directors' and officers'

26  liability insurance policies in the past few years, the policies covering the defendants in this case

27  contain provisions that eliminate coverage for any action brought directly by WFI against these

28  defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these

directors were to sue themselves or certain WFI officers, there would be no directors' and officers' insurance protection.  If there is no directors' and officers' liability insurance, then the current directors will not cause WFI to sue defendants, since they will face a large uninsured liability.  This is a further reason why they would not have brought such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.

248.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiffs, the Board has failed and refused to seek to recover for WFI for any of the wrongdoing alleged by plaintiffs herein.

**The Futility of Demand of WFI's Shareholders**

249.    Plaintiffs have not made any demand on shareholders of WFI to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    WFI is a publicly held company with approximately 68 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

**DEFENDANTS ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING AND SPRINGLOADING PRACTICES**

250.    At times relevant hereto, defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to WFI insiders.  These false disclosures prevented plaintiffs from recognizing that WFI insiders were illegally backdating their stock option grants.

- 104 -

251.    Indeed, before the March 18, 2006 *Wall Street Journal* article, titled "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable.  Luck – or something else?", the public consensus was that favorable option timing could be largely explained by an insider's ability to predict that favorable company news was coming and that insiders were timing grants to take advantage of it.  This consensus was not challenged until academic research—that included examinations of thousands of companies—revealed that it was likely that grant dates had been filled in retroactively.

252.    Thus, due to the public consensus that favorable option timing could be explained away by an insider's ability to predict the stock price and defendants' active concealment of their backdating practices, shareholders were prevented from recognizing the validity of the claims prior to the March 18, 2006 *Wall Street Journal* article.  The first public disclosure of backdating specifically at WFI did not occur until March 12, 2007, when WFI first announced that it was investigating its prior option grant practices.

253.    Further, plaintiffs' ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence.  It would be unreasonable to expect plaintiffs—typical shareholders—to undertake costly and extensive academic research and statistical analysis when defendants' false public statements indicated that stock options were being properly granted.  In any case, plaintiffs were entitled to rely upon the truthfulness of the disclosures contained within WFI's public statements and SEC filings.

254.    After the March 12, 2007 public disclosure of backdating practices at WFI, plaintiffs conducted an investigation of defendants' prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and brought this action on behalf of WFI to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

255.    It is apparent that defendants' scheme to profit from the backdated option grants was continuous, dating back to at least 1998.  Indeed, this scheme was a continuing and involved process that included: (i) the manipulation of option grant dates; (ii) the approval of backdated grants; (iii) the holding of the backdated grants throughout their respective vesting periods; (iv)

the concealment of the backdated grants via improper disclosures in WFI's public filings and statements; (v) the improper accounting for the backdated options over the vesting periods; and (vi) finally, the exercising of the backdated options for profit.  This continuous scheme, although it stretches back over 9 years, has resulted in present day damages to WFI that have only recently accrued as alleged above.

**PLAINTIFFS' CLAIMS IN CONNECTION WITH THE IMPROPRER FINANCIAL REPORTING AND ACCOUNTING AND THE ILLEGAL BACKDATING AND SPRINGLOADING PRACTICES**

**COUNT I**

**Against Individual Defendants M. Tayebi and Ashwill for Violations of the Sarbanes-Oxley Act of 2002**

256.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

257.    Section 304 of SOX provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.  Section 304, titled "Forfeiture of Certain Bonuses and Profits," provides in full:

(a)    **Additional compensation prior to noncompliance with commission financial reporting requirements**.  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, ***the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for*** –

1.    any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and

2.    any profits realized from the sale of securities of the issuer during that 12-month period.

(b)    **Commission exemption authority**.  The Commission may exempt any person from the application of subsection (a), as it deems necessary and appropriate.

- 106 -

258.    WFI restated previously reported financial results for 2000-2003 and will restate its financials for 2003 to 2005 to correct for the illegal backdating.  These restatements are due to material non-compliance with federal securities laws reporting requirements.  These restatements also resulted from "misconduct" within the meaning of Section 304 of the SOX.  As a result, defendant M. Tayebi, as WFI's former CEO, and defendant Ashwill, as WFI's former CFO are required to reimburse WFI for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the SOX) through their respective resignations to the Company.  Further, defendants M. Tayebi and Ashwill are liable to WFI for any profits realized from the sales of securities by the Company during that same period of time.

259.    Defendants M. Tayebi and Ashwill are also liable to plaintiffs for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of WFI.

## COUNT II

**Against the Insider Selling Defendants for Violation of
California Corporations Code §25402**

260.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

261.    At the time that the Insider Selling Defendants sold their WFI common stock as set forth herein, by reason of their high executive and/or directorship positions with WFI, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of WFI's improper accounting and defendants' illegal backdating and springloading practices.  Further, the Insider Selling Defendants cashed in their illegally backdated stock options and sold them for millions in proceeds.

262.    At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of WFI shares at that time.

263.    The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their WFI common stock in California in violation of California Corporations Code §25402.

264.    Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to WFI for damages in an amount up to three times the difference between the price at which WFI common stock was sold by the defendants, and each of them, and the market value which that WFI common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**COUNT III**

**Against the the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre for Violation of California Corporations Code §25403**

265.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

266.    The Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre, through their positions, possessed control and influence over the Insider Selling Defendants' sale of WFI common stock in violation of the California Corporations Code.  The Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre are statutorily liable to the same extent as the Insider Selling Defendants under California Corporations Code §25403.

267.    The Director Defendants were aware of the Insider Selling Defendants' knowledge of the material adverse non-public information and the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre were aware of the Insider Selling Defendants' intent to sell WFI common stock while in possession material adverse non-public information.

268.    The Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre are culpable for the Insider Selling Defendants' underlying

violations of California Corporations Code §25402 because of their knowledge and ability to control and influence the Insider Selling Defendants and because of their involvement in preparing and/or approving improper financials.

269.   Under California Corporations Code §25403, the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre, and each of them, are liable to WFI for damages in an amount up to three times the difference between the price at which WFI common stock was sold by the Insider Selling Defendants, and each of them, and the market value which WFI common stock would have had at the time of the sale if the information known to the Individual Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT IV

**Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

270.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

271.   At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold WFI common stock on the basis of such information.

272.   The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold WFI common stock.

273.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated because of the improper financial reporting, improper accounting and the undisclosed stock option and other related compensation expenses. The Insider Selling Defendants' sales of WFI common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

274.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT V

### Against All Defendants for Abuse of Control

275.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

276.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence WFI, for which they are legally responsible.

277.    As a direct and proximate result of the Individual Defendants' abuse of control, WFI has sustained significant damages.

278.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

279.    Plaintiffs on behalf of WFI have no adequate remedy at law.

## COUNT VI

### Against All Defendants for Gross Mismanagement

280.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

281.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of WFI in a manner consistent with the operations of a publicly held corporation.

282.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, WFI has sustained significant damages in excess of hundreds of millions of dollars.

283.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

284.    Plaintiffs on behalf of WFI have no adequate remedy at law.

## COUNT VII

### Against All Defendants for Waste of Corporate Assets

285.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

286.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused WFI to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers, incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions, unnecessarily pay WFI monies and stock to members of the Tayebi family, granting illegally backdated option grants and illegally springloaded options grants, and to direct manpower to the task of restating WFI's past financials to correct for the improperly backdated stock option grants.

287.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

288.    Plaintiffs on behalf of WFI have no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Unjust Enrichment

289.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

290.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of WFI.  These wrongful acts included the approval of improperly backdated stock options by the Director Defendants as well as the receipt of undeserved compensation in connection with those options by the Officer Defendants.

291.    Plaintiffs, as shareholders and representatives of WFI, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**PLAINTIFFS' CLAIM IN CONNECTION WITH THE IMPROPRER FINANCIAL REPORTING AND ACCOUNTING**

**COUNT IX**

**Against All Defendants for Breach of Fiduciary Duty in Connection with the Improper Financial Reporting and Accounting**

292.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

293.    The Individual Defendants owed and owe WFI fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe WFI the highest obligation of good faith, fair dealing, loyalty and due care.

294.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

295.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

296.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, WFI has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

297.    Plaintiffs on behalf of WFI have no adequate remedy at law.

**PLAINTIFFS' CLAIMS IN CONNECTION WITH THE ILLEGAL BACKDATING AND SPRINGLOADING PRACTICES**

**COUNT X**

**Against the Director Defendants and Defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre for Breach of Fiduciary Duty for Approving Improperly Dated Stock Option Grants to WFI's Executive Officers, Directors, Employees and Other Insiders**

298.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

299.   The Director Defendants and Defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre owed and owe WFI fiduciary obligations.  By reason of their fiduciary relationships, these defendants owed and owe WFI the highest obligation of good faith, fair dealing, loyalty and due care.

300.   The Director Defendants and Defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

301.   The Director Defendants and Defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre had actual or constructive knowledge that they had approved the improper backdating of stock option grants and the corresponding issuance of inaccurate financial results that did not properly account for the stock option grants and failed to correct or prevent these improprieties.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

302.   As a direct and proximate result of the Director Defendants' and Defendants Edwards', Lund's, Munro's, Ashwill's, Garrison's, Weller's and Whitacre's failure to perform their fiduciary obligations, WFI has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

303.   Plaintiffs on behalf of WFI have no adequate remedy at law.

**COUNT XI**

**Against Defendants Farjood, Ghassemi, Weller, Anderson, Jarvis, Hoglund, M. Tayebi and M.K. Tayebi for Breach of Fiduciary Duties for Springloading and Misappropriation of Information**

304.   Plaintiffs incorporate by reference and reallege each and every allegation set forth

- 113 -

1    above, as though fully set forth herein.

2        305.   At the time of the grant of the spring-loaded stock options described herein,

3    defendants Farjood, Ghassemi and Weller knew that the disclosure of record financial results for

4    WFI's fiscal year 1999 was imminent, and received WFI stock options on the basis of such

5    information.  Defendants Anderson, Jarvis, Hoglund, M. Tayebi and M.K. Tayebi as members of

6    the Board, Compensation and/or Audit Committees approved the springloaded grants at times

7    that they knew: (i) that positive material non-public information would be imminently released

8    and (ii) that the options were granted with the intent to circumvent valid shareholder-approved

9    restrictions upon the exercise price of the springloaded options.

10       306.   The information described above was proprietary information concerning the

11   Company's financial condition and future business prospects.  It was a proprietary asset

12   belonging to the Company, which defendants Farjood, Ghassemi and Weller used for their own

13   benefit when they received the spring-loaded stock options in breach of their fiduciary duties of

14   loyalty and good faith.

15       307.   Because defendants Anderson, Jarvis, Hoglund, M. Tayebi and M.K. Tayebi

16   authorized the springloaded options at times when they knew they were worth more than what

17   their publicly disclosed exercise price represented, these defendants breached their fiduciary

18   duties of loyalty and good faith owed to the Company.

19       308.   Since the use of the Company's proprietary information for their own gain

20   constitutes a breach of defendants Farjood's, Ghassemi's, Weller's, Anderson's, Jarvis',

21   Hoglund's, M. Tayebi's and M.K. Tayebi's fiduciary duties, the Company is entitled to the

22   imposition of a constructive trust on any profits these defendants obtained thereby.

23                          **COUNT XII**

24
     **Against the Options Recipient Defendant, the Director Defendants and Defendants**
25   **Edwards, Lund, Munro, Ashwill,Garrison, Weller and Whitacre Defendants for an**
                              **Accounting**
26
         309.   Plaintiffs incorporate by reference and reallege each and every allegation
27
     contained above, as though fully set forth herein.
28

310.    At all relevant times, the defendants, as directors and/or officers of WFI, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

311.    In breach of their fiduciary duties owed to WFI and its shareholders, the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre authorized the granting of backdated and springloaded WFI stock options to themselves, the Options Recipient Defendants and/or certain other WFI insiders. By this wrongdoing, the defendants breached their fiduciary duties owed to WFI and its shareholders.

312.    The Director Defendants, Options Recipient Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the defendants.

313.    As a result of defendants' misconduct, WFI has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

314.    Plaintiffs demand an accounting be made of all stock options grants made to defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Options Recipient Defendants, as well as the disposition of any proceeds received by the Options Recipient Defendants, via sale or other exercise of backdated stock option grants.

### COUNT XIII

### Against the Options Recipient Defendants for Rescission

315.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

316.    As a result of the acts alleged herein, the stock option contracts between the Options Recipient Defendants and WFI entered into at times relevant were obtained through defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control. Further, the backdated stock options were illegal in that they were backdated in violation

- 115 -

of the California Corporate Securities Law of 1968, including, without limit, §§25401, 25402 and 25403.  Moreover, the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre authorized these options in breach of the terms of the publicly filed employment agreements and the Company's stock option plans, which were also approved by WFI shareholders and filed with the SEC.  Consequently, the option grants are void.

317.    All contracts which provide for stock option grants between the Options Recipient Defendants and WFI and were entered into during times relevant hereto should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

## COUNT XIV

**Against the Options Recipient Defendants, the Director Defendants and Defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre Defendants for Constructive Trust**

318.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

319.    As a result of the acts alleged herein, the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre authorized the grant of backdated, springloaded or otherwise manipulated equity based compensation to themselves and other WFI insiders.  In effect, these backdated options and other manipulated equity or incentive based compensation constitutes illegal compensation in violation of WFI's stock option plans, employment contracts and other compensation polices.

320.    The Company has a right for the return of this compensation because it was illegally authorized by the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre and paid out of the Company's assets.

321.    The Options Recipient Defendants and other WFI insiders profited from the illegally backdated options by wrongful acts.

322.    Accordingly, plaintiffs seek a declaratory judgment that the illicit stock options, and all proceeds derived from exercise thereof and any assets or other property acquired in

connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Determining and awarding WFI treble damages pursuant to California Corporations Code §25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code §25402;

C.      Determining and awarding WFI treble damages against the Director Defendants and defendants Edwards, Lund, Munro, Ashwill, Garrison, Weller and Whitacre pursuant to California Corporations Code §25403;

D.      Declaring defendant M.K. Tayebi, as WFI's former CEO and defendant Ashwill, as WFI's former CFO, are required to reimburse WFI for all bonuses or other incentive-based or equity-based compensation, received by them from WFI between 2001 and 2003 and the profits they realized from the sale of WFI securities during that period for violation of §304 of the SOX;

E.      Directing WFI to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect WFI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to remove from the Board and its committees all directors who are found to have participated in the illegal stock options backdating and springloading;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.      a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

4.      a provision to control and limit insider stock selling;

5.      a provision to permit the shareholders of WFI to nominate at least three candidates for election to the Board; and

6.      a proposal to appropriately test and then strengthen the internal audit and control functions.

F.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions issued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, backdated stock options, springloaded stock options or their other assets so as to assure that plaintiffs, on behalf of WFI, have an effective remedy;

G.      Directing an accounting of all undisclosed backdated and springloaded stock options granted, directing that all the unexercised backdated, springloaded and/or improperly manipulated options granted to defendants be cancelled, ordering the financial gains obtained via the exercise of such stock options returned to the Company, and ordering WFI to revise the Company's financial statements to reflect the truth concerning these option grants;

H.      Declaring that all stock options that were issued to the Options Recipient Defendants and illegally backdated or springloaded are void and all proceeds from their exercise or sale are and have been held in constructive trust by defendants for the Company;

I.      Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise thereof, and any assets or other property acquired in connection therewith, are and have been held in constructive trust by the Options Recipient Defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

- 118 -

1    J.    Awarding to WFI restitution from the defendants, and each of them, and ordering

2 disgorgement of all profits, benefits and other compensation obtained by the defendants through

3 the improper backdating and springloading of stock option grants;

4    K.    Awarding to plaintiffs the costs and disbursements of the action, including

5 reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

6    L.    Granting such other and further relief as the Court deems just and proper.

7

8                              **JURY DEMAND**

9    Plaintiffs demand a trial by jury.

10 DATED: March 27, 2007            ROBBINS UMEDA & FINK, LLP
                                   BRIAN J. ROBBINS
11                                 JEFFREY P. FINK

12
                                   /s/Brian J. Robbins
13                                 Brian J. Robbins
                                   brobbins@ruflaw.com
14
                                   610 West Ash Street, Suite 1800
15                                 San Diego, CA 92101
                                   Telephone: (619) 525-3990
16                                 Facsimile: (619) 525-3991

17                                 FARUQI & FARUQI, LLP
                                   LUBNA FARUQI
18                                 ADAM GONELLI
                                   369 Lexington Avenue, 10th Floor
19                                 New York, NY  10017-6531
                                   Telephone: (212) 983-9330
20                                 Facsimile: (212) 983-9331

21                                 Co-Lead Counsel for Plaintiffs

22

23

24

25

26

27

28

- 119 -

## VERIFICATION

The undersigned verifies that said pleading is based on information which either I have furnished to counsel and/or upon which information has been gathered by counsel in the course of this lawsuit. The language of the pleading is that of counsel and not of signer. Signer verifies that he has read said pleading and that all averments therein are true and correct to the best of the signer's personal knowledge, information and belief. This verification is made subject to the penalties relating to unsworn falsifications to authorities and under penalty of perjury.

_____
Rosario Pedicini

Dated: March 21, 2007

Document: Verified Consolidated Amended Shareholder Derivative Complaint.

**VERIFICATION**


I, Michael Roth,  am a plaintiff in the within action and a resident of the State of New

York.  I have read the foregoing complaint and know the contents thereof, except as to the

matters therein stated to be alleged on information and belief, and as to those matters I believe

them to be true.

March 21, 2007

_____
Michael Roth

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Eric M. Acker
MORRISON & FOERSTER, LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130
eacker@mofo.com

/s/Dafne M. Maytorena
Dafne M. Maytorena